**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division – Baltimore)**

| | |
|---|---|
| PSEG RENEWABLE TRANSMISSION LLC | * |
| | * |
| Petitioner | * |
| | * |
| v. | * |
| | * |
| THEODORE H. BUTZ, *et al.* | * |
| | * |
| Respondents | *     Civil Action No.: _____ |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DECLARATION OF DAWN SHILKOSKI:**
**NEED FOR PROJECT, EXIGENT NEED FOR ACCESS TO PROPERTIES TO**
**CONDUCT NON-INVASIVE SURVEYS IN THE NEAR FUTURE, AND PUBLIC**
**NOTICE OF LAWSUIT PRIOR TO FILING**

I, Dawn Shilkoski, pursuant to 28 U.S.C. § 1746, hereby swear as follows under penalty of perjury:

1.      I am over 18 years of age and fully competent to give this Declaration.

2.      I am employed as a Senior Project Manager at PSEG Services Corporation.  In this capacity, I manage high voltage electric transmission upgrade projects on behalf of Public Service Enterprise Group, Inc. ("PSEG") and its subsidiary, PSEG Renewable Transmission LLC ("PSEG Renewable Transmission," the "Company," or the "Petitioner").  PSEG Services Corporation is an affiliate of and provides services to the Petitioner.

3.      PSEG is headquartered in Newark, New Jersey and provides electric and gas services to millions of residential and commercial customers.  It also owns and maintains 834 miles of high voltage electric transmission rights of way.

4.      I have a Bachelor of Engineering from Stevens Institute of Technology and a

Exhibit "1"

Master of Business Administration ("MBA") from Rutgers University.  I have been employed by PSEG for approximately thirteen years.

5.      My duties and job responsibilities for PSEG include, among other things, ensuring the Maryland Piedmont Reliability Project ("MPRP" or the "Project," further defined below) meets its defined scope, schedule, and budget.  My work experience and responsibilities have made me familiar with the design and construction scheduling requirements for electric transmission lines, including the MPRP.

### The Maryland Piedmont Reliability Project

6.      The MPRP is an approximately 67-mile 500 kilovolt ("kV") alternating current ("AC") single circuit overhead transmission line that is proposed to traverse portions of Baltimore, Carroll and Frederick Counties, including, among others, the properties listed below, which are situated in and around the proposed route of the MPRP (the "Subject Properties") and owned by the following Respondents in this action:

| Respondent(s) | Premises Address(es) | Tax Parcel Number(s) |
|---|---|---|
| Theodore H. Butz, Jeremy F. Butz, Robert T. Butz, and Thompson H. Butz, | 2223 Pleasant View Road Frederick, MD 21703 | 11-01-588814 |
| Francis O. Day Co., Inc. | 10401 Fingerboard Road, Ijamsville, MD 21754 | 11-07-202237 |

7.      The MPRP will extend from Allegheny Power System's ("APS") existing Doubs Station, which is located in Frederick County, to an interconnection or demarcation point west of Baltimore Gas and Electric Company's ("BGE") Conastone Station in northern Baltimore County.

8.      PJM Interconnection, L.L.C. ("PJM") is the federally regulated and independent regional transmission organization ("RTO") approved by the Federal Energy Regulatory

Commission ("FERC") with responsibility for planning and overseeing the high-voltage electricity grid for 13 states, including Maryland.[1]  Among other things, PJM plans and oversees the regional transmission system to ensure it operates reliably and will not violate any of the controlling federally approved criteria for safely and reliably operating going forward.  With respect to transmission planning, PJM's authorities and responsibilities as a FERC-approved RTO are based on the PJM Operating Agreement, the PJM Tariff, and the PJM Consolidated Transmission Owners Agreement, each of which has been filed with and accepted by FERC.[2]

9.      For several years, PJM has observed a significant load growth in Maryland and Virginia. PJM has also been notified that approximately 11,100 MW of power generation within its region has been deactivated (i.e., retired) or is in the process of deactivating.  As a result, in 2022, PJM has identified multiple 500 kV transmission lines within its region that, among other reliability criteria violations, will become severely overloaded in 2027.  Transmission lines at the 500 kV level are a critical part of the region's electric system and allow electricity to flow across states from where power is generated to where it is needed.  When a transmission line overloads, the transmission line equipment, which consists of a combination of steel and aluminum, begin to overheat, which, in turn, may render the steel and aluminum brittle and inoperable.

10.      For example, PJM has observed that, absent intervention, the key 500 kV transmission lines located in Maryland will become severely overloaded, with these lines carrying 115% to 213% of their rated capacity.

11.      In addition, PJM's analysis has projected thousands of voltage collapse violations,

---

[1] PJM coordinates the transmission of electricity through all or parts of 13 states (Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia) and the District of Columbia.

[2] *See* FERC Order No. 888, Promoting Wholesale Competition Through Open-Access Non-discriminatory Transmission Services By Public Utilities, 1991-96 FERC Stats. & Regs., Regs. Preambles 31,036 (1996); FERC Order No. 890; FERC Stats. & Regs., Regs. Preambles 31,089 (1999), on reh'g, III FERC Stats. & Regs., Regs. Preambles 31,092 (2000) for the MAAC Control Zone and the PJM West Region.

meaning the inability of the transmission system to deliver power to load, as well as extreme low voltage (non-sustainable) violations occurring in 2027 in various areas, including Maryland. PJM further determined that if these reliability criteria violations are not addressed, overall system reliability for customers within PJM's region, including the electric system serving Maryland customers, could be compromised, which could, in turn, lead to widespread and extreme conditions, including system collapse and electric service blackouts. PJM has also determined that simply upgrading existing electric transmission lines would be insufficient to address these concerns and, instead, that an entirely new 500 kV transmission line is needed by 2027.

12.     On February 24, 2023, in accordance with the provision of its FERC-approved Operating Agreement and Tariff, as discussed above, PJM solicited proposed solutions from qualified transmission owners and developers to address these forecasted system reliability issues. In response to its solicitation, PJM received and analyzed a total of 72 project proposals for PJM's evaluation to determine the more efficient and cost-effective solutions to address and prevent the identified reliability criteria violations from occurring. One of those proposals submitted to and evaluated by PJM was the MPRP.

13.     After several months of analysis, PJM selected the MPRP, in addition to several other transmission enhancement proposals, as needed to prevent extensive, severe, and widespread thermal overloads and voltage instability from occurring in and after 2027 on the bulk 500 kV transmission system that serves Maryland electric customers and the surrounding PJM region.

14.     In April 2024, PJM and the Company entered into the Designated Entity Agreement ("DEA"). A true and correct copy of the DEA is attached hereto as **Exhibit A**. PJM

filed the DEA with FERC on May 10, 2024, which FERC accepted for filing on September 10, 2024. A true and correct copy of PJM's May 10, 2024 letter to FERC is attached hereto as **Exhibit B**, and a true and correct copy of FERC's September 10, 2024 order accepting the filing is attached hereto as **Exhibit C**.

15.    Consistent with the DEA, PJM has directed the Company to construct the MPRP by June 1, 2027.

16.    At the time that the MPRP goes in-service, the Company will be subject to regulation by FERC as a public utility.

<u>**The Required Field Surveys**</u>

17.    To obtain state authorization to construct the MPRP, the Petitioner filed an application on December 31, 2024 with the Maryland Public Service Commission ("PSC") for a Certificate of Public Convenience and Necessity ("CPCN") pursuant to MD. CODE ANN., Pub. Util. Art. ("PUA") § 7-207. The Company's application included its proposed route for the Project. This route was determined after several months of study and evaluation that included the consideration and analysis of multiple alternative routes to determine the least impactful route based on environmental, social, land use, and engineering criteria. A link to the Company's CPCN application is available at: https://webpscxb.psc.state.md.us/DMS/case/9773.

18.    As part of its evaluation of the Petitioner's CPCN application, the PSC must consider various aspects of the public use of the Project, including the need for the Project, as well as the effect of the transmission line on the environment, conservation of natural resources, and the preservation of natural quality. Ultimately, as part of the approval of the Project, it is the PSC's responsibility to approve or deny the Company's proposed alignment for the transmission line.

19.    Through the CPCN proceeding, the Power Plant Research Program ("PPRP"), a division of the Maryland Department of Natural Resources, is required by law to coordinate the review and analysis of the Petitioner's application by certain environmental state agencies ("State Agencies").[3]  The PPRP evaluates CPCN applications and provides the PSC with the State Agencies' assessment of the environmental and socioeconomic impacts of the proposed project.  Specifically, the PPRP is required by law to provide the PSC with proposed recommended licensing conditions for the Project that address its anticipated environmental and socioeconomic impacts.  On January 10, 2025, the PSC issued a notice directing PPRP to report, by March 26, 2025, its recommendation as to whether the application is administratively complete in accordance with COMAR 20.79.01.06.  Attached hereto as **Exhibit D** is a true and correct copy of the PSC's January 10, 2025 notice.

20.    On March 26, 2025, PPRP filed a report with the PSC in which it advised that it does not consider the Company's CPCN application to be complete, in part because it "lacks a sufficient summary of the environmental and socioeconomic effects from the construction and operation of the Project, including field studies, which are necessary to meet the requirements of COMAR 20.79.04.04(B) and (C)."  PPRP stated that, without the various surveys that PPRP has requested, it "cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources."  PPRP further recommended that the PSC consider the Company's application "be deemed incomplete" until the Company provides the requested information from field-based surveys (together, "Field Surveys").  These Field Surveys are: wetland delineations, forest stand delineations, geotechnical surveys, sensitive species project review area surveys, and

---

[3] These State Agencies are the Maryland Departments of Natural Resources, Environment, Agriculture, Commerce, Planning, and Transportation, as well as the Maryland Energy Administration.  *See* Md. Code Ann., Nat. Res. § 3-303 *et seq.*

surveys required by the Maryland Historical Trust.  A true and correct copy of PPRP's March 26, 2025 report to the PSC is attached hereto as **Exhibit E.**

21.    On April 11, 2025 and May 8, 2025, PPRP repeated its demand that the Company perform Field Surveys on Respondents' properties so that PPRP can assess completeness and has acknowledged that access to Respondents' properties is necessary for conducting the Field Surveys.  True and correct copies of PPRP's April 11, 2025 and May 8, 2025 correspondence to the PSC are attached hereto as **Exhibit F** and **Exhibit G**.

22.    On September 11, 2025, the PSC entered an Order Establishing a Procedural Schedule for its consideration of the Company's application (the "Procedural Schedule"). Therein, the PSC held that PPRP "cannot" "perform its statutorily required evaluation of [the Company's] Application . . . without the required field studies."  The PSC set March 2, 2026 as the deadline for the Company to provide an updated environmental analysis, including field study reports for all properties in the MPRP's proposed right-of-way (excluding field studies that can only be conducted at certain times of year).  A true and correct copy of the Procedural Schedule is attached hereto as **Exhibit H**.

## The Exigent Need for Property Access in the Immediate Future to Conduct the Requisite Field Surveys

23.    As stated above, PJM forecasts a significant risk for electric transmission system collapse and blackout conditions beginning in 2027.

24.    The MPRP is designed to address these risks.  The Company, however, can only commence construction of the MPRP <u>after</u> obtaining CPCN approval from the PSC and other requisite permits, including those required by the Maryland Department of the Environment, the Maryland Department of Natural Resources, and Baltimore, Carroll, and Frederick Counties, all of which will require the Company to first complete the necessary Field Surveys.

25.     Moreover, to meet the deadline set forth in the Procedural Schedule, the Company must complete the necessary Field Surveys by March 2, 2026.

26.     Therefore, there is a compelling and exigent need for the Petitioner to obtain access to the properties in and along the MPRP's proposed route in the near future so that the Petitioner can conduct the requisite Field Surveys and PPRP may complete its review of the Project for submission to the PSC during the CPCN proceedings.

27.     Given the time it will take for the Petitioner to complete the Field Surveys, analyze the data to prepare permit drawings and revised alignment sheets, and survey any new areas, which may be required by the results of the initial Field Surveys, the Petitioner must have access to the Subject Properties as soon as possible, and through the date that the PSC issues a CPCN to the Company, in order to conduct all required Field Surveys in an expeditious manner to perform the necessary analysis that is required under the permitting process in Maryland.

**<u>The Required Field Surveys Allow the State Agencies and Other Permitting Authorities to Complete Their Review of the Company's CPCN Application and Issue Other Required Permits</u>**

28.     Without the information from the Field Surveys sought herein, PPRP has stated that it cannot evaluate the character, impacts, or mitigation required for the Project and as a result, the Company's efforts to construct the MPRP in a timely manner would be stymied. Without the State's evaluation, the MPRP's in-service date would be inevitably delayed, which puts at risk the reliable electric service to the region, resulting in grid collapse and rolling blackouts.

29.     Accordingly, if the Petitioner cannot enter onto each of the properties that are listed and proceed with the required surveys and investigations, then the Company would be required to redraw the proposed line for the MPRP and submit a new CPCN application to the

Commission to attempt to meet its obligations under the DEA.  Implementation of the Project will be significantly delayed as a result, threatening the reliability and stability of the electric transmission system within PJM's territory that includes Maryland.  Moreover, based on public comments and correspondence the Company has received to date, it is likely that the Company would encounter additional opposition with any proposed line, such that redrawing the proposed line and submitting a new CPCN application would put the Company in exactly the same position as it finds itself currently—*i.e.*, seeking Court approval to access various properties in order to conduct surveys and gather information as directed by PPRP and other state agencies. As further described in PSEG's CPCN application, routing efforts were completed within a large study area encompassing portions of Frederick, Carroll and Baltimore Counties between the project's end points.  Feedback was solicited for multiple route alternatives and over 5,300 comments were received and processed prior to the selection of the Proposed Route.  **Figure 1**, below, depicts in blue the location of approximately 5,300 comments that the Company received when determining the route the Company proposed in its CPCN application:



30.     The Company would also be forced to incur significant expenses in such an event. Among other costs and expenses to prepare the Company's CPCN application, the Company has, as of the end of August 2025, spent approximately $3,076,471 in fees to siting and environmental consultants, who have assisted the Company in analyzing numerous specific properties through available public data and assessing the feasibility of the properties for a high voltage transmission line as well as the impact of the line on sensitive environmental areas for the purpose of identifying a proposed route that is designed to both function effectively and minimize the scope of environmental impacts as much as possible.  The Company has also spent, as of the end of August 2025, approximately $2,787,798 in fees to a real estate firm that has assisted, among other things, with contacting property owners to gain access for surveying purposes (as set forth in more detail in the accompanying Declarations of Roger Trudeau).  To prepare a new application that reflects a new proposed route, the Petitioner would be required to again incur these fees, in addition to significant legal fees and the cost of time spent by PSEG Services Corporation and PSEG employees.

31.     Moreover, if the Project is stymied because the Company is unable to provide the field level survey information required by PPRP, the Company will lose significant revenue it would have otherwise received.  Once the Project is completed, Company will charge rates for service that are overseen by FERC under the Federal Power Act ("FPA").  Under the FPA, transmission owners such as the Company are permitted to charge rates that recover their "cost of service" which would include all expense of constructing, owning, and maintaining the Project, as well as a return on the Company's investment (Return on Equity or "ROE").  While the ultimate rate is not set yet, FERC will set those rates to allow the Company to recover all its operating expenses plus a reasonable ROE on the Company's investment in the Project.  Under

the DEA between the Company and PJM, the ROE for the Project is 9.6% unless and until

modified by FERC.  The Company plans to invest over $400 million in constructing the Project.

**The Company Provided Public Notice of Its Intent to File the Instant Action**

32.     As set forth in the accompanying affidavits of Roger Trudeau, the Company has

made real and bona fide efforts to seek consent from each Respondent to enter their property to

perform the surveys and gather the information that I have described above.

33.     In addition to these efforts, on April 9, 2025, the Company issued a public

statement conveying that it would file the instant action if consent could not be obtained from

each Respondent by April 14, 2025.  The Company issued this public statement to provide full

transparency to Respondents and the public and to encourage resolution with Respondents,

where possible, without the need for litigation.  A true and correct copy of the Company's

public statement is attached hereto as **Exhibit I**.

**Organizers Have Instructed Landowners to Refuse Entry to the Company**

34.     Based on my role as senior project manager for the MPRP, I am aware of certain

community efforts that have advised landowners to refuse entry to the Company to conduct

surveys.

35.     On April 11, 2025, I accessed the document located at the following link:

https://img1.wsimg.com/blobby/go/bea7ca9f-15d6-4b59-9636-
83641861a7d8/downloads/38e0f282-36e2-4d1f-8d30-
e93bbaf97087/UPDATED%20Just%20Say%20No%20Flyer%2011-22-
24.pdf?ver=1738784991661.  This document is titled "Just Say 'No' if Contacted by PSEG."

This document advises landowners that "[i]t is critical that you do NOT engage with PSEG at

this time, in any capacity" and that, "[i]f a PSEG representative or agent requests access to your

property, ASK THEM TO LEAVE IMMEDIATELY." Attached hereto as **Exhibit J** is a true and correct copy of the document I accessed at the above web link.

36.     On April 11, 2025, I accessed the document located at the following link: https://stopmprp.com/landowner-hub/f/landowner-alert-on-pseg-tactics.  This document is titled "Landowner Alert on PSEG Tactics" and is hosted on the website StopMPRP.com. This document advises landowners that land agents may be visiting their property and "encourage[s] everyone to 'Just Say No!' and not allow any survey or study of their property." Attached hereto as **Exhibit K** is a true and correct copy of the document I accessed at the above web link.

37.     On April 11, 2025, I accessed the document located at the following link: https://stopmprp.com/f/protecting-your-property-rights-navigating-eminentdomain? fbclid=IwY2xjawI0DO5leHRuA2FlbQIxMAABHUMq6G97geFu3oiqJKQIqMgKsEMfx5czoie M4UpnoLdU4eZV5glfP-9yWQ_aem_v7j_LJJQjpMYTML4MpcjWg&blogcategory=Landowner+Resource+Info.   This document is titled "Protecting Your Property Rights: Navigating Eminent Domain" and is hosted on the website StopMPRP.com.  This document encourages landowners to retain counsel so that "the barrage of letters, calls, and visits" from the Company "will cease." Attached hereto as **Exhibit L** is a true and correct copy of the document I accessed at the above web link.

38.     On April 11, 2025, I accessed the document located at the following link: https://stopmprp.com/landowner-hub/f/just-say-no---protect-your-land-from-land-agents.  This document is titled "Just Say No – Protect Your Land from Land Agents" and is hosted on the website StopMPRP.com. This document "urge[s]" landowners "to stand firm and 'just say no' to signing anything prematurely." This document further advises to "[b]e wary of allowing access to your land for these so-called 'surveys.' . . . Without the proper permits or court orders, tell

12

them to leave." (emphasis in original).  Attached hereto as **Exhibit M** is a true and correct copy of the document I accessed at the above web link.

[Signature appears on next page]

I solemnly affirm under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

Dated: 10/10/2025 _____          _____

Dawn Shilkoski

DocuSign Envelope ID: BFF21554-E86D-4C94-86B8-220FF320CC97

Service Agreement No. 7226

# DESIGNATED ENTITY AGREEMENT

**Between**

**PJM Interconnection, L.L.C.**

**And**

**PSEG Renewable Transmission LLC**

**PJM RTEP Projects b3800.43 & b3800.7:**
**PJM 2022 Window 3 Recommended Solution**

Exhibit "1A"

DocuSign Envelope ID: BFF21554-E86D-4C94-86B8-220FF320CC97

Service Agreement No. 7226

# DESIGNATED ENTITY AGREEMENT

### Between

### PJM Interconnection, L.L.C.

### And

### PSEG Renewable Transmission LLC

This Designated Entity Agreement, including the Schedules attached hereto and incorporated herein (collectively, "Agreement") is made and entered into as of the Effective Date between PJM Interconnection, L.L.C. ("Transmission Provider" or "PJM"), and PSEG Renewable Transmission LLC ("Designated Entity" or "PSEG"), referred to herein individually as "Party" and collectively as "the Parties."

### WITNESSETH

WHEREAS, in accordance with FERC Order No. 1000 and Schedule 6 of the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement"), Transmission Provider is required to designate among candidates, pursuant to a FERC-approved process, an entity to develop and construct a specified project to expand, replace and/or reinforce the Transmission System operated by Transmission Provider;

WHEREAS, pursuant to Section 1.5.8(i) of Schedule 6 of the Operating Agreement, the Transmission Provider notified Designated Entity that it was designated as the Designated Entity for the Project (described in Schedule A to this Agreement) to be included in the Regional Transmission Expansion Plan;

WHEREAS, pursuant to Section 1.5.8(j) of Schedule 6 of the Operating Agreement, Designated Entity accepted the designation as the Designated Entity for the Project and therefore has the obligation to construct the Project; and

NOW, THEREFORE, in consideration of the mutual covenants herein contained, together with other good and valuable consideration, the receipt and sufficiency is hereby mutually acknowledged by each Party, the Parties mutually covenant and agree as follows:

### Article 1 – Definitions

## 1.0     Defined Terms.

All capitalized terms used in this Agreement shall have the meanings ascribed to them in Part I of the Tariff or in definitions either in the body of this Agreement or its attached Schedules.  In the event of any conflict between defined terms set forth in the Tariff or defined terms in this Agreement, including the Schedules, such conflict will be resolved in favor of the terms as defined in this Agreement.

## 1.1     Confidential Information.

Any confidential, proprietary, or trade secret information of a plan, specification, pattern, procedure, design, device, list, concept, policy, or compilation relating to the Project or Transmission Owner facilities to which the Project will interconnect, which is designated as confidential by the party supplying

the information, whether conveyed verbally, electronically, in writing, through inspection, or otherwise, and shall include, but may not be limited to, information relating to the producing party's technology, research and development, business affairs and pricing, land acquisition and vendor contracts relating to the Project.

**1.2    Designated Entity Letter of Credit.**

Designated Entity Letter of Credit shall mean the letter of credit provided by the Designated Entity pursuant to Section 1.5.8(j) of Schedule 6 of the Operating Agreement and Section 3.0 of this Agreement as security associated with the Project.

**1.3    Development Schedule.**

Development Schedule shall mean the schedule of milestones set forth in Schedule C of this Agreement.

**1.4    Effective Date.**

Effective Date shall mean the date this Agreement becomes effective pursuant to Section 2.0 of this Agreement.

**1.5    Initial Operation.**

Initial Operation shall mean the date the Project is (i) energized and (ii) under Transmission Provider operational dispatch.

**1.6    Project.**

Project shall mean the enhancement or expansion included in the PJM Regional Transmission Expansion Plan described in Schedule A of this Agreement.

**1.7    Project Finance Entity.**

Project Finance Entity shall mean holder, trustee or agent for holders, of any component of Project Financing.

**1.8    Project Financing.**

Project Financing shall mean: (a) one or more loans, leases, equity and/or debt financings, together with all modifications, renewals, supplements, substitutions and replacements thereof, the proceeds of which are used to finance or refinance the costs of the Project, any alteration, expansion or improvement to the Project, or the operation of the Project; or (b) loans and/or debt issues secured by the Project.

**1.9    Reasonable Efforts.**

Reasonable Efforts shall mean such efforts as are consistent with ensuring the timely and effective design and construction of the Project in a manner, which ensures that the Project, once placed in service, meets the requirements of the Project as described in Schedule B and are consistent with Good Utility Practice.

**1.10    Required Project In-Service Date.**

Required Project In-Service Date shall mean the date the Project is required to: (i) be completed in accordance with the Scope of Work in Schedules B this Agreement, (ii) meet the criteria outlined in Schedule D of this Agreement and (iii) be under Transmission Provider operational dispatch.

## Article 2 – Effective Date and Term

**2.0    Effective Date.**

Subject to regulatory acceptance, this Agreement shall become effective on the date the Agreement has been executed by all Parties, or if this Agreement is filed with FERC for acceptance, rather than reported only in PJM's Electric Quarterly Report, upon the date specified by FERC.

**2.1    Term.**

This Agreement shall continue in full force and effect from the Effective Date until: (i) the Designated Entity executes the Consolidated Transmission Owners Agreement; and (ii) the Project (a) has been completed in accordance with the terms and conditions of this Agreement, (b) meets all relevant required planning criteria, and (c) is under Transmission Provider's operational dispatch; or (iii) the Agreement is terminated pursuant to Article 8 of this Agreement.

## Article 3 – Security

**3.0    Obligation to Provide Security.**

In accordance with Section 1.5.8(j) of Schedule 6 of the Operating Agreement, Designated Entity shall provide Transmission Provider a letter of credit as acceptable to Transmission Provider (Designated Entity Letter of Credit) or cash security in the amount of $11,708,274, which is three percent of the estimated cost of the Project. Designated Entity is required provide and maintain the Designated Entity Letter of Credit, as required by Section 1.5.8(j) of Schedule 6 of the Operating Agreement and Section 3.0 of this Agreement. The Designated Entity Letter of Credit shall remain in full force and effect for the term of this Agreement and for the duration of the obligations arising therefrom in accordance with Article 17.0.

**3.1    Distribution of Designated Entity Letter of Credit or Cash Security.**

In the event that Transmission Provider draws upon the Designated Entity Letter of Credit or retains the cash security in accordance with Sections 7.5, 8.0, or 8.1, Transmission Provider shall distribute such funds as determined by FERC.

## Article 4 – Project Construction

**4.0    Construction of Project by Designated Entity.**

Designated Entity shall design, engineer, procure, install and construct the Project, including any modifications thereto, in accordance with: (i) the terms of this Agreement, including but not limited to the Scope of Work in Schedule B and the Development Schedule in Schedule C; (ii) applicable reliability principles, guidelines, and standards of the Applicable Regional Reliability Council and NERC; (iii) the Operating Agreement; (iv) the PJM Manuals; and (v) Good Utility Practice.

**4.1    Milestones.**

**4.1.0    Milestone Dates.**

Designated Entity shall meet the milestone dates set forth in the Development Schedule in Schedule C of this Agreement.  Milestone dates set forth in Schedule C only may be extended by Transmission Provider in writing.  Failure to meet any of the milestone dates specified in Schedule C, or as extended as described in this Section 4.1.0 or Section 4.3.0 of this Agreement, shall constitute a Breach of this Agreement.  Transmission Provider reasonably may extend any such milestone date, in the event of delays not caused by the Designated Entity that could not be remedied by the Designated Entity through the exercise of due diligence, or if an extension will not delay the Required Project In-Service Date specified in Schedule C of this Agreement; provided that a corporate officer of the Designated Entity submits a revised Development Schedule containing revised milestones and showing the Project in full operation no later than the Required Project In-Service Date specified in Schedule C of this Agreement.

**4.1.1    Right to Inspect.**

Upon reasonable notice, Transmission Provider shall have the right to inspect the Project for the purposes of assessing the progress of the Project and satisfaction of milestones.  Such inspection shall not be deemed as review or approval by Transmission Provider of any design or construction practices or standards used by the Designated Entity.

**4.2    Applicable Technical Requirements and Standards.**

For the purposes of this Agreement, applicable technical requirements and standards of the Transmission Owner(s) to whose facilities the Project will interconnect shall apply to the design, engineering, procurement, construction and installation of the Project to the extent that the provisions thereof relate to the interconnection of the Project to the Transmission Owner(s) facilities.

**4.3    Project Modification.**

**4.3.0    Project Modification Process.**

The Scope of Work and Development Schedule, including the milestones therein, may be revised, as required, in accordance with Transmission Provider's project modification process set forth in the PJM Manuals, or otherwise by Transmission Provider in writing.  Such modifications may include alterations as necessary and directed by Transmission Provider to meet the system condition for which the Project was included in the Regional Transmission Expansion Plan.

**4.3.1    Consent of Transmission Provider to Project Modifications.**

Designated Entity may not modify the Project without prior written consent of Transmission Provider, including but not limited to, modifications necessary to obtain siting approval or necessary permits, which consent shall not be unreasonably withheld, conditioned, or delayed.

**4.3.2    Customer Facility Interconnections And Transmission Service Requests.**

Designated Entity shall perform or permit the engineering and construction necessary to accommodate the interconnection of Customer Facilities to the Project and transmission service requests that are determined

necessary for such interconnections and transmission service requests in accordance with Parts IV and VI, and Parts II and III, respectively, of the Tariff.

**4.4     Project Tracking.**

The Designated Entity shall provide regular, quarterly construction status reports in writing to Transmission Provider.  The reports shall contain, but not be limited to, updates and information specified in the PJM Manuals regarding: (i) current engineering and construction status of the Project; (ii) Project completion percentage, including milestone completion; (iii) current target Project or phase completion date(s); (iv) applicable outage information; and (v) cost expenditures to date and revised projected cost estimates for completion of the Project.  Transmission Provider shall use such status reports to post updates regarding the progress of the Project.

**4.5     Exclusive Responsibility of Designated Entity.**

Designated Entity shall be solely responsible for all planning, design, engineering, procurement, construction, installation, management, operations, safety, and compliance with applicable laws and regulations associated with the Project, including but not limited to obtaining all necessary permits, siting, and other regulatory approvals.  Transmission Provider shall have no responsibility to manage, supervise, or ensure compliance or adequacy of same.

**Article 5 – Coordination with Third-Parties**

**5.0     Interconnection Coordination Agreement with Transmission Owner(s).**

By the dates specified in the Development Schedule in Schedule C of this Agreement, Designated Entity shall execute or request to file unexecuted with the Commission: (a) an Interconnection Coordination Agreement; and (b) an interconnection agreement among and between Designated Entity, Transmission Provider, and the Transmission Owner(s) to whose facilities the Project will interconnect.

**5.1     Connection with Entities Not a Party to the Consolidated Transmission Owners Agreement.**

Designated Entity shall not permit any part of the Project facilities to be connected with the facilities of any entity which is not: (i) a party to Consolidated Transmission Owners Agreement without an interconnection agreement that contains provisions for the safe and reliable interconnection and operation of such interconnection in accordance with Good Utility Practice, and principles, guidelines and standards of the Applicable Regional Reliability Council and NERC or comparable requirements of an applicable retail tariff or agreement approved by appropriate regulatory authority; or (ii) a party to a separate Designated Entity Agreement.

**Article 6 – Insurance**

**6.0     Designated Entity Insurance Requirements.**

Designated Entity shall obtain and maintain in full force and effect such insurance as is consistent with Good Utility Practice.  The Transmission Provider shall be included as an Additional Insured in the Designated Entity's applicable liability insurance policies.  The Designated Entity shall provide evidence of compliance with this requirement upon request by the Transmission Provider.

**6.1    Subcontractor Insurance.**

In accord with Good Utility Practice, Designated Entity shall require each of its subcontractors to maintain and, upon request, provide Designated Entity evidence of insurance coverage of types, and in amounts, commensurate with the risks associated with the services provided by the subcontractor. Bonding and hiring of contractors or subcontractors shall be the Designated Entity's discretion, but regardless of bonding or the existence or non-existence of insurance, the Designated Entity shall be responsible for the performance or non-performance of any contractor or subcontractor it hires.

## Article 7 – Breach and Default

**7.0    Breach.**

Except as otherwise provided in Article 10, a Breach of this Agreement shall include:

(a)    The failure to comply with any term or condition of this Agreement, including but not limited to, any Breach of a representation, warranty, or covenant made in this Agreement, and failure to provide and maintain security in accordance with Section 3.0 of this Agreement;

(b)    The failure to meet a milestone or milestone date set forth in the Development Schedule in Schedule C of this Agreement, or as extended in writing as described in Sections 4.1.0 and 4.3.0 of this Agreement;

(c)    Assignment of this Agreement in a manner inconsistent with the terms of this Agreement; or

(d)    Failure of any Party to provide information or data required to be provided to another Party under this Agreement for such other Party to satisfy its obligations under this Agreement.

**7.1    Notice of Breach.**

In the event of a Breach, a Party not in Breach of this Agreement shall give written notice of such Breach to the breaching Party, and to any other persons, including a Project Finance Entity, if applicable, that the breaching Party identifies in writing prior to the Breach.  Such notice shall set forth, in reasonable detail, the nature of the Breach, and where known and applicable, the steps necessary to cure such Breach.

**7.2    Cure and Default.**

A Party that commits a Breach and does not take steps to cure the Breach pursuant to Section 7.3 shall be in Default of this Agreement.

**7.3    Cure of Breach.**

The breaching Party may:  (i) cure the Breach within thirty days from the receipt of the notice of Breach or other such date as determined by Transmission Provider to ensure that the Project meets its Required Project In-Service Date set forth in Schedule C; or, (ii) if the Breach cannot be cured within thirty days but may be cured in a manner that ensures that the Project meets the Required Project In-Service Date for the Project, within such thirty day time period, commences in good faith steps that are reasonable and appropriate to cure the Breach and thereafter diligently pursue such action to completion.

**7.4    Re-evaluation if Breach Not Cured.**

In the event that a breaching Party does not cure a Breach in accordance with Section 7.3 of this Agreement, Transmission Provider shall conduct a re-evaluation pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement. If based on such re-evaluation, the Project is retained in the Regional Transmission Expansion Plan and the Designated Entity's designation for the Project also is retained, the Parties shall modify this Agreement, including Schedules, as necessary. In all other events, Designated Entity shall be considered in Default of this Agreement, and this Agreement shall terminate in accordance with Section 8.1 of this Agreement.

**7.5    Remedies.**

Upon the occurrence of an event of Default, the non-Defaulting Party shall be entitled to: (i) commence an action to require the Defaulting Party to remedy such Default and specifically perform its duties and obligations hereunder in accordance with the terms and conditions hereof; (ii) suspend performance hereunder; and (iii) exercise such other rights and remedies as it may have in equity or at law. Upon Default by Designated Entity, Transmission Provider may draw upon the Designated Entity Letter of Credit. Nothing in this Section 7.5 is intended in any way to affect the rights of a third-party to seek any remedy it may have in equity or at law from the Designated Entity resulting from Designated Entity's Default of this Agreement.

**7.6    Remedies Cumulative.**

No remedy conferred by any provision of this Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**7.7    Waiver.**

Any waiver at any time by any Party of its rights with respect to a Breach or Default under this Agreement, or with respect to any other matters arising in connection with this Agreement, shall not be deemed a waiver or continuing waiver with respect to any other Breach or Default or other matter.

**Article 8 – Early Termination**

**8.0    Termination by Transmission Provider.**

In the event that: (i) pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement, Transmission Provider determines to remove the Project from the Regional Transmission Expansion Plan and/or not to retain Designated Entity's status for the Project; (ii) Transmission Provider otherwise determines pursuant to Regional Transmission Expansion Planning Protocol in Schedule 6 of the Operating Agreement that the Project is no longer required to address the specific need for which the Project was included in the Regional Transmission Expansion Plan; or (iii) an event of force majeure, as defined in section 10.0 of this Attachment KK, or other event outside of the Designated Entity's control that, with the exercise of Reasonable Efforts, Designated Entity cannot alleviate and which prevents the Designated Entity from satisfying its obligations under this Agreement, Transmission Provider may terminate this Agreement by providing written notice of termination to Designated Entity, which shall become effective the later of sixty calendar days after the Designated Entity receives such notice or other such date the FERC establishes for the termination. In the event termination pursuant to this Section 8.0

is based on (ii) or (iii) above, Transmission Provider shall not have the right to draw upon the Designated Entity Letter of Credit or retain the cash security and shall cancel the Designated Entity Letter of Credit or return the cash security within thirty days of the termination of this Agreement.

**8.1     Termination by Default.**

This Agreement shall terminate in the event a Party is in Default of this Agreement in accordance with Sections 7.2 or 7.4 of this Agreement.  Upon Default by Designated Entity, Transmission Provider may draw upon the Designated Entity Letter of Credit or retain the cash security.

**8.2     Filing at FERC.**

Transmission Provider shall make the appropriate filing with FERC as required to effectuate the termination of this Agreement pursuant to this Article 8.

## Article 9 – Liability and Indemnity

**9.0     Liability.**

For the purposes of this Agreement, Transmission Provider's liability to the Designated Entity, any third-party, or any other person arising or resulting from any acts or omissions associated in any way with performance under this Agreement shall be limited in the same manner and to the same extent that Transmission Provider's liability is limited to any Transmission Customer, third-party or other person under Section 10.2 of the Tariff arising or resulting from any act or omission in any way associated with service provided under the Tariff or any Service Agreement thereunder.

**9.1     Indemnity.**

For the purposes of this Agreement, Designated Entity shall at all times indemnify, defend, and save Transmission Provider and its directors, managers, members, shareholders, officers and employees harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third-parties, arising out of or resulting from the Transmission Provider's acts or omissions associated with the performance of its obligations under this Agreement to the same extent and in the same manner that a Transmission Customer is required to indemnify, defend and save Transmission Provider and its directors, managers, members, shareholders, officers and employees harmless under Section 10.3 of the Tariff.

## Article 10 – Force Majeure

**10.0    Force Majeure.**

For the purpose of this section, an event of force majeure shall mean any cause beyond the control of the affected Party, including but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightening, epidemic, war, riot, civil disturbance or disobedience, labor dispute, labor or material shortage, sabotage, acts of public enemy, explosions, orders, regulations or restrictions imposed by governmental, military, or lawfully established civilian authorities, which in any foregoing cases, by exercise of due diligence, it has been unable to overcome.  An event of force majeure does not include: (i) a failure of performance that is due to an affected Party's own negligence or intentional wrongdoing; (ii) any

removable or remedial causes (other than settlement of a strike or labor dispute) which an affected Party fails to remove or remedy within a reasonable time; or (iii) economic hardship of an affected Party.

**10.1    Notice.**

A Party that is unable to carry out an obligation imposed on it by this Agreement due to Force Majeure shall notify the other Party in writing within a reasonable time after the occurrence of the cause relied on.

**10.2    Duration of Force Majeure.**

A Party shall not be responsible for any non-performance or considered in Breach or Default under this Agreement, for any deficiency or failure to perform any obligation under this Agreement to the extent that such failure or deficiency is due to Force Majeure.  A Party shall be excused from whatever performance is affected only for the duration of the Force Majeure and while the Party exercises Reasonable Efforts to alleviate such situation.  As soon as the non-performing Party is able to resume performance of its obligations excused because of the occurrence of Force Majeure, such Party shall resume performance and give prompt notice thereof to the other Party.  In the event that Designated Entity is unable to perform any of its obligations under this Agreement because of an occurrence of Force Majeure, Transmission Provider may terminate this Agreement in accordance with Section 8.0 of this Agreement.

**10.3    Breach or Default of or Force Majeure under Interconnection Coordination Agreement**

If either of the following events prevents Designated Entity from performing any of its obligations under this Agreement, such event shall be considered a Force Majeure event under this Agreement and the provisions of this Article 10 shall apply:  (i) a breach or default of the Interconnection Coordination Agreement associated with the Project by a party to the Interconnection Coordination Agreement other than the Designated Entity; or (ii) an event of Force Majeure under the Interconnection Coordination Agreement associated with the Project.

**Article 11 – Assignment**

**11.0    Assignment.**

A Party may assign all of its rights, duties, and obligations under this Agreement in accordance with this Section 11.0.  Except for assignments described in Section 11.1 of this Agreement that may not result in the assignment of all rights, duties, and obligations under this Agreement to a Project Finance Entity, no partial assignments will be permitted.  No Party may assign any of its rights or delegate any of its duties or obligations under this Agreement without prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.  Any such assignment or delegation made without such written consent shall be null and void.  Assignment by the Designated Entity shall be contingent upon, prior to the effective date of the assignment: (i) the Designated Entity or assignee demonstrating to the satisfaction of Transmission Provider that the assignee has the technical competence and financial ability to comply with the requirements of this Agreement and to construct the Project consistent with the assignor's cost estimates for the Project; and (ii) the assignee is eligible to be a Designated Entity for the Project pursuant to Sections 1.5.8(a) and (f) of Schedule 6 of the Operating Agreement.  Except as provided in an assignment to a Finance Project Entity to the contrary, for all assignments by any Party, the assignee must assume in a writing, to be provided to the other Party, all rights, duties, and obligations of the assignor arising under this Agreement.  Any assignment described herein shall not relieve or discharge the assignor from any of its obligations hereunder absent the written consent of the other Party. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations

under this Agreement diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement. Any assignees that will construct, maintain, or operate the Project shall be subject to, and comply with the terms of this Agreement, the Tariff and the Operating Agreement.

## 11.1    Project Finance Entity Assignments

### 11.1.1    Assignment to Project Finance Entity

If an arrangement between the Designated Entity and a Project Finance Entity provides that the Project Finance Entity may assume any of the rights, duties and obligations of the Designated Entity under this Agreement or otherwise provides that the Project Finance Entity may cure a Breach of this Agreement by the Designated Entity, the Project Finance Entity may be assigned this Agreement or any of the rights, duties, or obligations hereunder only upon written consent of the Transmission Provider, which consent shall not be unreasonably withheld, conditioned, or delayed. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement.

### 11.1.2    Assignment By Project Finance Entity

A Project Finance Entity that has been assigned this Agreement or any of the rights, duties or obligations under this Agreement or otherwise is permitted to cure a Breach of this Agreement, as described pursuant to Section 11.1.1 above, may assign this Agreement or any of the rights, duties or obligations under this Agreement to another entity not a Party to this Agreement only: (i) upon the Breach of this Agreement by the Designated Entity; and (ii) with the written consent of the Transmission Provider, which consent shall not be unreasonably withheld, conditioned, or delayed. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement alter or diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement. Any assignees that will construct, maintain, or operate the Project shall be subject to, and comply with the Tariff and Operating Agreement.

## Article 12 – Information Exchange

## 12.0    Information Access.

Subject to Applicable Laws and Regulations, each Party shall make available to the other Party information necessary to carry out each Party's obligations and responsibilities under this Agreement, the Operating Agreement, and the Tariff. Such information shall include but not be limited to, information reasonably requested by Transmission Provider to prepare the Regional Transmission Expansion Plan. The Parties shall not use such information for purposes other than to carry out their obligations or enforce their rights under this Agreement, the Operating Agreement, and the Tariff.

## 12.1    Reporting of Non-Force Majeure Events.

Each Party shall notify the other Party when it becomes aware of its inability to comply with the provisions of this Agreement for a reason other than Force Majeure. The Parties agree to cooperate with each other and provide necessary information regarding such inability to comply, including, but not limited to, the date, duration, reason for the inability to comply, and corrective actions taken or planned to be taken with respect to such inability to comply. Notwithstanding the foregoing, notification, cooperation or information provided under this Section 12.1 shall not entitle the receiving Party to allege a cause of action for anticipatory Breach of this Agreement.

DocuSign Envelope ID: BFF21554-E86D-4C94-86B8-220FF320CC97

## Article 13 – Confidentiality

**13.0    Confidentiality.**

For the purposes of this Agreement, information will be considered and treated as Confidential Information only if it meets the definition of Confidential Information set forth in Section 1.1 of this Agreement and is clearly designated or marked in writing as "confidential" on the face of the document, or, if the information is conveyed orally or by inspection, if the Party providing the information orally informs the Party receiving the information that the information is "confidential." Confidential Information shall be treated consistent with Section 18.17 of the Operating Agreement. A Party shall be responsible for the costs associated with affording confidential treatment to its information.

## Article 14 – Regulatory Requirements

**14.0    Regulatory Approvals.**

Designated Entity shall seek and obtain all required government authority authorizations or approvals as soon as reasonably practicable, and by the milestone dates set forth in the Development Schedule of Schedule C of this Agreement, as applicable.

## Article 15 – Representations and Warranties

**15.0    General.**

Designated Entity hereby represents, warrants and covenants as follows, with these representations, warranties, and covenants effective as to the Designated Entity during the full time this Agreement is effective:

### 15.0.1   Good Standing

Designated Entity is duly organized or formed, as applicable, validly existing and in good standing under the laws of its State of organization or formation, and is in good standing under the laws of the respective State(s) in which it is incorporated.

### 15.0.2   Authority

Designated Entity has the right, power and authority to enter into this Agreement, to become a Party thereto and to perform its obligations hereunder. This Agreement is a legal, valid and binding obligation of Designated Entity, enforceable against Designated Entity in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

### 15.0.3   No Conflict

The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of Designated Entity, or any

judgment, license, permit, order, material agreement or instrument applicable to or binding upon Designated Entity or any of its assets.

## Article 16 – Operation of Project

### 16.0    Initial Operation.

The following requirements shall be satisfied prior to Initial Operation of the Project:

#### 16.0.1    Execution of the Consolidated Transmission Owners Agreement

Designated Entity has executed the Consolidated Transmission Owners Agreement and is able to meet all requirements therein.

#### 16.0.2 Execution of an Interconnection Agreement

Designated Entity has executed an Interconnection Agreement with the Transmission Owner(s) to whose facilities the Project will interconnect, or such agreement has been filed unexecuted with the Commission.

#### 16.0.3    Operational Requirements

The Project must meet all applicable operational requirements described in the PJM Manuals.

#### 16.0.4    Parallel Operation

Designated Entity shall have all necessary systems and personnel in place to allow for parallel operation of its facilities with the facilities of the Transmission Owner(s) to which the Project is interconnected consistent with the Interconnection Coordination Agreement associated with the Project.

#### 16.0.5    Synchronization

Designated Entity shall have received any necessary authorization from Transmission Provider and the Transmission Owner(s) to whose facilities the Project will interconnect to synchronize with the Transmission System or to energize, as applicable, per the determination of Transmission Provider, the Project.

### 16.1    Partial Operation.

If the Project is to be completed in phases, the completed part of the Project may operate prior to completion and Required Project In-Service Date set forth in Schedule C of this Agreement, provided that: (i) Designated Entity has notified Transmission Provider of the successful completion of the Project phase; (ii) Transmission Provider has determined that partial operation of the Project will not negatively impact the reliability of the Transmission System; (iii) Designated Entity has demonstrated that the requirements for Initial Operation set forth in Section 16.0 of this Agreement have been met for the Project phase; and (iv) partial operation of the Project is consistent with Applicable Laws and Regulations, Applicable Reliability Standards, and Good Utility Practice.

## Article 17 – Survival

**17.0    Survival of Rights.**

The rights and obligations of the Parties in this Agreement shall survive the termination, expiration, or cancellation of this Agreement to the extent necessary to provide for the determination and enforcement of said obligations arising from acts or events that occurred while this Agreement was in effect.  The Liability and Indemnity provisions in Article 9 also shall survive termination, expiration, or cancellation of this Agreement.

## Article 18 – Non-Standard Terms and Conditions

**18.0    Schedule E – Addendum of Non-Standard Terms and Conditions.**

Subject to FERC acceptance or approval, the Parties agree that the terms and conditions set forth in the attached Schedule E are hereby incorporated by reference, and made a part of, this Agreement.  In the event of any conflict between a provision of Schedule E that FERC has accepted and any provision of the standard terms and conditions set forth in this Agreement that relates to the same subject matter, the pertinent provision of Schedule E shall control.

## Article 19 – Miscellaneous

**19.0    Notices.**

Any notice or request made to or by any Party regarding this Agreement shall be made by U.S. mail or reputable overnight courier to the addresses set forth below:

> Transmission Provider:
> PJM Interconnection, L.L.C.
> 2750 Monroe Blvd.
> Audubon, PA 19403
> Attention: Manager, Transmission Coordination & Analysis

> Designated Entity:
> PSEG Renewable Transmission LLC
> 80 Park Plaza
> Newark, NJ 07102

> Attention: Deputy General Counsel - Regulatory
>       Moskowitz, Jodi L. (Jodi.Moskowitz@pseg.com)

> With copies to:
> Jason Kalwa (Jason.kalwa@pseg.com)
> Elizabeth Gostkowski (elizabeth.gostkowski@pseg.com)
> Heather Svenson (Heather.Svenson@pseg.com)

Ana Murteira (Ana.Murteira@pseg.com)

**19.1    No Transmission Service.**

This Agreement does not entitle the Designated Entity to take Transmission Service under the Tariff.

**19.2    No Rights.**

Neither this Agreement nor the construction or the financing of the Project entitles Designated Entity to any rights related to Customer-Funded Upgrades set forth in Subpart C of Part VI of the Tariff.

**19.3    Standard of Review.**

Future modifications to this Agreement by the Parties or the FERC shall be subject to the just and reasonable standard and the Parties shall not be required to demonstrate that such modifications are required to meet the "public interest" standard of review as described in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

**19.4    No Partnership.**

Notwithstanding any provision of this Agreement, the Parties do not intend to create hereby any joint venture, partnership, association taxable as a corporation, or other entity for the conduct of any business for profit.

**19.5    Headings.**

The Article and Section headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

**19.6    Interpretation.**

Wherever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms.  The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**19.7    Severability.**

Each provision of this Agreement shall be considered severable and if for any reason any provision is determined by a court or regulatory authority of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect and shall in no way be affected, impaired or invalidated, and such invalid, void or unenforceable provision shall be replaced with valid and enforceable provision or provisions which otherwise give effect to the original intent of the invalid, void or unenforceable provision.

**19.8    Further Assurances.**

Each Party hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

**19.9    Counterparts.**

This Agreement may be executed in multiple counterparts to be construed as one effective as of the Effective Date.

**19.10    Governing Law**

This Agreement shall be governed under the Federal Power Act and Delaware law, as applicable.

**19.11    Incorporation of Other Documents.**

The Tariff, the Operating Agreement, and the Reliability Assurance Agreement, as they may be amended from time to time, are hereby incorporated herein and made a part hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officials.

**Transmission Provider:  PJM Interconnection, L.L.C.**

By: _____    Manager, Transmission
Name                           Coordination & Analysis    4/11/2024
                               Title                      Date

Printed name of signer: _____Augustine C. Caven_____

**Designated Entity:  PSEG Renewable Transmission LLC**

By: _Lathrop Craig_____    President_____    4/9/2024_____
Name 1375D4D2E22D4ED...          Title                  Date

Printed name of signer: __Lathrop Craig_____

DocuSign Envelope ID: BFF21554-E86D-4C94-86B8-220FF320CC97

**SCHEDULE A**

**Description of Projects**

| PJM Baseline Upgrade IDs | Description of Projects |
|---|---|
| b3800.43 | Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion). |
| b3800.7 | Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion). |

**SCHEDULE**                                                                **B**

**Scope of Work**

| PJM Baseline Upgrade ID | Scopes of Work |
|---|---|
| **b3800.43** | Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion). |
| **b3800.7** | Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion). |

DocuSign Envelope ID: BFF21554-E86D-4C94-86B8-220FF320CC97

### SCHEDULE C

### Development Schedule

Designated Entity shall ensure and demonstrate to the Transmission Provider that it timely has met the following milestones and milestone dates and that the milestones remain in good standing:

| Milestones | | | | |
|---|---|---|---|---|
| **PJM Baseline Upgrade ID** | Execute Interconnection Coordination Agreement: On or before this date, Designated Entity must execute the Interconnection Coordination Agreement or request the agreement be filed unexecuted. | Demonstrate Adequate Project Financing: On or before this date, Designated Entity must demonstrate that adequate project financing has been secured. Project financing must be maintained for the term of this Agreement | Acquisition of all necessary federal, state, county, and local site permits: On or before this date, Designated Entity must demonstrate that all required federal, state, county and local site permits have been acquired. | Required Project In-Service Date: On or before this date, Designated Entity must: (i) demonstrate that the Project is completed in accordance with the Scope of Work in Schedules B of this Agreement; (ii) meets the criteria outlined in Schedule D of this Agreement; and (iii) is under Transmission Provider operational dispatch. |
| **b3800.43** | 12/31/2024 | 9/1/2024 | 9/1/2026 | 6/1/2027 |
| **b3800.7** | 12/31/2024 | 9/1/2024 | 9/1/2026 | 6/1/2027 |

**SCHEDULE D**

**PJM Planning Requirements and Criteria and Required Ratings**

| PJM Baseline Upgrade ID | Required Ratings(MVA): Summer Normal/Summer Emergency/Winter Normal/Winter Emergency | Planning Criteria |
|---|---|---|
| b3800.43 | 3341SN/4156SE/3759WN/4595WE | Projects that comprise 2022 RTEP Window 3 Recommended Solution collectively address the 2027/28 baseline local and regional constraints associated with Data Center load additions in APS and Dominion zones, reactive power needs, and the cumulative impact of over 11,000 MW of generation changes and deactivations. These projects all adhere to all applicable planning criteria, including PJM, NERC, SERC, RFC and local Transmission Owner FERC 715 criteria. |
| b3800.7 | 3341SN/4156SE/3759WN/4595WE | |

## SCHEDULE E

## Non-Standard Terms and Conditions

1.      These non-standard terms and conditions set forth in this Schedule E are in addition to the roles and responsibilities between PJM and the Designated Entity as set forth in the remainder of this Designated Entity Agreement.

2.      The inclusion of the cost commitment language in this Schedule E is not intended to preempt the right of any party to seek modifications to be ordered by FERC or otherwise challenge the recovery of costs through the FERC ratemaking process.

3.      The Designated Entity shall notify PJM in writing within a reasonable time after the Designated Entity becomes aware of a condition that would result in (i) the cost commitment set forth in this Schedule E being exceeded or (ii) triggering any exclusions to the cost commitment. PJM, in turn, will communicate such information to stakeholders via notice posted on PJM's website and to FERC by written notice.

### I.      Construction Cost Cap:

The Designated Entity agrees that it will not seek recovery through its Annual Transmission Revenue Requirement of any *Construction Costs* in excess of an amount equal to the <u>lesser</u> of:

(i)     the *Construction Cost Cap Amount*; or

(ii)    the aggregate amount of actual *Construction Costs* associated with the *Project*.

### II.     Force Majeure:

Section 10.0 of the Designated Entity Agreement is modified to include the following as events of Force Majeure:

(i)     any material modifications to the schedule, routing or Scope of Work that results from a PJM directed change in scope or schedule or settlement agreements within the siting process, or are imposed or required by any other governmental agency;

(ii)    changes in applicable laws and regulations, or interpretations thereof by governmental agencies;

(iii)   any orders of courts or action or inaction by governmental agencies or executive orders; or

(iv)    the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on of any permit, that is not the result of a lack of reasonable diligence of the Designated Entity, provided, however, that the contesting in good faith any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as lack of reasonable diligence.

For purpose of clarity, Section 10.0(iii) of the Designated Entity Agreement regarding "economic hardship" that does not qualify as a Force Majeure shall not be applicable to events that are both a Force

Majeure and an Uncontrollable Cost such that the relief provided for in Section 10.2 of the Designated Entity Agreement shall apply and the Uncontrollable Cost portion of Construction Cost Cap Amount will be increased as permitted by this Schedule E.

### III.    Return on Equity; Capital Structure and Incentives:

1.    Return on Equity

The Return on Equity ("ROE") shall be 9.6%. The ROE shall continue in effect, unless or until modified by FERC pursuant to Sections 205 or 206 of the Federal Power Act.

2.    Capital Structure

The capital structure to be used during construction shall be 45% equity and 55% debt ("Hypothetical Capital Structure"). As of the Project Availability Date, the Designated Entity's actual capital structure shall be used in the formula rate. The Designated Entity shall maintain an actual capital structure of up to 45% equity. This provision will apply to the Project, unless or until modified by the Commission pursuant to Section 205 or 206 of the Federal Power Act. All actual costs incurred based upon long-term debt outstanding shall be recoverable through the formula rate.

3.    Transmission Rate Incentives

Designated Entity intends to file with FERC for the following non-ROE incentives: (i) recovery of 100% of all prudently incurred costs in the event that the Project is abandoned for reasons outside of the Designated Entity's control; (ii) a hypothetical capital structure of 45% equity and 55% debt; and (iii) the establishment of a regulatory asset for pre-commercial operations costs for deferred cost recovery.

### IV.    Defined Terms:

As used herein, the capitalized terms have the meaning ascribed to them in the Designated Entity Agreement and as provided below:

1.    "**Bid Submission Date**" means May 31, 2023.

2.    "**Construction Costs**" means any and all costs and expenses directly or indirectly incurred by the *Designated Entity* to develop, construct, complete, start-up and commission the *Project* and place the *Project* in service in accordance with *Scope of Work*, including without limitation any costs and expenses incurred by the *Designated Entity* in connection with the following, in each case as and to the extent contemplated by the *Scope of Work*:

a.    obtaining permits and other governmental approvals for the *Project*,
b.    acquiring land and land rights for the *Project*,
c.    performing any environmental assessments or environmental mitigation activities in connection with the *Project*,
d.    designing and engineering the *Project*,
e.    procuring any equipment, supplies and other materials required to complete construction of the *Project* and place the *Project* in service,

    f.    sales tax or other similar taxes applicable to the *Scope of Work* associated with the *Project*, and

    g.    otherwise performing or completing any and all development and construction-related activities required in connection with the *Project* as part of *Scope of Work* including but not limited to all site clearing, equipment assembly and erection, testing and commissioning activities contemplated by the *Scope of Work*, whether performed directly by *Designated Entity* or by one or more third parties retained by *Designated Entity* (without regard to whether such third parties are affiliated or non-affiliated).

**3.**    "**Construction Cost Cap Amount**" means 1.2 times $390,275,805 in 2023 dollars as adjusted by (x) the Escalation Index Number published for the later of the first [January 1 or July 1] preceding the Project Availability Date and the denominator of which is the Escalation Index Number published for July 1, 2023; (y) plus *Uncontrollable Costs* and (z) plus any sales tax associated with the *Project*.

**4.**    "**Escalation Index Number**" means, as of any [January 1 or July 1], the number referenced in the Handy-Whitman Index for such date under Table E-1 "Cost Trends of Electric Utility Construction: North Atlantic Region," line 33, "Total Transmission Plant" or if the Handy-Whitman Index is no longer available the Parties will replace with a comparable index.

**5.**    "**Project**" means the work described in Schedule A.

**6.**    "**Project Availability Date**" means the date the Project is available for commercial use.

**7.**    "**Scope of Work**" means the approved scope of work for the Project.

**8.**    "**Uncontrollable Cost**" means:

    a.    *(Changes in Scope and Schedule)* any material modifications to the *Development Schedule*, routing or *Scope of Work* that results from a PJM directed change to scope or schedule, or settlement agreement within the siting process, or are imposed or required by any other governmental or regulatory agency;

    b.    *(Changes in Law)* any material change in the enforcement, interpretation or application of any statute, rule, regulation, order or other applicable law existing as of the *Bid Submission Date* or the issuance or enactment of any of the foregoing on or after the Bid Submission Date;

    c.    *(Governmental Orders)* any orders of courts or action or inaction by governmental agencies or executive orders;

    d.    *(Environmental Mitigations)* the costs to address environmental conditions and mitigation efforts, including, but not limited to, the

investigation and/or remediation of hazardous substances and wetlands mitigations, that are not the result of *Designated Entity's* failure to comply with environmental laws;

e. *(Geotechnical Data)* geotechnical information that is not in possession of the *Designated Entity* as of the *Bid Submission Date*;

f. *(Damage and Delays)* any destruction of or damage to any portion of the Project (not caused by *Designated Entity* or any contractors or subcontractors), or any interruption, suspension or interference with *Designated Entity's* (or any of its contractor's or subcontractor's) performance of activities required to complete the *Project*, which destruction, damage, interruption, suspension or interference is caused by events outside of *Designated Entity's* reasonable control, including landslides; lightning; earthquakes; hurricanes; tornadoes; typhoons; or similar severe weather events; fires or explosions; floods; epidemic; acts of a public enemy; acts or threats of terrorism; wars; blockades; riots; rebellions; sabotage; vandalism; insurrections; environmental contamination or damage not caused by *Designated Entity* (or any contractors or subcontractors); strike or labor disruption or civil disturbances (or governmental actions arising from any of the foregoing);

g. *(Permitting Delays)* the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on or after the *Bid Submission Date* of any permit, license, approval or consent to the extent that such denial, delay, suspension, termination, interruption, imposition or failure interferes with the performance of this Agreement or adversely impacts the *Project's* ability to meet the anticipated *Project Availability* date of June 1, 2027, and to the extent that such denial, delay, suspension, termination, interruption, imposition or failure is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the *Designated Entity*; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as such a willful misconduct or negligent action or omission or lack of reasonable diligence;

h. *(Route Changes)* any changes in the *Project* route not caused by the *Designated Entity*;

i. *(Real Estate Costs)* cost of real estate that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*;

j. *(Access Road Costs)* cost to acquire access roads to the *Project* that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*; and

DocuSign Envelope ID: BFF21554-E86D-4C94-86B8-220FF320CC97

k.   (*Breach of by Transmission Provider*) any Breach and Default by *Transmission Provider* of its obligations under this *Designated Entity Agreement* or any request by *Transmission Provider* to delay or suspend any activities associated with the *Project* or any Breach and Default, by any *Transmission Provider* under or in connection with an Interconnection Coordination Agreement or any interconnection agreement.



PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403

Jessica M. Lynch
Associate General Counsel
T:  (267) 563-3688 | F:  (610) 666-8211
jessica.lynch@pjm.com

May 10, 2024

Honorable Debbie-Anne A. Reese
Acting Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, D.C. 20426-0001

Re:     *PJM Interconnection, L.L.C., Docket No. ER24-____-000*
        *PSEG Renewable Transmission LLC (PJM RTEP Projects b3800.43 & b3800.7)*
        *PJM 2022 Window 3 Recommended Solutions; Service Agreement No. 7226*

Dear Acting Secretary Reese:

Pursuant to section 205 of the Federal Power Act ("FPA"),[1] part 35 of the rules and regulations of the Federal Energy Regulatory Commission ("Commission"),[2] and Schedule 6 of the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement"), PJM Interconnection L.L.C. ("PJM") submits for filing an executed designated entity agreement ("DEA"), assigned Service Agreement No. 7226, and entered into between PJM and PSEG Renewable Transmission LLC, ("PSEG RT" or "Designated Entity").[3] The PSEG RT DEA was fully executed as of April 11, 2024.[4] Consistent with Article 2.0, PJM requests an effective date of April 11, 2024 for the PSEG RT DEA.[5]

PJM is submitting the PSEG RT DEA because it contains non-standard terms and conditions not included in the *pro forma* DEA. The variations from the *pro forma* DEA are necessary to accommodate this designation of construction responsibility of baseline upgrade numbers b3800.43 and b3800.7 (the "Project") to PSEG RT DEA. The non-standard terms and

---

[1] 16 U.S.C. § 824d. Capitalized terms used in this filing that are not otherwise defined herein or in the Amended SAA Agreement will have the meaning provided under the PJM Open Access Transmission Tariff ("Tariff"), the Operating Agreement or Reliability Assurance Agreement (collectively, the "Governing Documents").

[2] 18 C.F.R. part 35 (2023).

[3] The Designated Entity Agreement between PJM Interconnection, L.L.C. and PSEG Renewable Transmission LLC ("PSEG RT DEA") is included as Attachment A to this filing. Article 1 of the *pro forma* DEA contains all of the definitions from Part 1 of the PJM Open Access Transmission Tariff ("PJM Tariff" or "Tariff"). Articles 2 through 19 contain all of the standard terms and conditions included in the *pro forma* DEA, as set forth in Tariff, Attachment KK.

[4] Because the PSEG RT DEA filed electronically with this transmittal letter contains electronic signatures and not the original signatures of the Parties, a copy of the original signatures is included as Attachment B to this transmittal letter.

[5] *See* Section III, *infra*.

Document Accession #: 20240510-5089     Filed Date: 05/10/2024

Honorable Debbie-Anne A. Reese, Acting Secretary
May 10, 2024
Page 2

conditions are described in more detail below and shown in redline in Attachment C to this transmittal letter.

## I.     DESCRIPTION OF DESIGNATED ENTITY, 2022 WINDOW 3, AND SELECTION OF THE PROJECT

### A.  Description of PSEG RT

PSEG RT is a wholly-owned, indirect subsidiary of Public Service Enterprise Group Incorporated ("PSEG"). PSEG RT is an affiliate of Public Service Electric and Gas Company ("PSE&G"). PSEG RT will develop, build, and own the Project, which was selected through a PJM competitive solicitation process, as described further below.

PSE&G is a direct subsidiary of its holding company parent PSEG. PSE&G provides electric and gas service to customers in New Jersey in an area consisting of 2,600-square-miles. PSE&G serves 2.2 million electric customers and 1.8 million gas customers in more than 300 urban, suburban, and rural communities, including New Jersey's six largest cities. In addition, PSE&G owns and maintains 834 miles of transmission right-of-way with 1,533 miles in total of transmission lines that include 1,049 miles over 100 kV up to 400 kV, and 484 miles of transmission lines over 400 kV up to 599 kV.

PSEG RT was pre-qualified under Schedule 6, section 1.5.8(a) as eligible to be designated rights to a proposed project should its project proposal be selected for inclusion in the regional transmission expansion plan ("RTEP") for cost allocation purposes.

### B.  Description of 2022 Window 3 and Selection of the Project

In developing the RTEP, PJM identifies system violations to reliability criteria and standards and determines the potential to improve the market efficiency and operational performance of the system. PJM incorporates federal and state public policy initiatives into these analyses to determine reliability and market efficiency needs. PJM posts on its website reliability violations, system conditions, economic constraints, and Public Policy Requirements, and it gives entities an opportunity to submit proposed enhancements or expansions to address the posted violations, system conditions, economic constraints and Public Policy Requirements.[6] Following the close of a competitive proposal window, PJM determines which proposed projects provide the more efficient or cost-effective solution to reliability or market efficiency transmission needs of the Transmission System that are then recommended for inclusion in the RTEP.[7]

---

[6] *See* Operating Agreement, Schedule 6, section 1.5.6(f). Public Policy Requirements are "policies pursued by: (a) state or federal entities, where such policies are reflected in duly enacted statutes or regulations, including but not limited to, state renewable portfolio standards and requirements under Environmental Protection Agency regulations; and (b) local governmental entities such as a municipal or county government, where such policies are reflected in duly enacted laws or regulations passed by the local governmental entity." Operating Agreement, Definitions, O-P.

[7] *See* Operating Agreement, Schedule 6, section 1.5.6(f).

Honorable Debbie-Anne A. Reese, Acting Secretary
May 10, 2024
Page 3

In February 2023, PJM opened "2022 Window 3" after it identified numerous reliability criteria violations.[8] Specifically, PJM identified and posted a number of reliability drivers requiring the need for Transmission System reinforcements, including primarily: (i) local constraints resulting from serving data center loads in the APS and Dominion zones through their current 230 kV networks; (ii) regional constraints resulting from imports into load center areas; (iii) reactive power needs of the system; (iv) the cumulative impact of 11,100 MW of announced deactivations and the operational characteristics of replacement generation; and (v) adherence to all applicable NERC, SERC, RFC, PJM, and local Transmission Owner FERC 715 criteria.[9]

On October 3, 2023, at a meeting of the Transmission Expansion Advisory Committee ("TEAC"), PJM shared a summary of the PJM reliability evaluations conducted on the 2022 Window 3 proposals, and walked through a shortlist of development scenarios from which a set of proposals would be selected by PJM for recommendation for inclusion in the RTEP.[10] On October 31, 2023[11] and December 5, 2023,[12] PJM presented to the TEAC first and second reads of the proposed solutions to the 2022 Window 3 Reliability violations, respectively. The solution that PJM ultimately recommended included 215 components of proposals submitted by seven developers, including PSEG RT ("Window 3 Projects"), which PJM recommended as the more efficient or cost effective solution to the reliability needs.

PJM submitted the Window 3 Projects, including the Project (*i.e.*, baseline upgrade numbers b3800.43 and b3800.7) to the PJM Board of Managers ("PJM Board") for review and approval at the December 2023 Board meeting. On December 11, 2023, the PJM Board approved the Window 3 Projects, including baseline upgrade numbers b3800.43 and b3800.7, for inclusion in the RTEP for cost allocation purposes.[13]

PJM notified PSEG RT that it satisfied the requirements of Schedule 6, section 1.5.8 to be the Designated Entity responsible for the Project. By letter dated January 18, 2024, PSEG RT

---

[8] *See* https://www.pjm.com/planning/competitive-planning-process.aspx.

[9] *See* PJM, Reliability Analysis Report 2022 RTEP Window 3, at 4-7 (Dec. 8, 2023), https://www.pjm.com/-/media/committees-groups/committees/teac/2023/20231205/20231205-2022-rtep-window-3-reliability-analysis-report.ashx ("PJM's Reliability Analysis Report"). *See also* PJM RTEP - 2022 RTEP Proposal Window #3, Problem Statement and Requirements, https://www.pjm.com/-/media/planning/rtep-dev/expan-plan-process/fercorder-1000/rtep-proposal-windows/2022-rtep-window-3/2022-rtep-window-3-without-study-files-v7.ashx ("2022 Window 3 Problem Statement").

[10] *See* PJM, Reliability Analysis Update (Oct. 3, 2023), https://www.pjm.com/-/media/committees-groups/committees/teac/2023/20231003/20231003-item-11---reliability-analysis-update.ashx.

[11] *See* PJM, Reliability Analysis Update (Oct. 31, 2023), https://www.pjm.com/-/media/committees-groups/committees/teac/2023/20231031/20231031-item-15---reliability-analysis-update.ashx.

[12] *See* PJM, Reliability Analysis Update (Dec. 5, 2023), https://www.pjm.com/-/media/committees-groups/committees/teac/2023/20231205/20231205-item-15---reliability-analysis-update-2022-window-3.ashx.

[13] *See* PJM, Transmission Expansion Advisory Committee Recommendations to the Board (Dec. 2023), https://www.pjm.com/-/media/committees-groups/committees/teac/2023/20231205/20231205-pjm-teac-board-whitepaper-december-2023.ashx.

Document Accession #: 20240510-5089        Filed Date: 05/10/2024

Honorable Debbie-Anne A. Reese, Acting Secretary
May 10, 2024
Page 4

accepted such designation and, consistent with section 1.5.8(j) of Schedule 6, submitted a development schedule providing milestones and milestone dates for the Project.[14]

## II.    DESCRIPTION OF THE PSE&G DEA

The *pro forma* DEA is a two-party agreement entered into between PJM and the Designated Entity. Pursuant to the terms of the *pro forma* DEA, the Designated Entity is designated responsibility for the construction, ownership and/or financing of transmission enhancements and expansions approved by the PJM Board for inclusion in the RTEP.

Pursuant to the terms of the PSEG RT DEA, PSEG RT agrees to be responsible for construction, ownership and financing of the following:[15]

| PJM Baseline Upgrade ID | Description of Projects and Scopes of Work | Required In-Service Date |
|---|---|---|
| b3800.43 | Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion). | 6/1/2027 |
| b3800.7 | Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion). | 6/1/2027 |

Consistent with section 1.5.8(j) of Schedule 6, PSEG RT submitted security in the amount of $11,708,274, which is three percent of the estimated cost of the Project, developed independently by PJM.[16] As shown in the chart above, the required in-service date for the Project is on or before June 1, 2027 for baseline upgrade numbers b3800.43 and b3800.7.[17]

As indicated above, the PSEG RT DEA contains terms and conditions that do not conform to the *pro forma* DEA. Specifically, Schedule E of the PSEG RT DEA includes a voluntarily-submitted, binding cost commitment proposal as permitted under Operating Agreement, Schedule 6, section 1.5.8(c)(2).[18] Specifically, PSEG RT commits that it will not seek recovery through its Annual Transmission Revenue Requirement of any Construction Costs[19] in excess of an amount

---

[14] *See* PSEG RT DEA, Schedule C.

[15] *Id.*, Schedules A and B.

[16] *Id.*, Article 3.0.

[17] *Id.*, Schedule C.

[18] *Id.*, Schedule E. Where a proposal contains cost containment language, and the propose project is approved for inclusion in the RTEP, the cost commitment language must be included in the relevant DEA as a non-standard term that is filed with the Commission. *See* PJM, *Manual 14F: Competitive Planning Process*, § 8.1.5 (rev. 9, Apr. 27, 2022), https://www.pjm.com/-/media/documents/manuals/m14f.ashx ("PJM Manual 14F").

[19] Construction Costs are defined in Schedule E, Section IV.2.

Honorable Debbie-Anne A. Reese, Acting Secretary
May 10, 2024
Page 5

that is equal to the lesser of (i) the Construction Cost Cap Amount[20] or (ii) the aggregate amount of actual Construction Costs associated with the Project. The PSEG RT DEA also modifies section 10.0 of the *pro forma* DEA to include four additional events that would be considered events of Force Majeure.[21]

The PSEG RT DEA includes a Return on Equity ("ROE") for the Project of 9.6%.[22] The PSEG RT DEA further provides that the capital structure to be used during construction of the Project shall be 45% equity and 55% debt, and that as of the Project Availability Date,[23] PSEG RT's actual capital structure shall be used in the formula rate and PSEG RT shall maintain an actual capital structure of up to 45% equity.[24] The PSEG RT DEA provides that both the ROE and capital structure will apply to the Project, unless or until modified by the Commission pursuant to Section 205 or 206 of the Federal Power Act. Additionally, the PSEG RT DEA provides that through a filing with the Commission, PSEG RT will seek following non-ROE incentives: (i) recovery of 100% of all prudently incurred costs in the event that the Project is abandoned for reasons outside of the Designated Entity's control; (ii) a hypothetical capital structure of 45% equity and 55% debt; and (iii) the establishment of a regulatory asset for pre-commercial operations costs for deferred cost recovery.[25]

Finally, the PSEG RT DEA includes language that, consistent with PJM Manual 14F, must be included in any DEA in which the Designated Entity commits to capping project construction costs or any other aspect related to revenue recovery for the project.[26]

The remainder of the PSEG RT DEA is conforming.

---

[20] As defined in Schedule E, Section IV.3, the "Construction Cost Cap" means 1.2 times $390,275,805 in 2023 dollars as adjusted by (x) the Escalation Index Number published for the later of the first [January 1 or July 1] preceding the Project Availability Date and the denominator of which is the Escalation Index Number published for July 1, 2023; (y) plus Uncontrollable Costs and (z) plus any sales tax associated with the Project. Uncontrollable Costs are defined in Schedule E, Section IV.8.

[21] *Id.,* Schedule E, Section II.

[22] *Id.,* Schedule E, Section III.1. As set forth in Operating Agreement, Schedule 6, section 1.5.8(e) provides that "[i]n evaluating any cost, ROE and/or capital structure proposal, PJM is not making a determination that the cost, ROE or capital structure results in just and reasonable rates, which shall be addressed in the required rate filing with the [Commission]."

[23] As defined in Schedule E, Section IV.3, the "Project Availability Date" is the "date the Project is available for commercial use."

[24] Schedule E, Section III.2.

[25] On April 15, 2024, PSEG RT filed a petition for declaratory order requesting Commission approval for three non-ROE incentives: (1) the ability to recover 100% of all prudently incurred costs if the Project is abandoned for reasons outside of PSEG RT's control (the "Abandoned Plant Incentive"); (2) the deferral of prudently incurred pre-commercial costs through the creation of a regulatory asset ("Regulatory Asset Incentive"); and (3) use of a hypothetical capital structure of 45% equity and 55% debt ("Hypothetical Capital Structure Incentive") until the Project is placed into service. *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, Docket No. EL24-103-000 (Apr. 15, 2024).

[26] *See* PSEG RT DEA, Schedule E, .2 and .3. *See also* PJM Manual 14F, § 8.5.1

Honorable Debbie-Anne A. Reese, Acting Secretary
May 10, 2024
Page 6

PJM has reviewed the provisions of Schedule E and believes that the provisions conform to the terms and conditions submitted in PSEG RT's proposal. The Commission has previously accepted other designated entity agreements that included similar non-conforming language.[27]

## III.    REQUEST FOR EFFECTIVE DATE AND WAIVER

PJM requests a waiver of the Commission's 60-day prior notice requirements to allow an effective date of April 11, 2024, for the PSEG RT DEA. Waiver is appropriate because the documents are being filed within thirty (30) days of the requested effective date.[28]

## IV.    CORRESPONDENCE AND COMMUNICATIONS

Correspondence and communications with respect to this filing should be sent to the following persons:

Craig Glazer                                    Jessica M. Lynch
Vice President-Federal Government Policy         Associate General Counsel
PJM Interconnection, L.L.C.                      PJM Interconnection, L.L.C.
1200 G Street, N.W., Suite 600                   2750 Monroe Blvd.
Washington, D.C. 20005                           Audubon, PA 19403
Ph:  (202) 423-4743                             Ph:  (610) 635-3055
Fax: (202) 393-7741                              Fax: (610) 666-8211
craig.glazer@pjm.com                             jessica.lynch@pjm.com

## V.    DOCUMENTS ENCLOSED

PJM encloses the following:

1.    Transmittal Letter;

2.    Attachment A: PSEG RT DEA, Service Agreement No. 7226;

3.    Attachment B: Copy of the original signatures for Service Agreement No. 7226; and

4.    Attachment C: Redline of Non-standard terms in PSEG RT DEA, Service Agreement No. 7226.

---

[27] *See PJM Interconnection, L.L.C.*, PPL Electric Utilities Corp. (PJM RTEP Project b3730), SA No. 6892, Docket No. ER23-1873-000 (accepted by letter order issued July 6, 2023).

[28] *See* 18 C.F.R. § 35.3(a)(2) (2023); *Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139, at 61,983-84, *order on reh'g and clarification*, 65 FERC ¶ 61,081 (1993) (the Commission will grant waiver of the 60-day prior notice requirement "if service agreements are filed within 30 days after service commences").

Honorable Debbie-Anne A. Reese, Acting Secretary
May 10, 2024
Page 7

## VI.    SERVICE

PJM has served a copy of this filing on PSEG RT, as well as all the state utility regulatory commissions within the PJM region.

Respectfully submitted,

 */s/  Jessica M. Lynch*

| | |
|---|---|
| Craig Glazer | Jessica M. Lynch |
| Vice President-Federal Government Policy | Associate General Counsel |
| PJM Interconnection, L.L.C. | PJM Interconnection, L.L.C. |
| 1200 G Street, N.W., Suite 600 | 2750 Monroe Blvd. |
| Washington, D.C. 20005 | Audubon, PA 19403 |
| Ph:  (202) 423-4743 | Ph:  (267) 563-3688 |
| Fax: (202) 393-7741 | Fax: (610) 666-8211 |
| craig.glazer@pjm.com | jessica.lynch@pjm.com |

cc:    PSEG Renewable Transmission LLC
        Jodi Moskowitz, Jodi.Moskowitz@pseg.com
        Roseanne Circelli, Roseanne.Circelli@pseg.com
        Heather Svenson, Heather.Svenson@pseg.com
        Ana Murteira, Ana.Murteira@pseg.com
        Viet Ngo, Viet.Ngo@pseg.com
        Jason Kalwa, Jason.Kalwa@pseg.com
        Colleen Cassidy, Colleen.Cassidy@pseg.com

        All state utility regulatory commissions within the PJM Region

Document Accession #: 20240510-5089    Filed Date: 05/10/2024

# ATTACHMENT A

## Service Agreement No. 7226

## (Clean Version)

Document Accession #: 20240510-5089     Filed Date: 05/10/2024

Service Agreement No. 7226

**DESIGNATED ENTITY AGREEMENT**

**Between**

**PJM Interconnection, L.L.C.**

**And**

**PSEG Renewable Transmission LLC**

**PJM RTEP Projects b3800.43 & b3800.7:**
**PJM 2022 Window 3 Recommended Solution**

# DESIGNATED ENTITY AGREEMENT

## Between

## PJM Interconnection, L.L.C.

## And

## PSEG Renewable Transmission LLC

This Designated Entity Agreement, including the Schedules attached hereto and incorporated herein (collectively, "Agreement") is made and entered into as of the Effective Date between PJM Interconnection, L.L.C. ("Transmission Provider" or "PJM"), and PSEG Renewable Transmission LLC ("Designated Entity" or "PSEG"), referred to herein individually as "Party" and collectively as "the Parties."

## WITNESSETH

WHEREAS, in accordance with FERC Order No. 1000 and Schedule 6 of the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement"), Transmission Provider is required to designate among candidates, pursuant to a FERC-approved process, an entity to develop and construct a specified project to expand, replace and/or reinforce the Transmission System operated by Transmission Provider;

WHEREAS, pursuant to Section 1.5.8(i) of Schedule 6 of the Operating Agreement, the Transmission Provider notified Designated Entity that it was designated as the Designated Entity for the Project (described in Schedule A to this Agreement) to be included in the Regional Transmission Expansion Plan;

WHEREAS, pursuant to Section 1.5.8(j) of Schedule 6 of the Operating Agreement, Designated Entity accepted the designation as the Designated Entity for the Project and therefore has the obligation to construct the Project; and

NOW, THEREFORE, in consideration of the mutual covenants herein contained, together with other good and valuable consideration, the receipt and sufficiency is hereby mutually acknowledged by each Party, the Parties mutually covenant and agree as follows:

## Article 1 – Definitions

### 1.0    Defined Terms.

All capitalized terms used in this Agreement shall have the meanings ascribed to them in Part I of the Tariff or in definitions either in the body of this Agreement or its attached Schedules. In the event of any conflict between defined terms set forth in the Tariff or defined terms in this Agreement, including the Schedules, such conflict will be resolved in favor of the terms as defined in this Agreement.

### 1.1    Confidential Information.

Any confidential, proprietary, or trade secret information of a plan, specification, pattern, procedure, design, device, list, concept, policy, or compilation relating to the Project or Transmission Owner facilities to which the Project will interconnect, which is designated as confidential by the party supplying

the information, whether conveyed verbally, electronically, in writing, through inspection, or otherwise, and shall include, but may not be limited to, information relating to the producing party's technology, research and development, business affairs and pricing, land acquisition and vendor contracts relating to the Project.

**1.2     Designated Entity Letter of Credit.**

Designated Entity Letter of Credit shall mean the letter of credit provided by the Designated Entity pursuant to Section 1.5.8(j) of Schedule 6 of the Operating Agreement and Section 3.0 of this Agreement as security associated with the Project.

**1.3     Development Schedule.**

Development Schedule shall mean the schedule of milestones set forth in Schedule C of this Agreement.

**1.4     Effective Date.**

Effective Date shall mean the date this Agreement becomes effective pursuant to Section 2.0 of this Agreement.

**1.5     Initial Operation.**

Initial Operation shall mean the date the Project is (i) energized and (ii) under Transmission Provider operational dispatch.

**1.6     Project.**

Project shall mean the enhancement or expansion included in the PJM Regional Transmission Expansion Plan described in Schedule A of this Agreement.

**1.7     Project Finance Entity.**

Project Finance Entity shall mean holder, trustee or agent for holders, of any component of Project Financing.

**1.8     Project Financing.**

Project Financing shall mean: (a) one or more loans, leases, equity and/or debt financings, together with all modifications, renewals, supplements, substitutions and replacements thereof, the proceeds of which are used to finance or refinance the costs of the Project, any alteration, expansion or improvement to the Project, or the operation of the Project; or (b) loans and/or debt issues secured by the Project.

**1.9     Reasonable Efforts.**

Reasonable Efforts shall mean such efforts as are consistent with ensuring the timely and effective design and construction of the Project in a manner, which ensures that the Project, once placed in service, meets the requirements of the Project as described in Schedule B and are consistent with Good Utility Practice.

**1.10     Required Project In-Service Date.**

Required Project In-Service Date shall mean the date the Project is required to:  (i) be completed in accordance with the Scope of Work in Schedules B this Agreement, (ii) meet the criteria outlined in Schedule D of this Agreement and (iii) be under Transmission Provider operational dispatch.

## Article 2 – Effective Date and Term

**2.0      Effective Date.**

Subject to regulatory acceptance, this Agreement shall become effective on the date the Agreement has been executed by all Parties, or if this Agreement is filed with FERC for acceptance, rather than reported only in PJM's Electric Quarterly Report, upon the date specified by FERC.

**2.1      Term.**

This Agreement shall continue in full force and effect from the Effective Date until:  (i) the Designated Entity executes the Consolidated Transmission Owners Agreement; and (ii) the Project (a) has been completed in accordance with the terms and conditions of this Agreement, (b) meets all relevant required planning criteria, and (c) is under Transmission Provider's operational dispatch; or (iii) the Agreement is terminated pursuant to Article 8 of this Agreement.

## Article 3 – Security

**3.0      Obligation to Provide Security.**

In accordance with Section 1.5.8(j) of Schedule 6 of the Operating Agreement, Designated Entity shall provide Transmission Provider a letter of credit as acceptable to Transmission Provider (Designated Entity Letter of Credit) or cash security in the amount of $11,708,274, which is three percent of the estimated cost of the Project.  Designated Entity is required provide and maintain the Designated Entity Letter of Credit, as required by Section 1.5.8(j) of Schedule 6 of the Operating Agreement and Section 3.0 of this Agreement.  The Designated Entity Letter of Credit shall remain in full force and effect for the term of this Agreement and for the duration of the obligations arising therefrom in accordance with Article 17.0.

**3.1      Distribution of Designated Entity Letter of Credit or Cash Security.**

In the event that Transmission Provider draws upon the Designated Entity Letter of Credit or retains the cash security in accordance with Sections 7.5, 8.0, or 8.1, Transmission Provider shall distribute such funds as determined by FERC.

## Article 4 – Project Construction

**4.0      Construction of Project by Designated Entity.**

Designated Entity shall design, engineer, procure, install and construct the Project, including any modifications thereto, in accordance with:  (i) the terms of this Agreement, including but not limited to the Scope of Work in Schedule B and the Development Schedule in Schedule C; (ii) applicable reliability principles, guidelines, and standards of the Applicable Regional Reliability Council and NERC; (iii) the Operating Agreement; (iv) the PJM Manuals; and (v) Good Utility Practice.

**4.1      Milestones.**

**4.1.0      Milestone Dates.**

Designated Entity shall meet the milestone dates set forth in the Development Schedule in Schedule C of this Agreement. Milestone dates set forth in Schedule C only may be extended by Transmission Provider in writing. Failure to meet any of the milestone dates specified in Schedule C, or as extended as described in this Section 4.1.0 or Section 4.3.0 of this Agreement, shall constitute a Breach of this Agreement. Transmission Provider reasonably may extend any such milestone date, in the event of delays not caused by the Designated Entity that could not be remedied by the Designated Entity through the exercise of due diligence, or if an extension will not delay the Required Project In-Service Date specified in Schedule C of this Agreement; provided that a corporate officer of the Designated Entity submits a revised Development Schedule containing revised milestones and showing the Project in full operation no later than the Required Project In-Service Date specified in Schedule C of this Agreement.

### 4.1.1    Right to Inspect.

Upon reasonable notice, Transmission Provider shall have the right to inspect the Project for the purposes of assessing the progress of the Project and satisfaction of milestones. Such inspection shall not be deemed as review or approval by Transmission Provider of any design or construction practices or standards used by the Designated Entity.

## 4.2    Applicable Technical Requirements and Standards.

For the purposes of this Agreement, applicable technical requirements and standards of the Transmission Owner(s) to whose facilities the Project will interconnect shall apply to the design, engineering, procurement, construction and installation of the Project to the extent that the provisions thereof relate to the interconnection of the Project to the Transmission Owner(s) facilities.

## 4.3    Project Modification.

### 4.3.0    Project Modification Process.

The Scope of Work and Development Schedule, including the milestones therein, may be revised, as required, in accordance with Transmission Provider's project modification process set forth in the PJM Manuals, or otherwise by Transmission Provider in writing. Such modifications may include alterations as necessary and directed by Transmission Provider to meet the system condition for which the Project was included in the Regional Transmission Expansion Plan.

### 4.3.1    Consent of Transmission Provider to Project Modifications.

Designated Entity may not modify the Project without prior written consent of Transmission Provider, including but not limited to, modifications necessary to obtain siting approval or necessary permits, which consent shall not be unreasonably withheld, conditioned, or delayed.

### 4.3.2    Customer Facility Interconnections And Transmission Service Requests.

Designated Entity shall perform or permit the engineering and construction necessary to accommodate the interconnection of Customer Facilities to the Project and transmission service requests that are determined necessary for such interconnections and transmission service requests in accordance with Parts IV and VI, and Parts II and III, respectively, of the Tariff.

## 4.4    Project Tracking.

The Designated Entity shall provide regular, quarterly construction status reports in writing to Transmission Provider. The reports shall contain, but not be limited to, updates and information specified in the PJM Manuals regarding: (i) current engineering and construction status of the Project; (ii) Project

completion percentage, including milestone completion; (iii) current target Project or phase completion date(s); (iv) applicable outage information; and (v) cost expenditures to date and revised projected cost estimates for completion of the Project. Transmission Provider shall use such status reports to post updates regarding the progress of the Project.

**4.5     Exclusive Responsibility of Designated Entity.**

Designated Entity shall be solely responsible for all planning, design, engineering, procurement, construction, installation, management, operations, safety, and compliance with applicable laws and regulations associated with the Project, including but not limited to obtaining all necessary permits, siting, and other regulatory approvals. Transmission Provider shall have no responsibility to manage, supervise, or ensure compliance or adequacy of same.

## Article 5 – Coordination with Third-Parties

**5.0     Interconnection Coordination Agreement with Transmission Owner(s).**

By the dates specified in the Development Schedule in Schedule C of this Agreement, Designated Entity shall execute or request to file unexecuted with the Commission: (a) an Interconnection Coordination Agreement; and (b) an interconnection agreement among and between Designated Entity, Transmission Provider, and the Transmission Owner(s) to whose facilities the Project will interconnect.

**5.1     Connection with Entities Not a Party to the Consolidated Transmission Owners Agreement.**

Designated Entity shall not permit any part of the Project facilities to be connected with the facilities of any entity which is not: (i) a party to Consolidated Transmission Owners Agreement without an interconnection agreement that contains provisions for the safe and reliable interconnection and operation of such interconnection in accordance with Good Utility Practice, and principles, guidelines and standards of the Applicable Regional Reliability Council and NERC or comparable requirements of an applicable retail tariff or agreement approved by appropriate regulatory authority; or (ii) a party to a separate Designated Entity Agreement.

## Article 6 – Insurance

**6.0     Designated Entity Insurance Requirements.**

Designated Entity shall obtain and maintain in full force and effect such insurance as is consistent with Good Utility Practice. The Transmission Provider shall be included as an Additional Insured in the Designated Entity's applicable liability insurance policies. The Designated Entity shall provide evidence of compliance with this requirement upon request by the Transmission Provider.

**6.1     Subcontractor Insurance.**

In accord with Good Utility Practice, Designated Entity shall require each of its subcontractors to maintain and, upon request, provide Designated Entity evidence of insurance coverage of types, and in amounts, commensurate with the risks associated with the services provided by the subcontractor. Bonding and hiring of contractors or subcontractors shall be the Designated Entity's discretion, but regardless of bonding or the existence or non-existence of insurance, the Designated Entity shall be responsible for the performance or non-performance of any contractor or subcontractor it hires.

## Article 7 – Breach and Default

**7.0     Breach.**

Except as otherwise provided in Article 10, a Breach of this Agreement shall include:

(a)     The failure to comply with any term or condition of this Agreement, including but not limited to, any Breach of a representation, warranty, or covenant made in this Agreement, and failure to provide and maintain security in accordance with Section 3.0 of this Agreement;

(b)     The failure to meet a milestone or milestone date set forth in the Development Schedule in Schedule C of this Agreement, or as extended in writing as described in Sections 4.1.0 and 4.3.0 of this Agreement;

(c)     Assignment of this Agreement in a manner inconsistent with the terms of this Agreement; or

(d)     Failure of any Party to provide information or data required to be provided to another Party under this Agreement for such other Party to satisfy its obligations under this Agreement.

**7.1     Notice of Breach.**

In the event of a Breach, a Party not in Breach of this Agreement shall give written notice of such Breach to the breaching Party, and to any other persons, including a Project Finance Entity, if applicable, that the breaching Party identifies in writing prior to the Breach.  Such notice shall set forth, in reasonable detail, the nature of the Breach, and where known and applicable, the steps necessary to cure such Breach.

**7.2     Cure and Default.**

A Party that commits a Breach and does not take steps to cure the Breach pursuant to Section 7.3 shall be in Default of this Agreement.

**7.3     Cure of Breach.**

The breaching Party may:  (i) cure the Breach within thirty days from the receipt of the notice of Breach or other such date as determined by Transmission Provider to ensure that the Project meets its Required Project In-Service Date set forth in Schedule C; or, (ii) if the Breach cannot be cured within thirty days but may be cured in a manner that ensures that the Project meets the Required Project In-Service Date for the Project, within such thirty day time period, commences in good faith steps that are reasonable and appropriate to cure the Breach and thereafter diligently pursue such action to completion.

**7.4     Re-evaluation if Breach Not Cured.**

In the event that a breaching Party does not cure a Breach in accordance with Section 7.3 of this Agreement, Transmission Provider shall conduct a re-evaluation pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement.  If based on such re-evaluation, the Project is retained in the Regional Transmission Expansion Plan and the Designated Entity's designation for the Project also is retained, the Parties shall modify this Agreement, including Schedules, as necessary.  In all other events, Designated Entity shall be considered in Default of this Agreement, and this Agreement shall terminate in accordance with Section 8.1 of this Agreement.

**7.5     Remedies.**

Upon the occurrence of an event of Default, the non-Defaulting Party shall be entitled to: (i) commence an action to require the Defaulting Party to remedy such Default and specifically perform its duties and obligations hereunder in accordance with the terms and conditions hereof; (ii) suspend performance hereunder; and (iii) exercise such other rights and remedies as it may have in equity or at law. Upon Default by Designated Entity, Transmission Provider may draw upon the Designated Entity Letter of Credit. Nothing in this Section 7.5 is intended in any way to affect the rights of a third-party to seek any remedy it may have in equity or at law from the Designated Entity resulting from Designated Entity's Default of this Agreement.

**7.6   Remedies Cumulative.**

No remedy conferred by any provision of this Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**7.7   Waiver.**

Any waiver at any time by any Party of its rights with respect to a Breach or Default under this Agreement, or with respect to any other matters arising in connection with this Agreement, shall not be deemed a waiver or continuing waiver with respect to any other Breach or Default or other matter.

**Article 8 – Early Termination**

**8.0   Termination by Transmission Provider.**

In the event that: (i) pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement, Transmission Provider determines to remove the Project from the Regional Transmission Expansion Plan and/or not to retain Designated Entity's status for the Project; (ii) Transmission Provider otherwise determines pursuant to Regional Transmission Expansion Planning Protocol in Schedule 6 of the Operating Agreement that the Project is no longer required to address the specific need for which the Project was included in the Regional Transmission Expansion Plan; or (iii) an event of force majeure, as defined in section 10.0 of this Attachment KK, or other event outside of the Designated Entity's control that, with the exercise of Reasonable Efforts, Designated Entity cannot alleviate and which prevents the Designated Entity from satisfying its obligations under this Agreement, Transmission Provider may terminate this Agreement by providing written notice of termination to Designated Entity, which shall become effective the later of sixty calendar days after the Designated Entity receives such notice or other such date the FERC establishes for the termination. In the event termination pursuant to this Section 8.0 is based on (ii) or (iii) above, Transmission Provider shall not have the right to draw upon the Designated Entity Letter of Credit or retain the cash security and shall cancel the Designated Entity Letter of Credit or return the cash security within thirty days of the termination of this Agreement.

**8.1   Termination by Default.**

This Agreement shall terminate in the event a Party is in Default of this Agreement in accordance with Sections 7.2 or 7.4 of this Agreement. Upon Default by Designated Entity, Transmission Provider may draw upon the Designated Entity Letter of Credit or retain the cash security.

**8.2   Filing at FERC.**

Transmission Provider shall make the appropriate filing with FERC as required to effectuate the termination of this Agreement pursuant to this Article 8.

## Article 9 – Liability and Indemnity

**9.0     Liability.**

For the purposes of this Agreement, Transmission Provider's liability to the Designated Entity, any third-party, or any other person arising or resulting from any acts or omissions associated in any way with performance under this Agreement shall be limited in the same manner and to the same extent that Transmission Provider's liability is limited to any Transmission Customer, third-party or other person under Section 10.2 of the Tariff arising or resulting from any act or omission in any way associated with service provided under the Tariff or any Service Agreement thereunder.

**9.1     Indemnity.**

For the purposes of this Agreement, Designated Entity shall at all times indemnify, defend, and save Transmission Provider and its directors, managers, members, shareholders, officers and employees harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third-parties, arising out of or resulting from the Transmission Provider's acts or omissions associated with the performance of its obligations under this Agreement to the same extent and in the same manner that a Transmission Customer is required to indemnify, defend and save Transmission Provider and its directors, managers, members, shareholders, officers and employees harmless under Section 10.3 of the Tariff.

## Article 10 – Force Majeure

**10.0     Force Majeure.**

For the purpose of this section, an event of force majeure shall mean any cause beyond the control of the affected Party, including but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightening, epidemic, war, riot, civil disturbance or disobedience, labor dispute, labor or material shortage, sabotage, acts of public enemy, explosions, orders, regulations or restrictions imposed by governmental, military, or lawfully established civilian authorities, which in any foregoing cases, by exercise of due diligence, it has been unable to overcome.  An event of force majeure does not include: (i) a failure of performance that is due to an affected Party's own negligence or intentional wrongdoing; (ii) any removable or remedial causes (other than settlement of a strike or labor dispute) which an affected Party fails to remove or remedy within a reasonable time; or (iii) economic hardship of an affected Party.

**10.1     Notice.**

A Party that is unable to carry out an obligation imposed on it by this Agreement due to Force Majeure shall notify the other Party in writing within a reasonable time after the occurrence of the cause relied on.

**10.2     Duration of Force Majeure.**

A Party shall not be responsible for any non-performance or considered in Breach or Default under this Agreement, for any deficiency or failure to perform any obligation under this Agreement to the extent that such failure or deficiency is due to Force Majeure.  A Party shall be excused from whatever performance is affected only for the duration of the Force Majeure and while the Party exercises Reasonable Efforts to alleviate such situation.  As soon as the non-performing Party is able to resume performance of its obligations excused because of the occurrence of Force Majeure, such Party shall resume performance

and give prompt notice thereof to the other Party. In the event that Designated Entity is unable to perform any of its obligations under this Agreement because of an occurrence of Force Majeure, Transmission Provider may terminate this Agreement in accordance with Section 8.0 of this Agreement.

**10.3    Breach or Default of or Force Majeure under Interconnection Coordination Agreement**

If either of the following events prevents Designated Entity from performing any of its obligations under this Agreement, such event shall be considered a Force Majeure event under this Agreement and the provisions of this Article 10 shall apply: (i) a breach or default of the Interconnection Coordination Agreement associated with the Project by a party to the Interconnection Coordination Agreement other than the Designated Entity; or (ii) an event of Force Majeure under the Interconnection Coordination Agreement associated with the Project.

**Article 11 – Assignment**

**11.0    Assignment.**

A Party may assign all of its rights, duties, and obligations under this Agreement in accordance with this Section 11.0. Except for assignments described in Section 11.1 of this Agreement that may not result in the assignment of all rights, duties, and obligations under this Agreement to a Project Finance Entity, no partial assignments will be permitted. No Party may assign any of its rights or delegate any of its duties or obligations under this Agreement without prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed. Any such assignment or delegation made without such written consent shall be null and void. Assignment by the Designated Entity shall be contingent upon, prior to the effective date of the assignment: (i) the Designated Entity or assignee demonstrating to the satisfaction of Transmission Provider that the assignee has the technical competence and financial ability to comply with the requirements of this Agreement and to construct the Project consistent with the assignor's cost estimates for the Project; and (ii) the assignee is eligible to be a Designated Entity for the Project pursuant to Sections 1.5.8(a) and (f) of Schedule 6 of the Operating Agreement. Except as provided in an assignment to a Finance Project Entity to the contrary, for all assignments by any Party, the assignee must assume in a writing, to be provided to the other Party, all rights, duties, and obligations of the assignor arising under this Agreement. Any assignment described herein shall not relieve or discharge the assignor from any of its obligations hereunder absent the written consent of the other Party. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement. Any assignees that will construct, maintain, or operate the Project shall be subject to, and comply with the terms of this Agreement, the Tariff and the Operating Agreement.

**11.1    Project Finance Entity Assignments**

**11.1.1    Assignment to Project Finance Entity**

If an arrangement between the Designated Entity and a Project Finance Entity provides that the Project Finance Entity may assume any of the rights, duties and obligations of the Designated Entity under this Agreement or otherwise provides that the Project Finance Entity may cure a Breach of this Agreement by the Designated Entity, the Project Finance Entity may be assigned this Agreement or any of the rights, duties, or obligations hereunder only upon written consent of the Transmission Provider, which consent shall not be unreasonably withheld, conditioned, or delayed. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement.

**11.1.2    Assignment By Project Finance Entity**

A Project Finance Entity that has been assigned this Agreement or any of the rights, duties or obligations under this Agreement or otherwise is permitted to cure a Breach of this Agreement, as described pursuant to Section 11.1.1 above, may assign this Agreement or any of the rights, duties or obligations under this Agreement to another entity not a Party to this Agreement only: (i) upon the Breach of this Agreement by the Designated Entity; and (ii) with the written consent of the Transmission Provider, which consent shall not be unreasonably withheld, conditioned, or delayed. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement alter or diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement. Any assignees that will construct, maintain, or operate the Project shall be subject to, and comply with the Tariff and Operating Agreement.

## Article 12 – Information Exchange

**12.0     Information Access.**

Subject to Applicable Laws and Regulations, each Party shall make available to the other Party information necessary to carry out each Party's obligations and responsibilities under this Agreement, the Operating Agreement, and the Tariff. Such information shall include but not be limited to, information reasonably requested by Transmission Provider to prepare the Regional Transmission Expansion Plan. The Parties shall not use such information for purposes other than to carry out their obligations or enforce their rights under this Agreement, the Operating Agreement, and the Tariff.

**12.1     Reporting of Non-Force Majeure Events.**

Each Party shall notify the other Party when it becomes aware of its inability to comply with the provisions of this Agreement for a reason other than Force Majeure. The Parties agree to cooperate with each other and provide necessary information regarding such inability to comply, including, but not limited to, the date, duration, reason for the inability to comply, and corrective actions taken or planned to be taken with respect to such inability to comply. Notwithstanding the foregoing, notification, cooperation or information provided under this Section 12.1 shall not entitle the receiving Party to allege a cause of action for anticipatory Breach of this Agreement.

## Article 13 – Confidentiality

**13.0     Confidentiality.**

For the purposes of this Agreement, information will be considered and treated as Confidential Information only if it meets the definition of Confidential Information set forth in Section 1.1 of this Agreement and is clearly designated or marked in writing as "confidential" on the face of the document, or, if the information is conveyed orally or by inspection, if the Party providing the information orally informs the Party receiving the information that the information is "confidential." Confidential Information shall be treated consistent with Section 18.17 of the Operating Agreement. A Party shall be responsible for the costs associated with affording confidential treatment to its information.

## Article 14 – Regulatory Requirements

**14.0     Regulatory Approvals.**

Designated Entity shall seek and obtain all required government authority authorizations or approvals as soon as reasonably practicable, and by the milestone dates set forth in the Development Schedule of Schedule C of this Agreement, as applicable.

## Article 15 – Representations and Warranties

### 15.0    General.

Designated Entity hereby represents, warrants and covenants as follows, with these representations, warranties, and covenants effective as to the Designated Entity during the full time this Agreement is effective:

#### 15.0.1    Good Standing

Designated Entity is duly organized or formed, as applicable, validly existing and in good standing under the laws of its State of organization or formation, and is in good standing under the laws of the respective State(s) in which it is incorporated.

#### 15.0.2    Authority

Designated Entity has the right, power and authority to enter into this Agreement, to become a Party thereto and to perform its obligations hereunder.  This Agreement is a legal, valid and binding obligation of Designated Entity, enforceable against Designated Entity in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

#### 15.0.3    No Conflict.

The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of Designated Entity, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon Designated Entity or any of its assets.

## Article 16 – Operation of Project

### 16.0    Initial Operation.

The following requirements shall be satisfied prior to Initial Operation of the Project:

#### 16.0.1    Execution of the Consolidated Transmission Owners Agreement

Designated Entity has executed the Consolidated Transmission Owners Agreement and is able to meet all requirements therein.

#### 16.0.2 Execution of an Interconnection Agreement

Designated Entity has executed an Interconnection Agreement with the Transmission Owner(s) to whose facilities the Project will interconnect, or such agreement has been filed unexecuted with the Commission.

#### 16.0.3    Operational Requirements

The Project must meet all applicable operational requirements described in the PJM Manuals.

### 16.0.4    Parallel Operation

Designated Entity shall have all necessary systems and personnel in place to allow for parallel operation of its facilities with the facilities of the Transmission Owner(s) to which the Project is interconnected consistent with the Interconnection Coordination Agreement associated with the Project.

### 16.0.5    Synchronization

Designated Entity shall have received any necessary authorization from Transmission Provider and the Transmission Owner(s) to whose facilities the Project will interconnect to synchronize with the Transmission System or to energize, as applicable, per the determination of Transmission Provider, the Project.

## 16.1    Partial Operation.

If the Project is to be completed in phases, the completed part of the Project may operate prior to completion and Required Project In-Service Date set forth in Schedule C of this Agreement, provided that: (i) Designated Entity has notified Transmission Provider of the successful completion of the Project phase; (ii) Transmission Provider has determined that partial operation of the Project will not negatively impact the reliability of the Transmission System; (iii) Designated Entity has demonstrated that the requirements for Initial Operation set forth in Section 16.0 of this Agreement have been met for the Project phase; and (iv) partial operation of the Project is consistent with Applicable Laws and Regulations, Applicable Reliability Standards, and Good Utility Practice.

## Article 17 – Survival

## 17.0    Survival of Rights.

The rights and obligations of the Parties in this Agreement shall survive the termination, expiration, or cancellation of this Agreement to the extent necessary to provide for the determination and enforcement of said obligations arising from acts or events that occurred while this Agreement was in effect.  The Liability and Indemnity provisions in Article 9 also shall survive termination, expiration, or cancellation of this Agreement.

## Article 18 – Non-Standard Terms and Conditions

## 18.0    Schedule E – Addendum of Non-Standard Terms and Conditions.

Subject to FERC acceptance or approval, the Parties agree that the terms and conditions set forth in the attached Schedule E are hereby incorporated by reference, and made a part of, this Agreement.  In the event of any conflict between a provision of Schedule E that FERC has accepted and any provision of the standard terms and conditions set forth in this Agreement that relates to the same subject matter, the pertinent provision of Schedule E shall control.

## Article 19 – Miscellaneous

**19.0    Notices.**

Any notice or request made to or by any Party regarding this Agreement shall be made by U.S. mail or reputable overnight courier to the addresses set forth below:

> Transmission Provider:
> PJM Interconnection, L.L.C.
> 2750 Monroe Blvd.
> Audubon, PA 19403
> Attention: Manager, Transmission Coordination & Analysis
>
> Designated Entity:
> PSEG Renewable Transmission LLC
> 80 Park Plaza
> Newark, NJ 07102
>
> Attention: Deputy General Counsel - Regulatory
>           Moskowitz, Jodi L. (Jodi.Moskowitz@pseg.com)
>
>
> With copies to:
> Jason Kalwa (Jason.kalwa@pseg.com)
> Elizabeth Gostkowski (elizabeth.gostkowski@pseg.com)
> Heather Svenson (Heather.Svenson@pseg.com)
> Ana Murteira (Ana.Murteira@pseg.com)

**19.1    No Transmission Service.**

This Agreement does not entitle the Designated Entity to take Transmission Service under the Tariff.

**19.2    No Rights.**

Neither this Agreement nor the construction or the financing of the Project entitles Designated Entity to any rights related to Customer-Funded Upgrades set forth in Subpart C of Part VI of the Tariff.

**19.3    Standard of Review.**

Future modifications to this Agreement by the Parties or the FERC shall be subject to the just and reasonable standard and the Parties shall not be required to demonstrate that such modifications are required to meet the "public interest" standard of review as described in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

**19.4    No Partnership.**

Notwithstanding any provision of this Agreement, the Parties do not intend to create hereby any joint venture, partnership, association taxable as a corporation, or other entity for the conduct of any business for profit.

**19.5    Headings.**

The Article and Section headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

**19.6    Interpretation.**

Wherever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms.  The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**19.7    Severability.**

Each provision of this Agreement shall be considered severable and if for any reason any provision is determined by a court or regulatory authority of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect and shall in no way be affected, impaired or invalidated, and such invalid, void or unenforceable provision shall be replaced with valid and enforceable provision or provisions which otherwise give effect to the original intent of the invalid, void or unenforceable provision.

**19.8    Further Assurances.**

Each Party hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

**19.9    Counterparts.**

This Agreement may be executed in multiple counterparts to be construed as one effective as of the Effective Date.

**19.10    Governing Law**

This Agreement shall be governed under the Federal Power Act and Delaware law, as applicable.

**19.11    Incorporation of Other Documents.**

The Tariff, the Operating Agreement, and the Reliability Assurance Agreement, as they may be amended from time to time, are hereby incorporated herein and made a part hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officials.

**Transmission Provider:  PJM Interconnection, L.L.C.**

By: _/s/ Augustine C. Caven_     Manager, Transmission Coordination & Analysis     4/11/2024____
Name                                          Title                                          Date

Printed name of signer:     Augustine C. Caven_____

**Designated Entity:  PSEG Renewable Transmission LLC**

By: _/s/ Lathrop Craig_____     President_____     4/9/2024_____
Name                                          Title                                          Date

Printed name of signer:     Lathrop Craig_____

Document Accession #: 20240510-5089    Filed Date: 05/10/2024

**SCHEDULE A**

**Description of Projects**

| PJM Baseline Upgrade IDs | Description of Projects |
|---|---|
| b3800.43 | Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion). |
| b3800.7 | Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion). |

## SCHEDULE                                                   B

**Scope of Work**

| PJM Baseline Upgrade ID | Scopes of Work |
|---|---|
| **b3800.43** | Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion). |
| **b3800.7** | Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion). |

## SCHEDULE C

### Development Schedule

Designated Entity shall ensure and demonstrate to the Transmission Provider that it timely has met the following milestones and milestone dates and that the milestones remain in good standing:

| Milestones | | | | |
|---|---|---|---|---|
| **PJM Baseline Upgrade ID** | Execute Interconnection Coordination Agreement: On or before this date, Designated Entity must execute the Interconnection Coordination Agreement or request the agreement be filed unexecuted. | Demonstrate Adequate Project Financing: On or before this date, Designated Entity must demonstrate that adequate project financing has been secured. Project financing must be maintained for the term of this Agreement | Acquisition of all necessary federal, state, county, and local site permits: On or before this date, Designated Entity must demonstrate that all required federal, state, county and local site permits have been acquired. | Required Project In-Service Date: On or before this date, Designated Entity must: (i) demonstrate that the Project is completed in accordance with the Scope of Work in Schedules B of this Agreement; (ii) meets the criteria outlined in Schedule D of this Agreement; and (iii) is under Transmission Provider operational dispatch. |
| **b3800.43** | 12/31/2024 | 9/1/2024 | 9/1/2026 | 6/1/2027 |
| **b3800.7** | 12/31/2024 | 9/1/2024 | 9/1/2026 | 6/1/2027 |

**SCHEDULE D**

**PJM Planning Requirements and Criteria and Required Ratings**

| PJM Baseline Upgrade ID | Required Ratings(MVA): Summer Normal/Summer Emergency/Winter Normal/Winter Emergency | Planning Criteria |
|---|---|---|
| b3800.43 | 3341SN/4156SE/3759WN/4595WE | Projects that comprise 2022 RTEP Window 3 Recommended Solution collectively address the 2027/28 baseline local and regional constraints associated with Data Center load additions in APS and Dominion zones, reactive power needs, and the cumulative impact of over 11,000 MW of generation changes and deactivations. These projects all adhere to all applicable planning criteria, including PJM, NERC, SERC, RFC and local Transmission Owner FERC 715 criteria. |
| b3800.7 | 3341SN/4156SE/3759WN/4595WE | |

**SCHEDULE E**

**Non-Standard Terms and Conditions**

1.    These non-standard terms and conditions set forth in this Schedule E are in addition to the roles and responsibilities between PJM and the Designated Entity as set forth in the remainder of this Designated Entity Agreement.

2.    The inclusion of the cost commitment language in this Schedule E is not intended to preempt the right of any party to seek modifications to be ordered by FERC or otherwise challenge the recovery of costs through the FERC ratemaking process.

3.    The Designated Entity shall notify PJM in writing within a reasonable time after the Designated Entity becomes aware of a condition that would result in (i) the cost commitment set forth in this Schedule E being exceeded or (ii) triggering any exclusions to the cost commitment. PJM, in turn, will communicate such information to stakeholders via notice posted on PJM's website and to FERC by written notice.

**I.    Construction Cost Cap:**

The Designated Entity agrees that it will not seek recovery through its Annual Transmission Revenue Requirement of any *Construction Costs* in excess of an amount equal to the <u>lesser</u> of:

(i)    the *Construction Cost Cap Amount*; or

(ii)    the aggregate amount of actual *Construction Costs* associated with the *Project*.

**II.    Force Majeure:**

Section 10.0 of the Designated Entity Agreement is modified to include the following as events of Force Majeure:

(i)    any material modifications to the schedule, routing or Scope of Work that results from a PJM directed change in scope or schedule or settlement agreements within the siting process, or are imposed or required by any other governmental agency;

(ii)    changes in applicable laws and regulations, or interpretations thereof by governmental agencies;

(iii)    any orders of courts or action or inaction by governmental agencies or executive orders; or

(iv)    the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on of any permit, that is not the result of a lack of reasonable diligence of the Designated Entity, provided, however, that the contesting in good faith any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as lack of reasonable diligence.

For purpose of clarity, Section 10.0(iii) of the Designated Entity Agreement regarding "economic hardship" that does not qualify as a Force Majeure shall not be applicable to events that are both a Force Majeure and an Uncontrollable Cost such that the relief provided for in Section 10.2 of the Designated

Entity Agreement shall apply and the Uncontrollable Cost portion of Construction Cost Cap Amount will be increased as permitted by this Schedule E.

### III.  Return on Equity; Capital Structure and Incentives:

1.  Return on Equity

The Return on Equity ("ROE") shall be 9.6%. The ROE shall continue in effect, unless or until modified by FERC pursuant to Sections 205 or 206 of the Federal Power Act.

2.  Capital Structure

The capital structure to be used during construction shall be 45% equity and 55% debt ("Hypothetical Capital Structure"). As of the Project Availability Date, the Designated Entity's actual capital structure shall be used in the formula rate. The Designated Entity shall maintain an actual capital structure of up to 45% equity. This provision will apply to the Project, unless or until modified by the Commission pursuant to Section 205 or 206 of the Federal Power Act. All actual costs incurred based upon long-term debt outstanding shall be recoverable through the formula rate.

3.  Transmission Rate Incentives

Designated Entity intends to file with FERC for the following non-ROE incentives: (i) recovery of 100% of all prudently incurred costs in the event that the Project is abandoned for reasons outside of the Designated Entity's control; (ii) a hypothetical capital structure of 45% equity and 55% debt; and (iii) the establishment of a regulatory asset for pre-commercial operations costs for deferred cost recovery.

### IV.  Defined Terms:

As used herein, the capitalized terms have the meaning ascribed to them in the Designated Entity Agreement and as provided below:

**1.**  "**Bid Submission Date**" means May 31, 2023.

**2.**  "**Construction Costs**" means any and all costs and expenses directly or indirectly incurred by the *Designated Entity* to develop, construct, complete, start-up and commission the *Project* and place the *Project* in service in accordance with *Scope of Work*, including without limitation any costs and expenses incurred by the *Designated Entity* in connection with the following, in each case as and to the extent contemplated by the *Scope of Work*:

    a.  obtaining permits and other governmental approvals for the *Project*,

    b.  acquiring land and land rights for the *Project*,

    c.  performing any environmental assessments or environmental mitigation activities in connection with the *Project*,

    d.  designing and engineering the *Project*,

    e.  procuring any equipment, supplies and other materials required to complete construction of the *Project* and place the *Project* in service,

    f.  sales tax or other similar taxes applicable to the *Scope of Work* associated with the *Project*, and

g.   otherwise performing or completing any and all development and construction-related activities required in connection with the *Project* as part of *Scope of Work* including but not limited to all site clearing, equipment assembly and erection, testing and commissioning activities contemplated by the *Scope of Work*, whether performed directly by *Designated Entity* or by one or more third parties retained by *Designated Entity* (without regard to whether such third parties are affiliated or non-affiliated).

3.    "**Construction Cost Cap Amount**" means 1.2 times $390,275,805 in 2023 dollars as adjusted by (x) the Escalation Index Number published for the later of the first [January 1 or July 1] preceding the Project Availability Date and the denominator of which is the Escalation Index Number published for July 1, 2023; (y) plus *Uncontrollable Costs* and (z) plus any sales tax associated with the *Project*.

4.    "**Escalation Index Number**" means, as of any [January 1 or July 1], the number referenced in the Handy-Whitman Index for such date under Table E-1 "Cost Trends of Electric Utility Construction: North Atlantic Region," line 33, "Total Transmission Plant" or if the Handy-Whitman Index is no longer available the Parties will replace with a comparable index.

5.    "**Project**" means the work described in Schedule A.

6.    "**Project Availability Date**" means the date the Project is available for commercial use.

7.    "**Scope of Work**" means the approved scope of work for the Project.

8.    "**Uncontrollable Cost**" means:
a.    *(Changes in Scope and Schedule)* any material modifications to the *Development Schedule*, routing or *Scope of Work* that results from a PJM directed change to scope or schedule, or settlement agreement within the siting process, or are imposed or required by any other governmental or regulatory agency;

b.    *(Changes in Law)* any material change in the enforcement, interpretation or application of any statute, rule, regulation, order or other applicable law existing as of the *Bid Submission Date* or the issuance or enactment of any of the foregoing on or after the Bid Submission Date;

c.    *(Governmental Orders)* any orders of courts or action or inaction by governmental agencies or executive orders;

d.    *(Environmental Mitigations)* the costs to address environmental conditions and mitigation efforts, including, but not limited to, the investigation and/or remediation of hazardous substances and wetlands mitigations, that are not the result of *Designated Entity's* failure to comply with environmental laws;

Document Accession #: 20240510-5089        Filed Date: 05/10/2024

e.  *(Geotechnical Data)* geotechnical information that is not in possession of the *Designated Entity* as of the *Bid Submission Date*;

f.  *(Damage and Delays)* any destruction of or damage to any portion of the Project (not caused by *Designated Entity* or any contractors or subcontractors), or any interruption, suspension or interference with *Designated Entity's* (or any of its contractor's or subcontractor's) performance of activities required to complete the *Project*, which destruction, damage, interruption, suspension or interference is caused by events outside of *Designated Entity's* reasonable control, including landslides; lightning; earthquakes; hurricanes; tornadoes; typhoons; or similar severe weather events; fires or explosions; floods; epidemic; acts of a public enemy; acts or threats of terrorism; wars; blockades; riots; rebellions; sabotage; vandalism; insurrections; environmental contamination or damage not caused by *Designated Entity* (or any contractors or subcontractors); strike or labor disruption or civil disturbances (or governmental actions arising from any of the foregoing);

g.  *(Permitting Delays)* the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on or after the *Bid Submission Date* of any permit, license, approval or consent to the extent that such denial, delay, suspension, termination, interruption, imposition or failure interferes with the performance of this Agreement or adversely impacts the *Project's* ability to meet the anticipated *Project Availability* date of June 1, 2027, and to the extent that such denial, delay, suspension, termination, interruption, imposition or failure is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the *Designated Entity*; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as such a willful misconduct or negligent action or omission or lack of reasonable diligence;

h.  *(Route Changes)* any changes in the *Project* route not caused by the *Designated Entity*;

i.  *(Real Estate Costs)* cost of real estate that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*;

j.  *(Access Road Costs)* cost to acquire access roads to the *Project* that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*; and

k.  (*Breach of by Transmission Provider*) any Breach and Default by *Transmission Provider* of its obligations under this *Designated Entity Agreement* or any request by *Transmission Provider* to delay or suspend any activities associated with the *Project* or any Breach and Default, by any *Transmission Provider* under or in connection with an

Interconnection Coordination Agreement or any interconnection
agreement.

# ATTACHMENT B

# Service Agreement No. 7226

# (Signature Page)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officials.

**Transmission Provider:  PJM Interconnection, L.L.C.**

By: _____    Manager, Transmission
Name                                        Coordination & Analysis    4/11/2024
                                                 Title                           Date

Printed name of signer:    Augustine C. Caven _____


**Designated Entity:  PSEG Renewable Transmission LLC**

By: _Lathrop Craig_____    President _____    4/9/2024_____
Name  1375D4D2E22D4ED...     Title                    Date

Printed name of signer:    Lathrop Craig _____

# <u>ATTACHMENT C</u>

**Redlines of Non-Conforming Language**

**Service Agreement No. 7226**

## SCHEDULE E

### Non-Standard Terms and Conditions

1.      These non-standard terms and conditions set forth in this Schedule E are in addition to the roles and responsibilities between PJM and the Designated Entity as set forth in the remainder of this Designated Entity Agreement.

2.      The inclusion of the cost commitment language in this Schedule E is not intended to preempt the right of any party to seek modifications to be ordered by FERC or otherwise challenge the recovery of costs through the FERC ratemaking process.

3.      The Designated Entity shall notify PJM in writing within a reasonable time after the Designated Entity becomes aware of a condition that would result in (i) the cost commitment set forth in this Schedule E being exceeded or (ii) triggering any exclusions to the cost commitment. PJM, in turn, will communicate such information to stakeholders via notice posted on PJM's website and to FERC by written notice.

### I.      Construction Cost Cap:

The Designated Entity agrees that it will not seek recovery through its Annual Transmission Revenue Requirement of any *Construction Costs* in excess of an amount equal to the lesser of:

> (i)      the *Construction Cost Cap Amount*; or
>
> (ii)     the aggregate amount of actual *Construction Costs* associated with the *Project*.

### II.      Force Majeure:

Section 10.0 of the Designated Entity Agreement is modified to include the following as events of Force Majeure:

> (i)      any material modifications to the schedule, routing or Scope of Work that results from a PJM directed change in scope or schedule or settlement agreements within the siting process, or are imposed or required by any other governmental agency;
> (ii)     changes in applicable laws and regulations, or interpretations thereof by governmental agencies;
> (iii)    any orders of courts or action or inaction by governmental agencies or executive orders; or
> (iv)     the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on of any permit, that is not the result of a lack of reasonable diligence of the Designated Entity, provided, however, that the contesting in good faith any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as lack of reasonable diligence.

For purpose of clarity, Section 10.0(iii) of the Designated Entity Agreement regarding "economic hardship" that does not qualify as a Force Majeure shall not be applicable to events that are both a Force Majeure and an Uncontrollable Cost such that the relief provided for in Section 10.2 of the Designated Entity Agreement shall apply and the Uncontrollable Cost portion of Construction Cost Cap Amount will be increased as permitted by this Schedule E.

### III.    Return on Equity; Capital Structure and Incentives:

1.    Return on Equity

The Return on Equity ("ROE") shall be 9.6%. The ROE shall continue in effect, unless or until modified by FERC pursuant to Sections 205 or 206 of the Federal Power Act.

2.    Capital Structure

The capital structure to be used during construction shall be 45% equity and 55% debt ("Hypothetical Capital Structure"). As of the Project Availability Date, the Designated Entity's actual capital structure shall be used in the formula rate. The Designated Entity shall maintain an actual capital structure of up to 45% equity. This provision will apply to the Project, unless or until modified by the Commission pursuant to Section 205 or 206 of the Federal Power Act. All actual costs incurred based upon long-term debt outstanding shall be recoverable through the formula rate.

3.    Transmission Rate Incentives

Designated Entity intends to file with FERC for the following non-ROE incentives: (i) recovery of 100% of all prudently incurred costs in the event that the Project is abandoned for reasons outside of the Designated Entity's control; (ii) a hypothetical capital structure of 45% equity and 55% debt; and (iii) the establishment of a regulatory asset for pre-commercial operations costs for deferred cost recovery.

### IV.    Defined Terms:

As used herein, the capitalized terms have the meaning ascribed to them in the Designated Entity Agreement and as provided below:

1.    "**Bid Submission Date**" means May 31, 2023.

2.    "**Construction Costs**" means any and all costs and expenses directly or indirectly incurred by the *Designated Entity* to develop, construct, complete, start-up and commission the *Project* and place the *Project* in service in accordance with *Scope of Work*, including without limitation any costs and expenses incurred by the *Designated Entity* in connection with the following, in each case as and to the extent contemplated by the *Scope of Work*:

   a.   obtaining permits and other governmental approvals for the *Project*,
   b.   acquiring land and land rights for the *Project*,
   c.   performing any environmental assessments or environmental mitigation activities in connection with the *Project*,
   d.   designing and engineering the *Project*,
   e.   procuring any equipment, supplies and other materials required to complete construction of the *Project* and place the *Project* in service,
   f.   sales tax or other similar taxes applicable to the *Scope of Work* associated with the *Project*, and
   g.   otherwise performing or completing any and all development and construction-related activities required in connection with the *Project* as part of *Scope of Work* including but not limited to all site clearing,

equipment assembly and erection, testing and commissioning activities contemplated by the *Scope of Work*, whether performed directly by *Designated Entity* or by one or more third parties retained by *Designated Entity* (without regard to whether such third parties are affiliated or non-affiliated).

3.    "**Construction Cost Cap Amount**" means 1.2 times $390,275,805 in 2023 dollars as adjusted by (x) the Escalation Index Number published for the later of the first [January 1 or July 1] preceding the Project Availability Date and the denominator of which is the Escalation Index Number published for July 1, 2023; (y) plus *Uncontrollable Costs* and (z) plus any sales tax associated with the *Project*.

4.    "**Escalation Index Number**" means, as of any [January 1 or July 1], the number referenced in the Handy-Whitman Index for such date under Table E-1 "Cost Trends of Electric Utility Construction: North Atlantic Region," line 33, "Total Transmission Plant" or if the Handy-Whitman Index is no longer available the Parties will replace with a comparable index.

5.    "**Project**" means the work described in Schedule A.

6.    "**Project Availability Date**" means the date the Project is available for commercial use.

7.    "**Scope of Work**" means the approved scope of work for the Project.

8.    "**Uncontrollable Cost**" means:
    a.    *(Changes in Scope and Schedule)* any material modifications to the *Development Schedule*, routing or *Scope of Work* that results from a PJM directed change to scope or schedule, or settlement agreement within the siting process, or are imposed or required by any other governmental or regulatory agency;

    b.    *(Changes in Law)* any material change in the enforcement, interpretation or application of any statute, rule, regulation, order or other applicable law existing as of the *Bid Submission Date* or the issuance or enactment of any of the foregoing on or after the Bid Submission Date;

    c.    *(Governmental Orders)* any orders of courts or action or inaction by governmental agencies or executive orders;

    d.    *(Environmental Mitigations)* the costs to address environmental conditions and mitigation efforts, including, but not limited to, the investigation and/or remediation of hazardous substances and wetlands mitigations, that are not the result of *Designated Entity's* failure to comply with environmental laws;

    e.    *(Geotechnical Data)* geotechnical information that is not in possession of the *Designated Entity* as of the *Bid Submission Date*;

f.  *(Damage and Delays)* any destruction of or damage to any portion of the Project (not caused by *Designated Entity* or any contractors or subcontractors), or any interruption, suspension or interference with *Designated Entity's* (or any of its contractor's or subcontractor's) performance of activities required to complete the *Project*, which destruction, damage, interruption, suspension or interference is caused by events outside of *Designated Entity's* reasonable control, including landslides; lightning; earthquakes; hurricanes; tornadoes; typhoons; or similar severe weather events; fires or explosions; floods; epidemic; acts of a public enemy; acts or threats of terrorism; wars; blockades; riots; rebellions; sabotage; vandalism; insurrections; environmental contamination or damage not caused by *Designated Entity* (or any contractors or subcontractors); strike or labor disruption or civil disturbances (or governmental actions arising from any of the foregoing);

g.  *(Permitting Delays)* the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on or after the *Bid Submission Date* of any permit, license, approval or consent to the extent that such denial, delay, suspension, termination, interruption, imposition or failure interferes with the performance of this Agreement or adversely impacts the *Project's* ability to meet the anticipated *Project Availability* date of June 1, 2027, and to the extent that such denial, delay, suspension, termination, interruption, imposition or failure is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the *Designated Entity*; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as such a willful misconduct or negligent action or omission or lack of reasonable diligence;

h.  *(Route Changes)* any changes in the *Project* route not caused by the *Designated Entity*;

i.  *(Real Estate Costs)* cost of real estate that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*;

j.  *(Access Road Costs)* cost to acquire access roads to the *Project* that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*; and

k.  (*Breach of by Transmission Provider*) any Breach and Default by *Transmission Provider* of its obligations under this *Designated Entity Agreement* or any request by *Transmission Provider* to delay or suspend any activities associated with the *Project* or any Breach and Default, by any *Transmission Provider* under or in connection with an Interconnection Coordination Agreement or any interconnection agreement.

Document Accession #: 20240510-5089        Filed Date: 05/10/2024

FERC rendition of the electronically filed tariff records in Docket No. ER24-01990-000
Filing Data:
CID: C000030
Filing Title: Designated Entity Agreement, SA No. 7226 between PJM and PSEG RT
Company Filing Identifier: 9731
Type of Filing Code: 10
Associated Filing Identifier:
Tariff Title: PJM Service Agreements Tariff
Tariff ID: 40
Payment Confirmation:
Suspension Motion:


Tariff Record Data:
Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 PJM SA No. 7226, PJM SA No. 7226 between PJM and PSEG, 0.0.0, A
Record Narative Name: PJM SA No. 7226 between PJM and PSEG
Tariff Record ID: 3749
Tariff Record Collation Value: 569118015      Tariff Record Parent Identifier: 0
Proposed Date: 2024-04-11
Priority Order: 500
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

Service Agreement No. 7226

**DESIGNATED ENTITY AGREEMENT**

**Between**

**PJM Interconnection, L.L.C.**

**And**

**PSEG Renewable Transmission LLC**


**PJM RTEP Projects b3800.43 & b3800.7:**
**PJM 2022 Window 3 Recommended Solution**

Service Agreement No. 7226

**DESIGNATED ENTITY AGREEMENT**

**Between**

**PJM Interconnection, L.L.C.**

**And**

**PSEG Renewable Transmission LLC**

This Designated Entity Agreement, including the Schedules attached hereto and incorporated herein (collectively, "Agreement") is made and entered into as of the Effective Date between PJM Interconnection, L.L.C. ("Transmission Provider" or "PJM"), and PSEG Renewable Transmission LLC

("Designated Entity" or "PSEG"), referred to herein individually as "Party" and collectively as "the Parties."

## WITNESSETH

WHEREAS, in accordance with FERC Order No. 1000 and Schedule 6 of the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement"), Transmission Provider is required to designate among candidates, pursuant to a FERC-approved process, an entity to develop and construct a specified project to expand, replace and/or reinforce the Transmission System operated by Transmission Provider;

WHEREAS, pursuant to Section 1.5.8(i) of Schedule 6 of the Operating Agreement, the Transmission Provider notified Designated Entity that it was designated as the Designated Entity for the Project (described in Schedule A to this Agreement) to be included in the Regional Transmission Expansion Plan;

WHEREAS, pursuant to Section 1.5.8(j) of Schedule 6 of the Operating Agreement, Designated Entity accepted the designation as the Designated Entity for the Project and therefore has the obligation to construct the Project; and

NOW, THEREFORE, in consideration of the mutual covenants herein contained, together with other good and valuable consideration, the receipt and sufficiency is hereby mutually acknowledged by each Party, the Parties mutually covenant and agree as follows:

## Article 1 – Definitions

### 1.0   Defined Terms.

All capitalized terms used in this Agreement shall have the meanings ascribed to them in Part I of the Tariff or in definitions either in the body of this Agreement or its attached Schedules.   In the event of any conflict between defined terms set forth in the Tariff or defined terms in this Agreement, including the Schedules, such conflict will be resolved in favor of the terms as defined in this Agreement.

### 1.1   Confidential Information.

Any confidential, proprietary, or trade secret information of a plan, specification, pattern, procedure, design, device, list, concept, policy, or compilation relating to the Project or Transmission Owner facilities to which the Project will interconnect, which is designated as confidential by the party supplying the information, whether conveyed verbally, electronically, in writing, through inspection, or otherwise, and shall include, but may not be limited to, information relating to the producing party's technology, research and development, business affairs and pricing, land acquisition and vendor contracts relating to the Project.

### 1.2   Designated Entity Letter of Credit.

Designated Entity Letter of Credit shall mean the letter of credit provided by the Designated Entity pursuant to Section 1.5.8(j) of Schedule 6 of the Operating Agreement and Section 3.0 of this Agreement as security associated with the Project.

### 1.3   Development Schedule.

Development Schedule shall mean the schedule of milestones set forth in Schedule C of this Agreement.

**1.4    Effective Date.**

Effective Date shall mean the date this Agreement becomes effective pursuant to Section 2.0 of this Agreement.

**1.5    Initial Operation.**

Initial Operation shall mean the date the Project is (i) energized and (ii) under Transmission Provider operational dispatch.

**1.6    Project.**

Project shall mean the enhancement or expansion included in the PJM Regional Transmission Expansion Plan described in Schedule A of this Agreement.

**1.7    Project Finance Entity.**

Project Finance Entity shall mean holder, trustee or agent for holders, of any component of Project Financing.

**1.8    Project Financing.**

Project Financing shall mean: (a) one or more loans, leases, equity and/or debt financings, together with all modifications, renewals, supplements, substitutions and replacements thereof, the proceeds of which are used to finance or refinance the costs of the Project, any alteration, expansion or improvement to the Project, or the operation of the Project; or (b) loans and/or debt issues secured by the Project.

**1.9    Reasonable Efforts.**

Reasonable Efforts shall mean such efforts as are consistent with ensuring the timely and effective design and construction of the Project in a manner, which ensures that the Project, once placed in service, meets the requirements of the Project as described in Schedule B and are consistent with Good Utility Practice.

**1.10    Required Project In-Service Date.**

Required Project In-Service Date shall mean the date the Project is required to:  (i) be completed in accordance with the Scope of Work in Schedules B this Agreement, (ii) meet the criteria outlined in Schedule D of this Agreement and (iii) be under Transmission Provider operational dispatch.

## Article 2 – Effective Date and Term

**2.0    Effective Date.**

Subject to regulatory acceptance, this Agreement shall become effective on the date the Agreement has been executed by all Parties, or if this Agreement is filed with FERC for acceptance, rather than reported only in PJM's Electric Quarterly Report, upon the date specified by FERC.

**2.1    Term.**

This Agreement shall continue in full force and effect from the Effective Date until: (i) the Designated Entity executes the Consolidated Transmission Owners Agreement; and (ii) the Project (a) has been completed in accordance with the terms and conditions of this Agreement, (b) meets all relevant required planning criteria, and (c) is under Transmission Provider's operational dispatch; or (iii) the Agreement is terminated pursuant to Article 8 of this Agreement.

## Article 3 – Security

**3.0     Obligation to Provide Security.**

In accordance with Section 1.5.8(j) of Schedule 6 of the Operating Agreement, Designated Entity shall provide Transmission Provider a letter of credit as acceptable to Transmission Provider (Designated Entity Letter of Credit) or cash security in the amount of $11,708,274, which is three percent of the estimated cost of the Project. Designated Entity is required provide and maintain the Designated Entity Letter of Credit, as required by Section 1.5.8(j) of Schedule 6 of the Operating Agreement and Section 3.0 of this Agreement. The Designated Entity Letter of Credit shall remain in full force and effect for the term of this Agreement and for the duration of the obligations arising therefrom in accordance with Article 17.0.

**3.1     Distribution of Designated Entity Letter of Credit or Cash Security.**

In the event that Transmission Provider draws upon the Designated Entity Letter of Credit or retains the cash security in accordance with Sections 7.5, 8.0, or 8.1, Transmission Provider shall distribute such funds as determined by FERC.

## Article 4 – Project Construction

**4.0     Construction of Project by Designated Entity.**

Designated Entity shall design, engineer, procure, install and construct the Project, including any modifications thereto, in accordance with: (i) the terms of this Agreement, including but not limited to the Scope of Work in Schedule B and the Development Schedule in Schedule C; (ii) applicable reliability principles, guidelines, and standards of the Applicable Regional Reliability Council and NERC; (iii) the Operating Agreement; (iv) the PJM Manuals; and (v) Good Utility Practice.

**4.1     Milestones.**

**4.1.0     Milestone Dates.**

Designated Entity shall meet the milestone dates set forth in the Development Schedule in Schedule C of this Agreement. Milestone dates set forth in Schedule C only may be extended by Transmission Provider in writing. Failure to meet any of the milestone dates specified in Schedule C, or as extended as described in this Section 4.1.0 or Section 4.3.0 of this Agreement, shall constitute a Breach of this Agreement. Transmission Provider reasonably may extend any such milestone date, in the event of delays not caused by the Designated Entity that could not be remedied by the Designated Entity through the exercise of due diligence, or if an extension will not delay the Required Project In-Service Date specified in Schedule C of this Agreement; provided that a corporate officer of the Designated Entity

submits a revised Development Schedule containing revised milestones and showing the Project in full operation no later than the Required Project In-Service Date specified in Schedule C of this Agreement.

### 4.1.1    Right to Inspect.

Upon reasonable notice, Transmission Provider shall have the right to inspect the Project for the purposes of assessing the progress of the Project and satisfaction of milestones.   Such inspection shall not be deemed as review or approval by Transmission Provider of any design or construction practices or standards used by the Designated Entity.

## 4.2    Applicable Technical Requirements and Standards.

For the purposes of this Agreement, applicable technical requirements and standards of the Transmission Owner(s) to whose facilities the Project will interconnect shall apply to the design, engineering, procurement, construction and installation of the Project to the extent that the provisions thereof relate to the interconnection of the Project to the Transmission Owner(s) facilities.

## 4.3    Project Modification.

### 4.3.0    Project Modification Process.

The Scope of Work and Development Schedule, including the milestones therein, may be revised, as required, in accordance with Transmission Provider's project modification process set forth in the PJM Manuals, or otherwise by Transmission Provider in writing.   Such modifications may include alterations as necessary and directed by Transmission Provider to meet the system condition for which the Project was included in the Regional Transmission Expansion Plan.

### 4.3.1    Consent of Transmission Provider to Project Modifications.

Designated Entity may not modify the Project without prior written consent of Transmission Provider, including but not limited to, modifications necessary to obtain siting approval or necessary permits, which consent shall not be unreasonably withheld, conditioned, or delayed.

### 4.3.2    Customer Facility Interconnections And Transmission Service Requests.

Designated Entity shall perform or permit the engineering and construction necessary to accommodate the interconnection of Customer Facilities to the Project and transmission service requests that are determined necessary for such interconnections and transmission service requests in accordance with Parts IV and VI, and Parts II and III, respectively, of the Tariff.

## 4.4    Project Tracking.

The Designated Entity shall provide regular, quarterly construction status reports in writing to Transmission Provider.   The reports shall contain, but not be limited to, updates and information specified in the PJM Manuals regarding: (i) current engineering and construction status of the Project; (ii) Project completion percentage, including milestone completion; (iii) current target Project or phase completion date(s); (iv) applicable outage information; and (v) cost expenditures to date and revised projected cost estimates for completion of the Project.   Transmission Provider shall use such status reports to post updates regarding the progress of the Project.

## 4.5    Exclusive Responsibility of Designated Entity.

Designated Entity shall be solely responsible for all planning, design, engineering, procurement, construction, installation, management, operations, safety, and compliance with applicable laws and regulations associated with the Project, including but not limited to obtaining all necessary permits, siting, and other regulatory approvals.   Transmission Provider shall have no responsibility to manage, supervise, or ensure compliance or adequacy of same.

## Article 5 – Coordination with Third-Parties

**5.0      Interconnection Coordination Agreement with Transmission Owner(s).**

By the dates specified in the Development Schedule in Schedule C of this Agreement, Designated Entity shall execute or request to file unexecuted with the Commission: (a) an Interconnection Coordination Agreement; and (b) an interconnection agreement among and between Designated Entity, Transmission Provider, and the Transmission Owner(s) to whose facilities the Project will interconnect.

**5.1      Connection with Entities Not a Party to the Consolidated Transmission Owners Agreement.**

Designated Entity shall not permit any part of the Project facilities to be connected with the facilities of any entity which is not: (i) a party to Consolidated Transmission Owners Agreement without an interconnection agreement that contains provisions for the safe and reliable interconnection and operation of such interconnection in accordance with Good Utility Practice, and principles, guidelines and standards of the Applicable Regional Reliability Council and NERC or comparable requirements of an applicable retail tariff or agreement approved by appropriate regulatory authority; or (ii) a party to a separate Designated Entity Agreement.

## Article 6 – Insurance

**6.0      Designated Entity Insurance Requirements.**

Designated Entity shall obtain and maintain in full force and effect such insurance as is consistent with Good Utility Practice.   The Transmission Provider shall be included as an Additional Insured in the Designated Entity's applicable liability insurance policies.   The Designated Entity shall provide evidence of compliance with this requirement upon request by the Transmission Provider.

**6.1      Subcontractor Insurance.**

In accord with Good Utility Practice, Designated Entity shall require each of its subcontractors to maintain and, upon request, provide Designated Entity evidence of insurance coverage of types, and in amounts, commensurate with the risks associated with the services provided by the subcontractor. Bonding and hiring of contractors or subcontractors shall be the Designated Entity's discretion, but regardless of bonding or the existence or non-existence of insurance, the Designated Entity shall be responsible for the performance or non-performance of any contractor or subcontractor it hires.

## Article 7 – Breach and Default

**7.0      Breach.**

Document Accession #: 20240510-5089    Filed Date: 05/10/2024

Except as otherwise provided in Article 10, a Breach of this Agreement shall include:

      (a)     The failure to comply with any term or condition of this Agreement, including but not limited to, any Breach of a representation, warranty, or covenant made in this Agreement, and failure to provide and maintain security in accordance with Section 3.0 of this Agreement;

      (b)     The failure to meet a milestone or milestone date set forth in the Development Schedule in Schedule C of this Agreement, or as extended in writing as described in Sections 4.1.0 and 4.3.0 of this Agreement;

      (c)     Assignment of this Agreement in a manner inconsistent with the terms of this Agreement; or

      (d)     Failure of any Party to provide information or data required to be provided to another Party under this Agreement for such other Party to satisfy its obligations under this Agreement.

**7.1**     **Notice of Breach.**

In the event of a Breach, a Party not in Breach of this Agreement shall give written notice of such Breach to the breaching Party, and to any other persons, including a Project Finance Entity, if applicable, that the breaching Party identifies in writing prior to the Breach.   Such notice shall set forth, in reasonable detail, the nature of the Breach, and where known and applicable, the steps necessary to cure such Breach.

**7.2**     **Cure and Default.**

A Party that commits a Breach and does not take steps to cure the Breach pursuant to Section 7.3 shall be in Default of this Agreement.

**7.3**     **Cure of Breach.**

The breaching Party may:   (i) cure the Breach within thirty days from the receipt of the notice of Breach or other such date as determined by Transmission Provider to ensure that the Project meets its Required Project In-Service Date set forth in Schedule C; or, (ii) if the Breach cannot be cured within thirty days but may be cured in a manner that ensures that the Project meets the Required Project In-Service Date for the Project, within such thirty day time period, commences in good faith steps that are reasonable and appropriate to cure the Breach and thereafter diligently pursue such action to completion.

**7.4**     **Re-evaluation if Breach Not Cured.**

In the event that a breaching Party does not cure a Breach in accordance with Section 7.3 of this Agreement, Transmission Provider shall conduct a re-evaluation pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement.   If based on such re-evaluation, the Project is retained in the Regional Transmission Expansion Plan and the Designated Entity's designation for the Project also is retained, the Parties shall modify this Agreement, including Schedules, as necessary.   In all other events, Designated Entity shall be considered in Default of this Agreement, and this Agreement shall terminate in accordance with Section 8.1 of this Agreement.

**7.5**     **Remedies.**

Upon the occurrence of an event of Default, the non-Defaulting Party shall be entitled to:   (i) commence an action to require the Defaulting Party to remedy such Default and specifically perform its duties and

obligations hereunder in accordance with the terms and conditions hereof; (ii) suspend performance hereunder; and (iii) exercise such other rights and remedies as it may have in equity or at law.   Upon Default by Designated Entity, Transmission Provider may draw upon the Designated Entity Letter of Credit.   Nothing in this Section 7.5 is intended in any way to affect the rights of a third-party to seek any remedy it may have in equity or at law from the Designated Entity resulting from Designated Entity's Default of this Agreement.

**7.6        Remedies Cumulative.**

No remedy conferred by any provision of this Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.   The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**7.7        Waiver.**

Any waiver at any time by any Party of its rights with respect to a Breach or Default under this Agreement, or with respect to any other matters arising in connection with this Agreement, shall not be deemed a waiver or continuing waiver with respect to any other Breach or Default or other matter.

**Article 8 – Early Termination**

**8.0        Termination by Transmission Provider.**

In the event that:   (i) pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement, Transmission Provider determines to remove the Project from the Regional Transmission Expansion Plan and/or not to retain Designated Entity's status for the Project; (ii) Transmission Provider otherwise determines pursuant to Regional Transmission Expansion Planning Protocol in Schedule 6 of the Operating Agreement that the Project is no longer required to address the specific need for which the Project was included in the Regional Transmission Expansion Plan; or (iii) an event of force majeure, as defined in section 10.0 of this Attachment KK, or other event outside of the Designated Entity's control that, with the exercise of Reasonable Efforts, Designated Entity cannot alleviate and which prevents the Designated Entity from satisfying its obligations under this Agreement, Transmission Provider may terminate this Agreement by providing written notice of termination to Designated Entity, which shall become effective the later of sixty calendar days after the Designated Entity receives such notice or other such date the FERC establishes for the termination.   In the event termination pursuant to this Section 8.0 is based on (ii) or (iii) above, Transmission Provider shall not have the right to draw upon the Designated Entity Letter of Credit or retain the cash security and shall cancel the Designated Entity Letter of Credit or return the cash security within thirty days of the termination of this Agreement.

**8.1        Termination by Default.**

This Agreement shall terminate in the event a Party is in Default of this Agreement in accordance with Sections 7.2 or 7.4 of this Agreement.   Upon Default by Designated Entity, Transmission Provider may draw upon the Designated Entity Letter of Credit or retain the cash security.

**8.2        Filing at FERC.**

Transmission Provider shall make the appropriate filing with FERC as required to effectuate the termination of this Agreement pursuant to this Article 8.

## Article 9 – Liability and Indemnity

**9.0    Liability.**

For the purposes of this Agreement, Transmission Provider's liability to the Designated Entity, any third-party, or any other person arising or resulting from any acts or omissions associated in any way with performance under this Agreement shall be limited in the same manner and to the same extent that Transmission Provider's liability is limited to any Transmission Customer, third-party or other person under Section 10.2 of the Tariff arising or resulting from any act or omission in any way associated with service provided under the Tariff or any Service Agreement thereunder.

**9.1    Indemnity.**

For the purposes of this Agreement, Designated Entity shall at all times indemnify, defend, and save Transmission Provider and its directors, managers, members, shareholders, officers and employees harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third-parties, arising out of or resulting from the Transmission Provider's acts or omissions associated with the performance of its obligations under this Agreement to the same extent and in the same manner that a Transmission Customer is required to indemnify, defend and save Transmission Provider and its directors, managers, members, shareholders, officers and employees harmless under Section 10.3 of the Tariff.

## Article 10 – Force Majeure

**10.0    Force Majeure.**

For the purpose of this section, an event of force majeure shall mean any cause beyond the control of the affected Party, including but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightening, epidemic, war, riot, civil disturbance or disobedience, labor dispute, labor or material shortage, sabotage, acts of public enemy, explosions, orders, regulations or restrictions imposed by governmental, military, or lawfully established civilian authorities, which in any foregoing cases, by exercise of due diligence, it has been unable to overcome.   An event of force majeure does not include: (i) a failure of performance that is due to an affected Party's own negligence or intentional wrongdoing; (ii) any removable or remedial causes (other than settlement of a strike or labor dispute) which an affected Party fails to remove or remedy within a reasonable time; or (iii) economic hardship of an affected Party.

**10.1    Notice.**

A Party that is unable to carry out an obligation imposed on it by this Agreement due to Force Majeure shall notify the other Party in writing within a reasonable time after the occurrence of the cause relied on.

**10.2    Duration of Force Majeure.**

A Party shall not be responsible for any non-performance or considered in Breach or Default under this Agreement, for any deficiency or failure to perform any obligation under this Agreement to the extent that such failure or deficiency is due to Force Majeure.   A Party shall be excused from whatever performance is affected only for the duration of the Force Majeure and while the Party exercises Reasonable Efforts to

alleviate such situation.   As soon as the non-performing Party is able to resume performance of its obligations excused because of the occurrence of Force Majeure, such Party shall resume performance and give prompt notice thereof to the other Party.   In the event that Designated Entity is unable to perform any of its obligations under this Agreement because of an occurrence of Force Majeure, Transmission Provider may terminate this Agreement in accordance with Section 8.0 of this Agreement.

**10.3     Breach or Default of or Force Majeure under Interconnection Coordination Agreement**

If either of the following events prevents Designated Entity from performing any of its obligations under this Agreement, such event shall be considered a Force Majeure event under this Agreement and the provisions of this Article 10 shall apply:   (i) a breach or default of the Interconnection Coordination Agreement associated with the Project by a party to the Interconnection Coordination Agreement other than the Designated Entity; or (ii) an event of Force Majeure under the Interconnection Coordination Agreement associated with the Project.

**Article 11 – Assignment**

**11.0     Assignment.**

A Party may assign all of its rights, duties, and obligations under this Agreement in accordance with this Section 11.0.   Except for assignments described in Section 11.1 of this Agreement that may not result in the assignment of all rights, duties, and obligations under this Agreement to a Project Finance Entity, no partial assignments will be permitted.   No Party may assign any of its rights or delegate any of its duties or obligations under this Agreement without prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.   Any such assignment or delegation made without such written consent shall be null and void.   Assignment by the Designated Entity shall be contingent upon, prior to the effective date of the assignment: (i) the Designated Entity or assignee demonstrating to the satisfaction of Transmission Provider that the assignee has the technical competence and financial ability to comply with the requirements of this Agreement and to construct the Project consistent with the assignor's cost estimates for the Project; and (ii) the assignee is eligible to be a Designated Entity for the Project pursuant to Sections 1.5.8(a) and (f) of Schedule 6 of the Operating Agreement.   Except as provided in an assignment to a Finance Project Entity to the contrary, for all assignments by any Party, the assignee must assume in a writing, to be provided to the other Party, all rights, duties, and obligations of the assignor arising under this Agreement.   Any assignment described herein shall not relieve or discharge the assignor from any of its obligations hereunder absent the written consent of the other Party. In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement.   Any assignees that will construct, maintain, or operate the Project shall be subject to, and comply with the terms of this Agreement, the Tariff and the Operating Agreement.

**11.1     Project Finance Entity Assignments**

**11.1.1     Assignment to Project Finance Entity**

If an arrangement between the Designated Entity and a Project Finance Entity provides that the Project Finance Entity may assume any of the rights, duties and obligations of the Designated Entity under this Agreement or otherwise provides that the Project Finance Entity may cure a Breach of this Agreement by the Designated Entity, the Project Finance Entity may be assigned this Agreement or any of the rights, duties, or obligations hereunder only upon written consent of the Transmission Provider, which consent shall not be unreasonably withheld, conditioned, or delayed.   In no circumstance, shall an assignment of

this Agreement or any of the rights, duties, and obligations under this Agreement diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement.

### 11.1.2   Assignment By Project Finance Entity

A Project Finance Entity that has been assigned this Agreement or any of the rights, duties or obligations under this Agreement or otherwise is permitted to cure a Breach of this Agreement, as described pursuant to Section 11.1.1 above, may assign this Agreement or any of the rights, duties or obligations under this Agreement to another entity not a Party to this Agreement only: (i) upon the Breach of this Agreement by the Designated Entity; and (ii) with the written consent of the Transmission Provider, which consent shall not be unreasonably withheld, conditioned, or delayed.   In no circumstance, shall an assignment of this Agreement or any of the rights, duties, and obligations under this Agreement alter or diminish the rights of the Transmission Provider under this Agreement, the Tariff, or the Operating Agreement.   Any assignees that will construct, maintain, or operate the Project shall be subject to, and comply with the Tariff and Operating Agreement.

### Article 12 – Information Exchange

## 12.0     Information Access.

Subject to Applicable Laws and Regulations, each Party shall make available to the other Party information necessary to carry out each Party's obligations and responsibilities under this Agreement, the Operating Agreement, and the Tariff.   Such information shall include but not be limited to, information reasonably requested by Transmission Provider to prepare the Regional Transmission Expansion Plan. The Parties shall not use such information for purposes other than to carry out their obligations or enforce their rights under this Agreement, the Operating Agreement, and the Tariff.

## 12.1     Reporting of Non-Force Majeure Events.

Each Party shall notify the other Party when it becomes aware of its inability to comply with the provisions of this Agreement for a reason other than Force Majeure.   The Parties agree to cooperate with each other and provide necessary information regarding such inability to comply, including, but not limited to, the date, duration, reason for the inability to comply, and corrective actions taken or planned to be taken with respect to such inability to comply.   Notwithstanding the foregoing, notification, cooperation or information provided under this Section 12.1 shall not entitle the receiving Party to allege a cause of action for anticipatory Breach of this Agreement.

### Article 13 – Confidentiality

## 13.0     Confidentiality.

For the purposes of this Agreement, information will be considered and treated as Confidential Information only if it meets the definition of Confidential Information set forth in Section 1.1 of this Agreement and is clearly designated or marked in writing as "confidential" on the face of the document, or, if the information is conveyed orally or by inspection, if the Party providing the information orally informs the Party receiving the information that the information is "confidential."   Confidential Information shall be treated consistent with Section 18.17 of the Operating Agreement.   A Party shall be responsible for the costs associated with affording confidential treatment to its information.

## Article 14 – Regulatory Requirements

### 14.0    Regulatory Approvals.

Designated Entity shall seek and obtain all required government authority authorizations or approvals as soon as reasonably practicable, and by the milestone dates set forth in the Development Schedule of Schedule C of this Agreement, as applicable.

## Article 15 – Representations and Warranties

### 15.0    General.

Designated Entity hereby represents, warrants and covenants as follows, with these representations, warranties, and covenants effective as to the Designated Entity during the full time this Agreement is effective:

#### 15.0.1    Good Standing

Designated Entity is duly organized or formed, as applicable, validly existing and in good standing under the laws of its State of organization or formation, and is in good standing under the laws of the respective State(s) in which it is incorporated.

#### 15.0.2    Authority

Designated Entity has the right, power and authority to enter into this Agreement, to become a Party thereto and to perform its obligations hereunder.  This Agreement is a legal, valid and binding obligation of Designated Entity, enforceable against Designated Entity in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

#### 15.0.3    No Conflict.

The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of Designated Entity, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon Designated Entity or any of its assets.

## Article 16 – Operation of Project

### 16.0    Initial Operation.

The following requirements shall be satisfied prior to Initial Operation of the Project:

#### 16.0.1    Execution of the Consolidated Transmission Owners Agreement

Designated Entity has executed the Consolidated Transmission Owners Agreement and is able to meet all requirements therein.

### 16.0.2 Execution of an Interconnection Agreement

Designated Entity has executed an Interconnection Agreement with the Transmission Owner(s) to whose facilities the Project will interconnect, or such agreement has been filed unexecuted with the Commission.

### 16.0.3   Operational Requirements

The Project must meet all applicable operational requirements described in the PJM Manuals.

### 16.0.4   Parallel Operation

Designated Entity shall have all necessary systems and personnel in place to allow for parallel operation of its facilities with the facilities of the Transmission Owner(s) to which the Project is interconnected consistent with the Interconnection Coordination Agreement associated with the Project.

### 16.0.5   Synchronization

Designated Entity shall have received any necessary authorization from Transmission Provider and the Transmission Owner(s) to whose facilities the Project will interconnect to synchronize with the Transmission System or to energize, as applicable, per the determination of Transmission Provider, the Project.

## 16.1     Partial Operation.

If the Project is to be completed in phases, the completed part of the Project may operate prior to completion and Required Project In-Service Date set forth in Schedule C of this Agreement, provided that: (i) Designated Entity has notified Transmission Provider of the successful completion of the Project phase; (ii) Transmission Provider has determined that partial operation of the Project will not negatively impact the reliability of the Transmission System; (iii) Designated Entity has demonstrated that the requirements for Initial Operation set forth in Section 16.0 of this Agreement have been met for the Project phase; and (iv) partial operation of the Project is consistent with Applicable Laws and Regulations, Applicable Reliability Standards, and Good Utility Practice.

## Article 17 – Survival

## 17.0     Survival of Rights.

The rights and obligations of the Parties in this Agreement shall survive the termination, expiration, or cancellation of this Agreement to the extent necessary to provide for the determination and enforcement of said obligations arising from acts or events that occurred while this Agreement was in effect.   The Liability and Indemnity provisions in Article 9 also shall survive termination, expiration, or cancellation of this Agreement.

## Article 18 – Non-Standard Terms and Conditions

**18.0    Schedule E – Addendum of Non-Standard Terms and Conditions.**

Subject to FERC acceptance or approval, the Parties agree that the terms and conditions set forth in the attached Schedule E are hereby incorporated by reference, and made a part of, this Agreement.   In the event of any conflict between a provision of Schedule E that FERC has accepted and any provision of the standard terms and conditions set forth in this Agreement that relates to the same subject matter, the pertinent provision of Schedule E shall control.

**Article 19 – Miscellaneous**

**19.0    Notices.**

Any notice or request made to or by any Party regarding this Agreement shall be made by U.S. mail or reputable overnight courier to the addresses set forth below:

> Transmission Provider:
> PJM Interconnection, L.L.C.
> 2750 Monroe Blvd.
> Audubon, PA 19403
> Attention: Manager, Transmission Coordination & Analysis
>
> Designated Entity:
> PSEG Renewable Transmission LLC
> 80 Park Plaza
> Newark, NJ 07102
> Attention: Deputy General Counsel - Regulatory
>        Moskowitz, Jodi L. (Jodi.Moskowitz@pseg.com)
>
>
> With copies to:
> Jason Kalwa (Jason.kalwa@pseg.com)
> Elizabeth Gostkowski (elizabeth.gostkowski@pseg.com)
> Heather Svenson (Heather.Svenson@pseg.com)
> Ana Murteira (Ana.Murteira@pseg.com)

**19.1    No Transmission Service.**

This Agreement does not entitle the Designated Entity to take Transmission Service under the Tariff.

**19.2    No Rights.**

Neither this Agreement nor the construction or the financing of the Project entitles Designated Entity to any rights related to Customer-Funded Upgrades set forth in Subpart C of Part VI of the Tariff.

**19.3    Standard of Review.**

Future modifications to this Agreement by the Parties or the FERC shall be subject to the just and reasonable standard and the Parties shall not be required to demonstrate that such modifications are required to meet the "public interest" standard of review as described in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

### 19.4    No Partnership.

Notwithstanding any provision of this Agreement, the Parties do not intend to create hereby any joint venture, partnership, association taxable as a corporation, or other entity for the conduct of any business for profit.

### 19.5    Headings.

The Article and Section headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

### 19.6    Interpretation.

Wherever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms.   The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

### 19.7    Severability.

Each provision of this Agreement shall be considered severable and if for any reason any provision is determined by a court or regulatory authority of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect and shall in no way be affected, impaired or invalidated, and such invalid, void or unenforceable provision shall be replaced with valid and enforceable provision or provisions which otherwise give effect to the original intent of the invalid, void or unenforceable provision.

### 19.8    Further Assurances.

Each Party hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

### 19.9    Counterparts.

This Agreement may be executed in multiple counterparts to be construed as one effective as of the Effective Date.

### 19.10    Governing Law

This Agreement shall be governed under the Federal Power Act and Delaware law, as applicable.

### 19.11    Incorporation of Other Documents.

The Tariff, the Operating Agreement, and the Reliability Assurance Agreement, as they may be amended from time to time, are hereby incorporated herein and made a part hereof.

Document Accession #: 20240510-5089    Filed Date: 05/10/2024

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officials.

**Transmission Provider:   PJM Interconnection, L.L.C.**

|  | Manager, Transmission |  |
|---|---|---|
| By: _/s/ Augustine C. Caven_ | Coordination & Analysis | 4/11/2024 |
| Name | Title | Date |

Printed name of signer: ___Augustine C. Caven_____

**Designated Entity:   PSEG Renewable Transmission LLC**

| By: _/s/ Lathrop Craig_____ | President_____ | 4/9/2024_____ |
|---|---|---|
| Name | Title | Date |

Printed name of signer: ___Lathrop Craig_____

**SCHEDULE A**

**Description of Projects**

| PJM Baseline Upgrade IDs | Description of Projects |
|---|---|
|  |  |

Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion).
Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion).

**SCHEDULE B**

**Scope of Work**

| PJM Baseline Upgrade ID | Scopes of Work |
|---|---|
| | Construct 31.6 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (APS zone portion). |
| | Construct 35.8 miles of 500 kV overhead AC line between the Conastone vicinity and the Doubs substations (BGE zone portion). |

## SCHEDULE C

### Development Schedule

Designated Entity shall ensure and demonstrate to the Transmission Provider that it timely has met the following milestones and milestone dates and that the milestones remain in good standing:

| Execute Interconnection Coordination Agreement: On or before this date, Designated Entity must execute the Interconnection Coordination Agreement or request the agreement be filed unexecuted. | Demonstrate Adequate Project Financing: On or before this date, Designated Entity must demonstrate that adequate project financing has been secured. Project financing must be maintained for the term of this Agreement | Acquisition of all necessary federal, state, county, and local site permits: On or before this date, Designated Entity must demonstrate that all required federal, state, county and local site permits have been acquired. | Required Project In-Service Date: On or before this date, Designated Entity must: (i) demonstrate that the Project is completed in accordance with the Scope of Work in Schedules B of this Agreement; (ii) meets the criteria outlined in Schedule D of this Agreement; and (iii) is under Transmission Provider operational dispatch. |
|---|---|---|---|
| 12/31/2024 | 9/1/2024 | 9/1/2026 | 6/1/2027 |
| 12/31/2024 | 9/1/2024 | 9/1/2026 | 6/1/2027 |

## SCHEDULE D

### PJM Planning Requirements and Criteria and Required Ratings

| | **(MVA):** | |
|---|---|---|
| | 3341SN/4156SE/3759WN/4595WE | Projects that comprise 2022 RTEP Window 3 Recommended Solution collectively address the 2027/28 baseline local and regional constraints associated with Data Center load additions in APS and Dominion zones, reactive power needs, and the cumulative impact of over 11,000 MW of generation changes and deactivations. These projects all adhere to all applicable planning criteria, including PJM, NERC, SERC, RFC and local Transmission Owner FERC 715 criteria. |
| | 3341SN/4156SE/3759WN/4595WE | |

## SCHEDULE E

## Non-Standard Terms and Conditions

1.  These non-standard terms and conditions set forth in this Schedule E are in addition to the roles and responsibilities between PJM and the Designated Entity as set forth in the remainder of this Designated Entity Agreement.

2.  The inclusion of the cost commitment language in this Schedule E is not intended to preempt the right of any party to seek modifications to be ordered by FERC or otherwise challenge the recovery of costs through the FERC ratemaking process.

3.  The Designated Entity shall notify PJM in writing within a reasonable time after the Designated Entity becomes aware of a condition that would result in (i) the cost commitment set forth in this Schedule E being exceeded or (ii) triggering any exclusions to the cost commitment. PJM, in turn, will communicate such information to stakeholders via notice posted on PJM's website and to FERC by written notice.

### I.    Construction Cost Cap:

The Designated Entity agrees that it will not seek recovery through its Annual Transmission Revenue Requirement of any *Construction Costs* in excess of an amount equal to the <u>lesser</u> of:

    (i)     the *Construction Cost Cap Amount*; or

    (ii)    the aggregate amount of actual *Construction Costs* associated with the *Project*.

### II.    Force Majeure:

Section 10.0 of the Designated Entity Agreement is modified to include the following as events of Force Majeure:

| | | |
|---|---|---|
| (i) | any material modifications to the schedule, routing or Scope of Work that results from a PJM directed change in scope or schedule or settlement agreements within the siting process, or are imposed or required by any other governmental agency; | |
| (ii) | changes in applicable laws and regulations, or interpretations thereof by governmental agencies; | |
| (iii) | any orders of courts or action or inaction by governmental agencies or executive orders; or | |
| (iv) | the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on of any permit, that is not the result of a lack of reasonable diligence of the Designated Entity, provided, however, that the contesting in good faith any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as lack of reasonable diligence. | |

For purpose of clarity, Section 10.0(iii) of the Designated Entity Agreement regarding "economic hardship" that does not qualify as a Force Majeure shall not be applicable to events that are both a Force Majeure and an Uncontrollable Cost such that the relief provided for in Section 10.2 of the Designated Entity Agreement shall apply and the Uncontrollable Cost portion of Construction Cost Cap Amount will be increased as permitted by this Schedule E.

### III.    Return on Equity; Capital Structure and Incentives:

1.    Return on Equity

The Return on Equity ("ROE") shall be 9.6%. The ROE shall continue in effect, unless or until modified by FERC pursuant to Sections 205 or 206 of the Federal Power Act.

2.    Capital Structure

The capital structure to be used during construction shall be 45% equity and 55% debt ("Hypothetical Capital Structure"). As of the Project Availability Date, the Designated Entity's actual capital structure shall be used in the formula rate. The Designated Entity shall maintain an actual capital structure of up to 45% equity. This provision will apply to the Project, unless or until modified by the Commission pursuant to Section 205 or 206 of the Federal Power Act. All actual costs incurred based upon long-term debt outstanding shall be recoverable through the formula rate.

3.    Transmission Rate Incentives

Designated Entity intends to file with FERC for the following non-ROE incentives: (i) recovery of 100% of all prudently incurred costs in the event that the Project is abandoned for reasons outside of the Designated Entity's control; (ii) a hypothetical capital structure of 45% equity and 55% debt; and (iii) the establishment of a regulatory asset for pre-commercial operations costs for deferred cost recovery.

### IV.    Defined Terms:

As used herein, the capitalized terms have the meaning ascribed to them in the Designated Entity Agreement and as provided below:

1.    "**Bid Submission Date**" means May 31, 2023.

2.    "**Construction Costs**" means any and all costs and expenses directly or indirectly incurred by the *Designated Entity* to develop, construct, complete, start-up and commission the *Project* and place the *Project* in service in accordance with *Scope of Work*, including without limitation any costs and expenses incurred by the *Designated Entity* in connection with the following, in each case as and to the extent contemplated by the *Scope of Work*:

    a.  obtaining permits and other governmental approvals for the *Project*,
    b.  acquiring land and land rights for the *Project*,
    c.  performing any environmental assessments or environmental mitigation activities in connection with the *Project*,
    d.  designing and engineering the *Project*,
    e.  procuring any equipment, supplies and other materials required to complete construction of the *Project* and place the *Project* in service,
    f.  sales tax or other similar taxes applicable to the *Scope of Work* associated with the *Project*, and
    g.  otherwise performing or completing any and all development and construction-related activities required in connection with the *Project* as part of *Scope of Work* including but not limited to all site clearing, equipment assembly and erection, testing and commissioning activities contemplated by the *Scope of Work*, whether performed directly by *Designated Entity* or by one or more third parties retained by *Designated Entity* (without regard to whether such third parties are affiliated or non-affiliated).

3.    "**Construction Cost Cap Amount**" means 1.2 times $390,275,805 in 2023 dollars as adjusted by (x) the Escalation Index Number published for the later of the first [January 1 or July 1] preceding the Project Availability Date and the denominator of which is the Escalation Index Number published for July 1, 2023; (y) plus *Uncontrollable Costs* and (z) plus any sales tax associated with the *Project*.

4.    "**Escalation Index Number**" means, as of any [January 1 or July 1], the number referenced in the Handy-Whitman Index for such date under Table E-1 "Cost Trends of Electric Utility Construction: North Atlantic Region," line 33, "Total Transmission Plant" or if the Handy-Whitman Index is no longer available the Parties will replace with a comparable index.

5.    "**Project**" means the work described in Schedule A.

6.    "**Project Availability Date**" means the date the Project is available for commercial use.

7.    "**Scope of Work**" means the approved scope of work for the Project.

8.    "**Uncontrollable Cost**" means:
    a.  *(Changes in Scope and Schedule)* any material modifications to the *Development Schedule*, routing or *Scope of Work* that results from a PJM directed change to scope or schedule, or settlement agreement within the

siting process, or are imposed or required by any other governmental or regulatory agency;

b.   *(Changes in Law)* any material change in the enforcement, interpretation or application of any statute, rule, regulation, order or other applicable law existing as of the *Bid Submission Date* or the issuance or enactment of any of the foregoing on or after the Bid Submission Date;

c.   *(Governmental Orders)* any orders of courts or action or inaction by governmental agencies or executive orders;

d.   *(Environmental Mitigations)* the costs to address environmental conditions and mitigation efforts, including, but not limited to, the investigation and/or remediation of hazardous substances and wetlands mitigations, that are not the result of *Designated Entity's* failure to comply with environmental laws;

e.   *(Geotechnical Data)* geotechnical information that is not in possession of the *Designated Entity* as of the *Bid Submission Date*;

f.   *(Damage and Delays)* any destruction of or damage to any portion of the Project (not caused by *Designated Entity* or any contractors or subcontractors), or any interruption, suspension or interference with *Designated Entity's* (or any of its contractor's or subcontractor's) performance of activities required to complete the *Project*, which destruction, damage, interruption, suspension or interference is caused by events outside of *Designated Entity's* reasonable control, including landslides; lightning; earthquakes; hurricanes; tornadoes; typhoons; or similar severe weather events; fires or explosions; floods; epidemic; acts of a public enemy; acts or threats of terrorism; wars; blockades; riots; rebellions; sabotage; vandalism; insurrections; environmental contamination or damage not caused by *Designated Entity* (or any contractors or subcontractors); strike or labor disruption or civil disturbances (or governmental actions arising from any of the foregoing);

g.   *(Permitting Delays)* the denial of an application for, delay in the review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or failure of issuance or renewal on or after the *Bid Submission Date* of any permit, license, approval or consent to the extent that such denial, delay, suspension, termination, interruption, imposition or failure interferes with the performance of this Agreement or adversely impacts the *Project's* ability to meet the anticipated *Project Availability* date of June 1, 2027, and to the extent that such denial, delay, suspension, termination, interruption, imposition or failure is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the *Designated Entity*; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition or failure shall not be construed as such a willful misconduct or negligent action or omission or lack of reasonable diligence;

h.  *(Route Changes)* any changes in the *Project* route not caused by the *Designated Entity*;

i.  *(Real Estate Costs)* cost of real estate that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*;

j.  *(Access Road Costs)* cost to acquire access roads to the *Project* that is in excess of the amount provided in *Designated Entities'* proposal as of the *Bid Submission Date*; and

k.  (*Breach of by Transmission Provider*) any Breach and Default by *Transmission Provider* of its obligations under this *Designated Entity Agreement* or any request by *Transmission Provider* to delay or suspend any activities associated with the *Project* or any Breach and Default, by any *Transmission Provider* under or in connection with an Interconnection Coordination Agreement or any interconnection agreement.

Case 1:25-cv-03392-ABA     Document 1-1     Filed 10/14/25     Page 103 of 169

Document Content(s)

Transmittal Letter.pdf...........................................................1
Attachment A - Clean Agreement.pdf..............................................8
Attachment B - Signature Page.pdf..............................................34
Attachment C.pdf...............................................................36
FERC GENERATED TARIFF FILING.rtf..............................................41

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, DC  20426

OFFICE OF ENERGY MARKET REGULATION

PJM Interconnection, L.L.C.
Docket No. ER24-1990-001

Issued: September 10, 2024

On May 10, 2024, as amended on July 31, 2024, PJM Interconnection, L.L.C. (PJM) submitted a designated entity agreement (DEA), assigned Service Agreement No. 7226, between PJM as a transmission provider and PSEG Renewable Transmission LLC as a designated entity.[1]  PJM requested that the filing be accepted effective April 11, 2024.  Pursuant to authority delegated to the Director, Division of Electric Power Regulation – East, under 18 C.F.R. § 375.307, the submittal is accepted for filing, effective April 11, 2024, as requested.[2]

The filing was publicly noticed.  No protests or adverse comments were filed.  Pursuant to Rule 214 of the Commission's regulations (18 C.F.R. § 385.214), notices of intervention, timely-filed motions to intervene, and any unopposed motions to intervene out-of-time filed before the issuance date of this order are granted.

This action does not constitute approval of any service, rate, charge, classification, or any rule, regulation, contract, or practice affecting such rate or service provided for in the filed document(s); nor shall such action be deemed as recognition of any claimed contractual right or obligation affecting or relating to such service or rate; and such action is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against the applicant(s).

This order constitutes final agency action.  Requests for rehearing by the Commission may be filed within 30 days of the date of issuance of this order, pursuant to 18 C.F.R. § 385.713.

Issued by:  Kurt M. Longo, Director, Division of Electric Power Regulation – East

---

[1] PJM Interconnection, L.L.C., PJM Service Agreements Tariff, PJM SA No. 7226, PJM SA No. 7226 between PJM and PSEG (0.1.0).

[2] *See* 18 C.F.R. § 35.3(a)(2).

Exhibit "1C"

Document Content(s)
ER24-1990-001 DLO.docx.................................................1

**COMMISSIONERS**

**FREDERICK H. HOOVER, JR.**
CHAIR

**MICHAEL T. RICHARD**
**KUMAR P. BARVE**
**BONNIE A. SUCHMAN**

**STATE OF MARYLAND**



# PUBLIC SERVICE COMMISSION

January 10, 2025

| | | |
|---|---|---|
| PSEG Renewable Transmission LLC's Application for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll and Frederick Counties | * * * * * * | Case No. 9773 |

\* \* \* \* \*

## NOTICE OF INTERVENTION DEADLINE AND REQUESTED COMPLETENESS DETERMINATION

On December 31, 2024, PSEG Renewable Transmission LLC ("PSEG Renewable Transmission" or "Applicant") filed an application for a Certificate of Public Convenience and Necessity ("CPCN") for authority to construct the Maryland Piedmont Reliability Project ("MPRP" or "the Maryland Piedmont Reliability Project").[1] As proposed, the MPRP is an approximately 67-mile, 500 kV alternating current ("AC") single circuit overhead transmission line that traverses portions of Baltimore, Carroll and Frederick Counties, in Maryland.

Petitions to intervene in the matter must be filed with the Commission's Executive Secretary, Andrew S. Johnston, William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, Maryland 21202, by **Monday, February 17, 2025**, and must reference "Case No. 9773".[2] Interventions are governed by *Annotated Code of Maryland*, Public Utilities Article

---

[1] Maillog No. 314555.
[2] Petitions to intervene may be mailed or e-filed. Details of the e-File system can be found on the Commission's website. www.psc.state.md.us.

Exhibit "1D"

Case No. 9773
Notice of Intervention Deadline and
 Requested Completeness Determination
January 10, 2025
Page 2 of 3

("PUA") § 3-106. Information regarding the CPCN process and intervention can be viewed on the Commission's website at:

- https://www.psc.state.md.us/electricity/cpcn-information/

The Applicant is directed to cause a display advertisement to be published in a newspaper in general circulation within Baltimore, Carroll, and Frederick Counties at least twice, in successive weeks, prior to **February 10, 2025**, to also advise persons who seek to intervene in this proceeding that petitions to intervene shall be filed with the Commission's Executive Secretary by close of business on **February 17, 2025**.

Additionally, the Applicant is encouraged to use any social media or other communication methods to advise residents/businesses of Baltimore, Carroll, and Frederick Counties of the date by which petitions to intervene must be submitted. The Applicant is directed to file a certificate of publication and postings with the Commission on or before the date of the intervention deadline. Further, if the Applicant has not done so at the time of the filing of its application with the Commission, the Applicant is directed to comply with all notice and service of copy requirements established under COMAR and the PUA, and file a certificate of compliance with the notice and service of copy requirements on or before **February 10, 2025**.

Additionally, the Commission hereby requests that the Maryland Department of Natural Resources, Power Plant Research Program ("PPRP") report by **March 26, 2025** as to whether PPRP considers the application to be administratively complete in accordance with COMAR 20.79.01.06.

Case No. 9773
Notice of Intervention Deadline and
 Requested Completeness Determination
January 10, 2025
Page 3 of 3

      Upon receipt of the completeness recommendation, the Commission will further consider

the procedural schedule in this matter.

                                                    By Direction of the Commission,

                                                */s/ Andrew S. Johnston*

                                                Andrew S. Johnston
                                                Executive Secretary

**MARYLAND**
DEPARTMENT OF
NATURAL RESOURCES

*Wes Moore*, Governor
*Aruna Miller*, Lt. Governor
*Josh Kurtz*, Secretary
*David Goshorn*, Deputy Secretary

March 26, 2025

Frederick Hoover
Chair
Public Service Commission of Maryland
William Donald Schaefer Tower
6 St. Paul Street
Baltimore, Maryland 21202-6806

Re:     Public Service Commission Case No. 9773 – The Report of the Department of Natural Resources' Power Plant Research Program as to the Administrative Completeness of the CPCN Application to Construct the PSEG Renewable Transmission LLC Maryland Piedmont Reliability Project

Dear Chair Hoover:

In accordance with the Public Service Commission's ("Commission") *Notice of Intervention Deadline and Requested Completeness Determination* issued on January 10, 2025, (ML No. 314771), the Maryland Department of Natural Resources Power Plant Research Program ("PPRP") respectfully submits the following report as to whether PPRP considers the *PSEG Renewable Transmission LLC's Application for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll and Frederick Counties*, filed on December 31, 2024 (ML No. 314555), to be administratively complete in accordance with COMAR 20.79.01.06.

PPRP has carried out an initial review of the material included in PSEG Renewable Transmission LLC's ("PSEG") Application[1] to construct the Maryland Piedmont Reliability Project ("MPRP" or "Project"), and the Update to ERD and Appendix A-1, Appendix B (Update), Appendix F, and Appendix G filed on February 14, 2025 (ML 315863), and PSEG Responses to PPRP Data Request No. 1, provided to PPRP on March 6, 2025. Based on its review, at this time, PPRP does not consider the Application to be administratively complete in accordance with COMAR 20.79.01.06 as it lacks information required under COMAR 20.79.01.06K(2).

**The Application lacks required information set forth in COMAR 20.79.01.06K(2): Information On Alternative Transmission Line Routes (COMAR 20.79.04.03), and Specific Environmental And Socioeconomic Information, including impacts of the Project (COMAR 20.79.04.04).**

---

[1] The Application includes a Petition, Attachments A through C of the Application, and accompanying Direct Testimonies with associated Expert Reports and Exhibits.

Exhibit "1E"

COMAR 20.79.04 requires an application to include information about the transmission line's purpose and justification (COMAR 20.79.04.01), description (COMAR 20.79.04.02), alternative transmission line routes (COMAR 20.79.04.03), and specific environmental and socioeconomic information, including impacts of the project (COMAR 20.79.04.04). The Application provides sufficient information regarding the Project's purpose and justification and description, but lacks information to meet all the requirements set forth in COMAR 20.79.04.03 and COMAR 20.79.04.04.

COMAR 20.79.04.03 – Alternative Transmission Line Routes

COMAR 20.79.04.03(A)(2) requires "the description of each alternative route considered for a transmission line shall include … [a] statement of the reason why each alternative route was rejected." The Direct Testimony of Kristin Weidner introduces the MPRP Routing Study (Attachment B of the CPCN Application), which is the detailed document in the Application that describes how PSEG chose its proposed route from the alternatives considered. Specifically, the Routing Study discusses how PSEG identified the alternative routes, Routes A through J, and provides summary tables of the metrics evaluated when considering environmental criteria, land use criteria, social criteria, engineering criteria, and cost for each of the ten alternative routes.

The Application, and more specifically the Routing Study, fails to provide sufficient information to meet this requirement relating to the following issues.

- The route selection portion of the Routing Study lacks any discussion detailing why each of the alternative routes other than the proposed route, Route H, were rejected and instead, focuses on why the proposed route was selected. This focus is illustrated by Table 7, entitled "Alternative Routes Compared to Route H" (p. 38-39), which simply provides a brief statement on how each of the alternative routes compares in relation to the proposed route (Route H). Lack of sufficient detail makes it impossible for PPRP and other parties to review the choices/decisions made during the siting process and validate how the proposed route was selected.

- The Routing Study does not provide an explanation on how each of the evaluation criteria listed in Table 1 impacted the decision to reject alternative routes. Specifically, whether the presence and quantity of each criterion was considered a favorable, neutral, or unfavorable aspect of an alternative route. In addition, the Direct Testimony of Kristin Weidner (p. 10) states that the Routing Team "did not use quantitative weighting or a ranking system for the route selection process" but instead considered the routing evaluation criteria "holistically." However, the Routing Study provides no details on how this holistic decision-making process was implemented. Specifically, how similar routes were evaluated without ranking any of the evaluation criteria.

- The Routing Study (p. 36) states that Route H "minimizes special design requirements and unreasonable costs". However, it does not include details on the decision threshold used to determine when costs become "unreasonable," nor does it specifically identify which alternate routes were rejected due to unreasonable costs.

- The Routing Study states that Routes A/B (North Entrance) and the associated Routes F/G (South Entrance) performed "more favorably within the environmental category because they had the fewest acres of total wetlands and forested wetlands in the ROW." This lesser environmental impact associated with Route A/B and Route F/G can be confirmed by reviewing the metrics listed in Table 2 of the Routing Study. However, the Routing Study lacks a sufficient explanation as to why those routes with the fewest environmental impacts were rejected.

- The Routing Study lacks sufficient explanation as to why the Applicant rejected routes that incorporate the highest percentage of routing by paralleling existing transmission lines. Table 3 of the Routing Study indicates that Routes A/B (North Entrance) and the associated Routes F/G (South Entrance) have the highest percentage of the length of the route paralleling 138kV or greater existing transmission line corridors. However, the Routing Study fails to provide sufficient explanation as to why the Applicant rejected those routes.[2]

- Maryland Public Utilities Article (PUA) §7-209 requires the Commission to consider the use of existing transmission lines of other utilities for the construction of a new transmission line. The Routing Study provides no details on the efforts the Applicant made to determine that existing transmission lines paralleled by the proposed route could not be used or rebuilt to accommodate the Project, including both technical factors and communications with existing transmission line ROW owners.

- The Routing Study uses certain unclear or potentially misleading terminology in the Routing Study for comparing the alternative routes, often referring to a certain alternative route as having the "most" or "fewest" of a particular criterion without providing clarifying context. For instance, in Table 2 of the Routing Study (p. 19), Route A is noted as having the "fewest" total wetlands and is listed as having a total of 35.2 acres of wetlands within the right-of-way ("ROW") while Route H (the proposed route) is listed as having a total of 57.3 acres of wetlands within the ROW (a greater than 60% increase over Route A). However, in Table 7 of the Routing Study (p. 38), Route A is listed as one of the routes that crosses the "most" SSPRAs[3] compared to Route H. Yet Table 2 of the Routing Study lists Route A as crossing less Group 1 (federally-listed) SSPRAs compared to Route H (271.5 acres compared to 276.2 acres). However, when all SSPRAs Groups 1-3 are reviewed, Route A crosses a total of 314.3 acres compared to Route H, which crosses 308.6 acres, less than a 2% difference.

Accordingly, for these reasons, PPRP considers the Application administratively incomplete as it does not meet the requirements of COMAR 20.79.04.03(A)(2). PSEG should provide an updated Routing Study that includes a detailed discussion for each alternative route, clearly explaining why it was rejected, and address the deficiencies noted above to meet this requirement.

---

[2] Direct Testimony of Kristin Weidner (p. 15) does note that PSEG performed an additional review of routing adjacent to the Conastone-Brighton-Doubs 500 kV transmission lines and determined it was infeasible for the MPRP to parallel this ROW as it would require the removal of more than 90 residences and community buildings.

[3] Sensitive Species Project Review Areas (SSPRAs): Group 1 includes federally-listed species; Group 2 includes state-listed species; and Group 3 includes species of concern with no listed status (i.e., not officially regulated).

COMAR 20.79.04.04(B) and (C) – Required Information and Studies about the Project's Environmental and Socioeconomic Effects

COMAR 20.79.04.04(B) requires that "the environmental information in the CPCN application for a transmission line must include …[a]summary of the environmental and socioeconomic effects of the construction and operation of the project, including a description of the unavoidable impacts and recommended mitigation." COMAR 20.79.04.04(C) requires "a copy of all studies of the environmental impact of the proposed project prepared by the applicant" to be included in the CPCN application. The Application is incomplete in meeting the requirements of COMAR 20.79.04.04 (B) and (C) as it lacks a sufficient summary of the environmental and socioeconomic effects from the construction and operation of the Project, including field studies, which are necessary to meet the requirements of COMAR 20.79.04.04(B) and (C). Field studies are imperative to verify and augment initial desktop information to confirm that the Project's effects are correctly documented, ensuring that all unavoidable impacts are accurately evaluated and that appropriate mitigation is proposed. This is especially important for this Project given its significant length and impacts to land uses, which will be necessary for its construction and operation. Yet, desktop-based information has been the only data available for developing the proposed ROW and, currently, is the only information available to PPRP to begin its independent assessment. Without field-based information,[4] PPRP cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources.

PPRP understands that PSEG currently does not have the necessary access to conduct field studies on the parcels located in the proposed 150-foot wide ROW and has put considerable effort into providing as much desktop-based environmental information as is currently available.[5] PSEG has indicated that field-based studies have been delayed due to circumstances beyond PSEG's control and that PSEG is currently working to obtain the required temporary access to the properties within the Project ROW so that these studies can be initiated. However, a desktop survey is insufficient to determine whether the proposed location of the ROW and transmission line poles have been positioned such that they best avoid and/or mitigate environmental and socioeconomic impacts and comply with relevant laws.

Specifically, the field-based studies listed below are necessary and have yet to be conducted for the proposed route and, thus, are not included in the Application. Of the five types of field studies/surveys identified below, some must be performed on all parcels within the Project ROW, while others are only necessary for parcels that meet specific requirements.

- *Field-Based Studies* - The Application does not include any of the following field-based surveys.
    - Wetland Delineations – necessary for the entirety of the Project ROW.
    - Forest Stand Delineations – necessary for the entirety of the Project ROW.
    - Geotechnical surveys – necessary for the entirety of the Project ROW.

---

[4] On page 12 of her Direct Testimony, PSEG Witness Shilkoski mentions that some field-level observations have been performed, but based on footnote 10, this is limited to observing the properties from public roadways only (i.e., "windshield surveys").
[5] Direct Testimony of Dawn Herring Shilkoski, p. 7.

- o Sensitive Species Project Review Areas (SSPRA) surveys - the SSPRA field surveys should be conducted on those parcels identified by the DNR Wildlife Heritage Service (WHS).
- o Maryland Historical Trust (MHT) required field surveys - the MHT field surveys should be conducted on those parcels identified by MHT as being of concern.

- *Assessment of Impacts Identified by the Field-Based Studies* - The Application does not address that the submittal of the results of these field-based studies/surveys is necessary to meet the requirements of COMAR 20.79.04.04(B). For COMAR 20.79.04.04(B) to be satisfied, PSEG will also need to revise its Environmental Review Document (ERD) to incorporate the results of these studies/surveys. Specifically, PSEG will need to provide updated Environmental Mapping for the proposed route, incorporating the results of the studies/surveys and any adjustments required to the proposed ROW and pole locations to avoid or mitigate impacts. The ERD will also need to incorporate updated information to specifically detail all unavoidable impacts and recommended mitigation for the following:

  - o Impacts on streams, wetlands, and their buffers
  - o Impacts on forests
  - o Impacts on the Monocacy Scenic River and its tributaries
  - o Impacts on the tributaries of the Deer Creek Scenic River
  - o Impacts on Sensitive Species habitat
  - o Impacts on historical and/or archeological areas of concern

- *Assessment of "Unavoidable Impacts and Recommended Mitigation"* - A description of the Project's "unavoidable impacts and recommended mitigation" is required by COMAR 20.79.04.04(C). The Project could potentially impact resources located in the Proposed Route that could have a less impactful alternative in the study corridor. Mitigation of these impacts could necessitate a shift of the ROW or pole placement of up to 275 feet on either side of the centerline of the current 150-foot wide ROW (i.e., the 550-foot wide study corridor). Currently, the desktop studies provided in the Application are limited to the proposed 150-foot-wide ROW, instead of the 550-foot study corridor. Therefore, there is insufficient environmental and socioeconomic information to identify the unavoidable impacts for the Proposed Route and recommended mitigation that may involve relocation within the 550-foot study corridor.

  Understanding the potential need for shifting the currently proposed ROW to address unavoidable impacts and potential mitigation, PSEG is requesting "reasonable flexibility to adjust the centerline up to 275 feet on each side of the proposed centerline." Specifically, PSEG requests this flexibility to allow it "to accommodate circumstances and concerns that may arise during this CPCN proceeding or after issuance of the CPCN."[6] PPRP agrees that flexibility will be needed, particularly given the unknown impacts of the Project to environmental and socioeconomic resources, which cannot be determined until field-based studies are completed for the Proposed Route.

---

[6] PSEG's CPCN Application, p. 31.

To provide sufficient information on unavoidable impacts and potential mitigation, PPRP believes it is also necessary, at a minimum, to carry out certain field-based studies in the 550-foot study corridor on parcels where significant impacts to socioeconomic and/or natural resources are anticipated. Specifically, wetland delineations and forest delineations should be conducted for the entire width of the 550-foot study corridor in the vicinity of parcels containing wetlands, streams, and/or forest. Also, PSEG should conduct the SSPRA surveys and MHT surveys for those parcels within the 550-foot corridor that are specifically identified as parcels of concern by WHS or MHT. It is PPRP's understanding that PSEG is already coordinating with WHS and MHT to identify the parcels within the 550-foot study corridor that will require a MHT field survey or SSPRA survey. Depending on the species of concern, some of these SSPRA surveys may have restrictions on the time of year they can be completed. Therefore, PPRP recommends that those parcels identified as requiring a SSPRA survey be PSEG's first priority for obtaining the needed temporary access.

Accordingly, for these reasons, PPRP considers the Application administratively incomplete as it does not meet COMAR 20.79.04.04. PSEG should provide the specified field-based studies and updated ERD to as set forth above, including field-based studies for the entirety of the 550-foot corridor for each parcel where impacts to socioeconomic and/or natural resources are anticipated within the Project ROW.

**Proposed Schedule**

While PPRP considers PSEG's CPCN Application to be administratively incomplete, PPRP is not opposed to scheduling a prehearing conference for the purpose of considering motions to intervene and to set a limited procedural schedule. However, PPRP will still need the required information identified above to undertake its independent assessment. To ensure that PPRP obtains the required studies with sufficient time to complete its review, the following requirements should be incorporated into any procedural schedule that is set at this time.

- PSEG file status updates on a regular basis (e.g., 60 days) beginning after the prehearing conference and until all the deficiencies have been met and the application is deemed administratively complete.
- PSEG file Supplemental Testimony and revised ERD providing all information needed for a complete CPCN Application.
- PPRP file an updated completeness determination within four weeks after PSEG files Supplemental Testimony.
- Once the Commission determines that the CPCN Application administratively complete, schedule a status conference to adopt further procedural dates.

**Conclusion**

Based on PPRP's review, PPRP considers the CPCN Application submitted by PSEG for the MPRP to be administratively incomplete as described above. Until the deficient information identified in PPRP's report is filed with the Public Service Commission, PPRP recommends that the CPCN Application for the MPRP be deemed incomplete.

Respectfully submitted,

Frederick Kelley

*Power Plant Research Program*
*Maryland Department of Natural Resources*

Cc:    Commissioner Richard
        Commissioner Barve
        Commissioner Suchman

PSEG Renewable Transmission LLC 's    *
Application for a Certificate of Public    *
Convenience and Necessity to Construct    *
a New 500 KV Transmission Line in Portions    *    Case No. 9773
of Baltimore, Carroll, and Frederick Counties    *

**THE DEPARTMENT OF NATURAL RESOURCES' POWER PLANT RESEARCH PROGRAM'S RESPONSE TO PSEG RENEWABLE TRANSMISSION LLC'S MOTION REQUESTING A PRE-HEARING CONFERENCE TO RULE ON INTERVENTION PETITIONS AND ESTABLISH A PROCEDURAL SCHEDULE**

**Introduction**

The Department of Natural Resources' Power Plant Research Program ("PPRP"), through undersigned counsel, hereby submits this response to the PSEG Renewable Transmission LLC'S ("PSEG" or "the Applicant") *Motion Requesting a Pre-Hearing Conference to Rule on Intervention Petitions and Establish a Procedural Schedule* ("Motion")[1] filed on March 26, 2025. For the reasons set forth below, PPRP disputes PSEG's assertion set forth in its Motion that its application to construct a new 500 kV transmission line in portions of Baltimore, Carroll, and Frederick Counties ("Application") is administratively complete. Also, while PPRP does not object to the Applicant's request to hold a prehearing conference, PPRP strongly objects to PSEG's unrealistically optimistic procedural schedule set forth in its Motion.

**Argument**

**1. *PSEG's Application does not include field survey data and should not be considered Administratively Complete.***

PPRP identified the pertinent data still needed for a complete application in its *Completeness Report and Recommendation*, filed in the docket for this case on March 26, 2025.[2]

---

[1] ML No. 317082 (filed March 26, 2025).
[2] ML No. 317070.

Exhibit "1F"

However, relying on a faulty premise that desktop-based data is sufficient for administrative completeness in this case[3], PSEG contends that its Application should be deemed complete "for the purposes of setting a procedural schedule."[4]  PSEG argues that because it has not yet been able to gain access to the properties upon which its new right-of-way will occupy, field-based surveys should not be required.  While PPRP agrees that access to properties is necessary for conducting field studies, the Applicant's inability to obtain this data does not obviate the requirement for submitting the information as part of PSEG's application.

In addition, the desktop-based data are not altogether comprehensive.  The sources of these desktop-based data (although publicly available and provided by many of the State Agencies involved in the review of the Project) mostly rely on historical documentation that needs further field verification to understand and adequately identify potential impacts. In fact, part of the coordination that goes on during the review of a CPCN application by reviewing State agencies involves discussion between the Applicant and the State resource managers to gain the best understanding of the resources at risk.

In a mischaracterization, PSEG asserts that the absence in COMAR of a specific reference to "survey level data" for transmission projects (which is included for generation projects) is instructive.[5]  However, no such meaning is merited.  A revision to the specific requirements for CPCN applications for generation projects were made in 2021 in a Commission rulemaking (RM-72) in direct response to a significant surge of CPCN applications for solar photovoltaic facilities in the State (currently, PPRP is reviewing more than 30 cases) and a myriad of concerns related

---

[3] *But see* Case No. 9733*, Chesapeake Bay Foundation, Comments on PSEG's Motion for Prehearing Conference, filed A*pril 11, 2025 (ML No.317810) p. 3 (providing real-life example where desktop studies without field studies is insufficient and identifying need for precisely defined ROW information).
[4] Motion, p. 3.
[5] Motion, fn. 36.

to this influx. The characterization of the resources that are potentially at risk from development are no less important for transmission line projects. In fact, this detailed examination of the potential impacts is of significant importance to PPRP and the reviewing State agencies' assessment of a project's potential impacts and associated mitigation and subsequent recommendations, which is required under Natural Resources Article, Section 3-306.

It is imperative that PPRP timely obtain the information identified in PPRP's Completeness Report and Recommendation to conduct its independent assessment of the Project. Requiring administrative completeness helps to assure that the necessary data is available to parties before considering filing deadlines and other dates in the procedural schedule. Without this vital information in a timely manner, PPRP, in coordination with the reviewing State agencies, will be unable to carry out its independent assessment and will not have an adequate basis to understand the Project's potential impacts to Maryland's socioeconomic and natural resources.

Even so, PPRP does not oppose holding a prehearing conference to consider a limited procedural schedule, with some specific milestones. For example, any deadlines for PPRP and other parties should be contingent upon the Applicant filing the information requested in PPRP's Completeness Report and Recommendation, and without reducing the allotted review time.

### 2. The Applicant's procedural schedule is implausible and should not be adopted.

PSEG claims its schedule "is consistent with the time periods allocated for similar milestones and comparable deadlines in other transmission line CPCN cases."[6] PPRP disagrees. The Applicant's proposed procedural schedule is implausible. PSEG asserts that its proposed timeframe is appropriate in this case as it is comparable to other transmission CPCN application

---

[6] Motion, p. 10-11.

3

cases in Maryland – Case Numbers 9470,[7] 9367,[8] and 9309.[9]  However, these cases are not comparable.  Although the schedules in these past cases ranged from seven to 13 months between the CPCN application filing date and issuance of a final order, each of these cases was to rebuild an existing transmission line within an existing right-of-way ("ROW").[10]  The projects being reviewed in these cases are not representative of comparable transmission line cases, as they were between 2.8 to 25.5 miles long and located within an existing ROW in Maryland.  The MPRP, a 67-mile greenfield transmission line project proposed to be located within a new ROW is not comparable, and the review period proposed is wholly inadequate.

Based on its review of Maryland's CPCN applications for transmission projects over the past 15 years, only Transource's Independence Energy Connection Project ("IEC") project (Case No. 9471[11]) is sufficiently comparable to the subject case to provide practical insight as to the time necessary to review the MPRP.  Like PSEG, Transource proposed a project within a new

---

[7] Case Number 9470, *In the Matter of the Application of The Potomac Edison Company for a Certificate of Public Convenience and Necessity to Modify the Ringgold-Catoctin Transmission Line in Frederick and Washington Counties, Maryland*. The Application was filed on Dec. 12, 2017 (ML No. 218316).

[8] Case Number 9367, *In the Matter of the Application of Delmarva Power & Light Company for a Certificate of Public Convenience and Necessity to Rebuild an Existing 138 KV Overhead Transmission Line on Existing Right-Of-Way from the Church Substation In Queen Anne's County to the Steele Substation in Caroline County.* The Application was filed on Oct. 28, 2014 (ML No. 159795).

[9] Case No. 9309, *In the Matter of the Application of The Potomac Edison Company for a Certificate of Public Convenience and Necessity to Rebuild the Maryland Segment of the Mt. Storm-Doubs 500 KV Electric Transmission Line in Frederick County, Maryland*. The Application was filed on November 12, 2012 (ML No. 143641).

[10] More recent cases with similar timeframes include Case No. 9699 *Potomac Electric Power Company's Application for a Certificate of Public Convenience and Necessity to Rebuild an Existing Double Circuit 230 KV Overhead Tower Line on Existing Right-of-Way from the Oak Grove Substation to the Talbert Substation in Prince George's County* (11 months between application filing and final order issued on March 14, 2024) and Case No. 9698 (8 months between application filing and final order issued 12/19/23).  However, Case 9698 requested and was granted an expedited CPCN application review schedule.

[11] Case No. 9471, *In the Matter of the Application of the Transource Maryland* LLC *for a Certificate of Public Convenience and Necessity to Construct Two New 230 KV Transmission Lines Associated with the Independence Energy Connection Project in portions of Harford and Washington Counties, Maryland*.  The Application was filed on Dec. 27, 2017 (ML No. 218329).

ROW in Maryland prior to conducting field surveys.[12]  For myriad reasons[13], Case No. 9471 took approximately 30 months from its CPCN application filing to issuance of a final order.  This CPCN timeframe is approximately double the timeframe of a transmission line project being rebuilt in existing ROW to obtain a final order.  Clearly, by comparison, the timeframe proposed in Applicant's Motion for reviewing a much larger greenfield project is entirely implausible.

The proposed procedural schedule in PSEG's Motion requires PPRP to file Direct Testimony approximately one month after the Applicant files Supplemental Direct Testimony and, subsequently, for PPRP to file its Project Assessment Report ("PAR") and Recommended Licensing Conditions with Surrebuttal Testimony three months later.  Yet, PSEG provides no details, or commitment, as to what additional information will be included in its Supplemental Direct Testimony, to be filed on May 30, 2025.[14]

PSEG's proposed procedural schedule also includes some perplexing features.  For example, PPRP is confused by the Applicant's proposal that PPRP file its Direct Testimony three months prior to its PAR and recommendation.  Such a bifurcation of testimony from the supporting documents is unwarranted.  PPRP's Direct Testimony describes in detail the independent environmental and socioeconomic assessment for the proposed project, which is conducted in coordination with the reviewing State agencies and supports the reviewing State agencies' recommendation in the case.  For PPRP to file its Direct Testimony separately and several months prior to PPRP's PAR and the reviewing State agencies' recommendation is impracticable.

---

[12] Case No. 9471, PPRP Completeness Review Correspondence, filed Sept.13, 2017 (ML No. 221271).
[13] For example, the number of parties that participated in Case No. 9471 were more than in most CPCN cases.  (*See e.g.* Case No. 9471, *Service List*, issued Apr. 25, 2019 (ML No. 224936) (listing approximately 13 parties); Case No. 9699, *Service List*, issued Jul. 7, 2023 (ML No. 303939) (listing four parties).
[14] Due to the vast scope of the Project and the number of parcels involved, PPRP believes it would be highly unlikely that PSEG could obtain the necessary access to the ROW to be able to provide all of the information identified in PPRP's Completeness Report and Recommendation by May 30, 2025.

Finally, PSEG asserts that its proposed procedural schedule allows for parties to have "six months to analyze the Application and issue discovery requests to the Company prior to filing their first round of testimony" (Applicant's Motion pp. 11, footnote 31). This statement does not appear accurate, as the procedural schedule proposes PSEG's Supplemental Direct Testimony will be filed on May 30, 2025 and then PPRP's Direct Testimony is due approximately one month later. Even if it were possible for PSEG to file a complete application at the end of May, one month is an unreasonable response timeframe.

The stated driver for PSEG's unrealistic proposed procedural schedule in this CPCN case is that PJM "has directed the Project to be placed in service by June 1, 2027," and the Applicant must begin construction of the MPRP by January 2026 "to meet PJM's deadline and ensure the continued reliability of the electric transmission system in Maryland."[15] Like the Applicant's proposed procedural schedule, given the size of the greenfield project and the timing of its CPCN application, PJM's deadline for this Project is also implausible and predicated on unverified assumptions. A 67-mile greenfield transmission line traversing three Maryland counties will substantially impact both Maryland's resources and its residents. Yet, the basis for determining that June 1, 2027 is the requisite in-service date – and not some subsequent date a few months thereafter – is uncorroborated. Given the potential for significant adverse impacts from such a project to Maryland's environment, residents, and economy, accelerating the CPCN review should only be considered after a factual basis for the significantly ambitious deadline is clearly shown by the Applicant.

## Conclusion

For these reasons, PPRP respectfully requests that the Commission:

---

[15] Motion at 2.

6

(1)     Deem the Application to be administratively deficient;

(2)     Hold a prehearing conference for purposes of ruling on motions to intervene;

(3)     Require the Applicant to file the information set forth in PPRP's Completeness Report and Recommendation; allow PPRP four weeks to carry out any subsequent completeness review; and delay setting a procedural schedule until the Application is deemed administratively complete.

(4)     In the alternative, the Commission should set a limited procedural schedule that requires the Applicant to provide the information identified in PPRP's Completeness Report and Recommendation; allow PPRP four weeks to review the information and file its Revised Completeness Recommendation; and provide other parties, including PPRP, a minimum of nine months[16] to review and analyze the complete Application before their deadline for filing their Direct Testimony and supporting documents.

April 11, 2025

Respectfully submitted,

Sondra Simpson McLemore
Assistant Attorney General
1800 Washington Blvd., Suite 755
Baltimore, Maryland 21230

*Counsel for PPRP*

---

[16] Given the size of the proposed project, sufficient time must be allocated for review of the extensive field-based surveys and coordination with the other reviewing State agencies to determine that impacts have been appropriately identified and sufficiently mitigated. In addition, reasonable time must be allotted for parties to serve multiple rounds of data requests as part of discovery.



**CAROLYN A. QUATTROCKI**
*Chief Deputy Attorney General*

**LEONARD J. HOWIE III**
*Deputy Attorney General*

**CARRIE J. WILLIAMS**
*Deputy Attorney General*

**SHARON S. MERRIWEATHER**
*Deputy Attorney General*

**ZENITA WICKHAM HURLEY**
*Chief, Equity, Policy, and Engagement*

**STEVEN M. TALSON**
*Principal Counsel*

**PETER V. BERNS**
*General Counsel*

**CHRISTIAN E. BARRERA**
*Chief Operating Officer*

**SONDRA SIMPSON MCLEMORE**
*Assistant Attorney General*

**STATE OF MARYLAND**
**OFFICE OF THE ATTORNEY GENERAL**
**MARYLAND ENERGY ADMINISTRATION**

**ANTHONY G. BROWN**
*Attorney General*

May 8, 2025

**Via E-File Only**

Andrew Johnston, Executive Secretary
Maryland Public Service Commission
6 St. Paul Street
Baltimore, MD 21202

> PSC Case No. 9773 - Application of PSEG Renewable Transmission LLC for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll, and Frederick Counties, Maryland

Dear Mr. Johnston:

On April 1, 2028, the Maryland Public Service Commission ("Commission") issued a Notice and Request for Comments[1] on PSEG Renewable Transmission LLC's ("PSEG" or the "Applicant") *Motion Requesting a Pre-Hearing Conference to Rule on Intervention Petitions and Establish a Procedural Schedule* (the "Motion")[2] and the *Report of the Department of Natural Resources' Power Plant Research Program as to the Administrative Completeness of the CPCN Application to Construct the PSEG Renewable Transmission LLC Maryland Piedmont Reliability Project*[3]. The Commission's Notice set forth a date for submitting comments on the motion and

---

[1] ML 317397.
[2] ML 317082 (filed on March 26, 2025).
[3] ML 317070 (filed on March 26, 2025).

Exhibit "1G"

the completeness but mentioned no opportunity for submitting reply or rebuttal comments. On April 28, 2025, the Applicant, through counsel, filed a 12-page correspondence rebutting and addressing points made in the respective comments by interested parties. The Power Plant Research Program ("PPRP") takes issue with many of the assertions included in the Applicant's Response Letter, most of which have been addressed in PPRP's filing or in other comments filed by interested parties. Below, through counsel, PPRP limits its response to two of the Applicant's arguments as they relate to PPRP's participation in the CPCN process: the attempt to fast-track PPRP's review of this 67-mile greenfield transmission line; and the suggestion that PPRP should be addressing the interests of the six interest groups requesting intervention in this case.

### PSEG's Application Should Not Be "Fast-Tracked" Through the CPCN Process.

PPRP is statutorily required to review all the data necessary for an independent assessment of the Project, develop its project assessment report and testimony, and submit them to the Commission, along with the recommendation of the reviewing State agencies, including any recommended licensing conditions. Obtaining a CPCN for a 67-mile greenfield transmission line in an area where the applicant has little access to the proposed new right-of-way has not been done in Maryland in over 30 years, if ever. Yet, the Applicant uses the term "unprecedented" to describe PPRP's request for nine months to review and assess the necessary information[4] (currently still unavailable to PPRP five months after the filing of this CPCN application) for a 67-mile-long transmission line in a new right-of-way. PPRP understands that, even with its continuing and diligent efforts, the Applicant is not yet able to access most of the properties within the proposed right-of-way, which is necessary to acquire the data. However, both PJM and the Applicant knew,

---

[4] PPRP's Completeness Report, filed in the docket on March 26, 2025 (ML No. 317070) sets forth the information still needed for PPRP to carry out its independent assessment of the Project.

or should have known, two important factors: obtaining access to properties along the new 67-mile right of way spanning three Maryland counties would be time-consuming; and field survey data would be necessary to get the required permits to construct the project.

Various other permits, like the CPCN, will also require an adequate timeframe for reviewing the vast amount of data that will be generated by conducting field surveys along the 67-mile-long proposed right-of-way.[5] Like the CPCN, sufficient time will be needed by the applicable state and county authorities to review the pertinent field data before issuing these respective permits.  For example, PSEG must complete wetland delineations along the project route to get a Joint Federal/State Wetland Permit, which can take on the order of a year to review and process. Thus, PSEG will still be waiting for these other permit actions irrespective of the CPCN review schedule. To obtain access to all the properties along the ROW for a Project of this size and have all the final permits for the Project - including a final order granting a CPCN - within a year of filing a CPCN application is unprecedented.  When considering the history of siting greenfield transmission lines of this magnitude, such a timeframe is also nonsensical.

### Interest Groups, Not PPRP, Should Be Allowed to Represent Their Own Relevant Interests in This Case.

In addition to the aggressive timeframe, PPRP also strongly opposes the Applicant's inference that it is in "the province of" PPRP to address the issues that may be raised by the respective interest groups who have requested intervention in this case. Pursuant to Section 3-306 of the Natural Resources Act, PPRP coordinates with the reviewing State agencies and presents their recommendation to the Commission along with an independent assessment of the Project's socioeconomic, natural resources, and environmental impacts and mitigation of these impacts.

---

[5] See the Applicant's Response Letter at p. 5 and ft. 20 (acknowledging the need to obtain other permits requiring field-level data).

These interest groups, as well as the various landowners,[6] have their own unique interests for the Commission's consideration. It is not PPRP's role to represent the "unique perspectives or specialized knowledge" of these interest groups or parties.[7]

### Conclusion

Like PSEG, PPRP agrees with Staff Comments that coordination among intervening parties should be encouraged.[8] Also, PPRP is not opposed to holding a prehearing conference and setting a schedule for this case in the near future. However, it is ill-advised to set a procedural schedule in this case at this time unless the dates established in the schedule provide a set amount of time *after* the Applicant provides all the Project data needed.

Therefore, PPRP requests that the Commission set timeframes from the date the Applicant cures the deficiencies set forth in PPRP's Completeness Report to establish any procedural schedule in the case and, as a part of this procedural schedule, provide PPRP and other parties with nine months from receipt of complete Project information before filing their respective direct testimony.

Respectfully submitted,

Sondra Simpson McLemore
Assistant Attorney General and Counsel to PPRP

---

[6] *See e.g.*, Comments on Behalf of Intervenors Hattery Farm LLC and Debbra M. Hattery, as Trustee for the Hattery Family Trust (collectively "Hattery Parties"), filed April 10, 2025 (ML No. 317719). "[T]hese parties each bring unique perspectives and specialized knowledge that can be very helpful to the parties and the Commission in this proceeding. …. PSEG thus brings tremendous resources to this project compared to the individual landowners and citizens seeking to intervene and there should be no restrictions placed on the citizens' opposing interests." *Id*. at 2.
[7] *Id*.
[8] Staff Comments, filed April 11, 2025 (ML No. 317928).

Cc:    F. Kelley, PPRP
       Service List

<u>**ORDER NO. 91825**</u>

| | | |
|---|---|---|
| Application of PSEG Renewable Transmission LLC for a Certificate of Public Convenience and Necessity to Construct a New 500 kV Transmission Line in Portions of Baltimore, Carroll, and Frederick Counties, Maryland | * * * * * * | BEFORE THE PUBLIC SERVICE COMMISSION OF MARYLAND ———— Case No. 9773 ———— |

Issue Date: September 11, 2025

<u>**ORDER ESTABLISHING A PROCEDURAL SCHEDULE FOR THE MARYLAND PIEDMONT RELIABILITY PROJECT**</u>

<u>**Background**</u>

On March 26, 2025, the Department of Natural Resources, Power Plant Research Program ("PPRP") filed its Report on the Administrative Completeness of PSEG Renewable Transmission LLC's ("PSEG") Application for a Certificate of Public Convenience and Necessity ("CPCN") for authorization to construct a single circuit 500 kilovolt ("kV") overhead transmission line for the Maryland Piedmont Reliability Project (the "MPRP" or the "Project") in portions of Baltimore, Frederick, and Carroll Counties, Maryland (the "Application"). PPRP's Report concluded that the Application lacks the required information set forth in Code of Maryland Regulations ("COMAR") 20.79.01.06K(2), Information on Alternative Transmission Line Routes (COMAR 20.79.04.03), and Specific Environmental and Socioeconomic Information, including impacts of the Project (COMAR 20.79.04.04).[1]

---

Exhibit "1H"

[1] Docket No. 245 at 1. For a more detailed summary of the basis for those COMAR deficiencies, *see* Docket No. 245 and Order No. 91709 at 2-6.

Also on March 26, 2025, PSEG filed a Motion for a Pre-Hearing Conference and Establishment of Procedural Schedule.[2] One of the primary purposes behind PSEG's requested procedural schedule was (and remains) to meet PJM Interconnection, LLC's ("PJM") stated June 2027 in-service date for the Project. PSEG's original proposed schedule anticipated the Commission's final order being issued by January 31, 2026. Despite PPRP's conclusion that the Company's Application is incomplete, PSEG stated that it can "work[] with PPRP through the discovery process to provide any relevant additional data it requests to complete its review of the Project prior to the evidentiary hearings."[3]

PSEG's primary disagreements with PPRP's Report were the assertions that (1) COMAR 20.79.04 (Details of Filing Requirements – Transmission Lines) does not require field studies to support information about the Project be included in the filing, and (2) that PPRP's framing of the issue should be construed as a request for additional information regarding its Routing Study rather than a failure to provide information required by COMAR.[4]

PSEG requested that the Commission deem the Application to be complete and adopt a procedural schedule consistent with Exhibit A attached to its Motion following a Scheduling Conference. PSEG stated that it had some flexibility as to its details of the schedule, provided the final schedule allows PSEG to meet the PJM's June 1, 2027 in-service date for the Project.[5] Under PSEG's final proposed schedule, the Commission must issue its final order by March 31, 2026.[6] PSEG claims its proposed schedule is consistent

---

[2] Docket No. 246.
[3] *Id.* at 2.
[4] *Id.*
[5] *Id.* at 10.
[6] Docket No. 509.

with time periods allocated for "similar milestones and comparable deadlines in other transmission line CPCN cases."[7] PSEG also stated that it could provide field studies to PPRP on a rolling basis as the matter otherwise proceeded.[8]

On April 10, 2025, PSEG filed a more detailed response to PPRP's conclusion that the MPRP Application is incomplete, essentially repeating its prior arguments in more detail.

On April 11, 2025, PPRP responded to the Applicant's March 26, 2025 Motion. PPRP also repeats many of its prior arguments in urging the Commission to reject PSEG's proposed schedule. PPRP describes the Company's proposed schedule as "implausible," and dismisses comparisons to prior CPCN cases involving transmission lines because, unlike the MPRP, those cases did not involve a 67-mile greenfield transmission line, but were instead focused on the rebuild of existing lines.[9]

On April 28, 2025, PSEG responded to the over 225 comments that had been submitted by that date.[10] In addition to repeating its arguments in its response to PPRP, PSEG stated that it will require a "collective effort"–on its part and on the part of the other parties–for the Commission to review and issue a decision in 13 months after filing of the Application. PSEG insists, however, that the "critical reliability issues facing the regional transmission system warrant such an effort."[11] Citing a communication between PJM and PPRP, PSEG claims that if there is a delay beyond June 1, 2027, "system operators may need to implement emergency or temporary mitigation measures," including "discontinuing

---

[7] *Id.* at 10-11.
[8] *Id.* at 14.
[9] Docket No. 450, PPRP Response at 4; Tr. at 54.
[10] Docket No. 493.
[11] *Id.* at 8.

electric service to certain customers or groups of customers in specific areas to reduce the line loading in order to prevent the consequences of potential transmission line overloads."[12]

On June 6, 2025, PSEG provided an update to its proposed schedule, providing for a final order date of March 31, 2026, contending that this two-month extension properly balances the Commission's need for review and the urgent nature of the project.[13]

Hundreds of individual comments were filed with the Commission. Commenters overwhelmingly supported PPRP's arguments against PSEG's schedule, both in written comments and in person during the Commission's June 10, 2025 pre-hearing conference.

## Order No. 91709

On June 26, 2025, the Commission issued Order No. 91709. In that order, the Commission summarized the parties' positions regarding PSEG's proposed schedule as well as the objections by PPRP and commenters. However, the Commission did not issue a procedural schedule within that order. Rather, the Commission directed PSEG to provide all information required by PPRP regarding its Routing Study and Alternative Transmission Line Routes within 30 days of the date of Order No. 91709.[14]

The Commission further directed its Technical Staff ("Staff") to facilitate discussions between PSEG and PPRP–as well as the Office of People's Counsel ("OPC")– regarding the time required to produce PPRP's field studies and the feasibility of proceeding

---

[12] *Id.*, citing PJM response to PPRP date Request 2-2 (April 18, 2025).
[13] Docket No. 509 (PSEG's Updated Proposed Procedural Schedule) at 3.
[14] Order No. 91709 at 13. The Commission also noted PSEG's ongoing difficulties obtaining PPRP's requested field surveys, citing the ongoing federal matter of *PSEG Transmission LLC v. Arentz Family, LP et al, Case No. 25-cv-1235-ABA*. At the time of Order No. 91709, Judge Adam Abelson had recently affirmed PSEG's right-of-access and granted PSEG's requested preliminary injunction to allow surveyors to enter the property of landowners in or adjacent to the right of way ("ROW"). That remains an issue as Judge Abelson recently denied PSEG's request for the assistance of U.S. Marshals to accompany the surveyors due to certain threats by landowners. *See* September 2, 2025 decision in the same case. However, Judge Abelson's decision allows PSEG to re-file its request if the issue arises again.

without them.[15] The Commission directed Staff to submit to the Commission a proposed schedule with recommended dates for the filing of testimony, as well as hearings and post-hearing briefs.[16]

The Commission initiated discovery as of the date of Order No. 91709 and set certain discovery rules consistent with prior matters regarding any discovery disputes.[17]

**Staff Recommendations**

In its July 28, 2025 filing, Staff noted that PSEG, PPRP and Staff communicated and held virtual meetings on July 7, 16 and 24, 2025 to discuss the procedural schedule and related issues. Staff observed that all parties engaged in good faith; however, consensus on an appropriate procedural schedule could not be achieved.

Due to PSEG's agreement with PJM, PSEG indicated it was unable to consent to any schedule that would not permit the Project to meet its June 1, 2027 in-service date. Staff's filing specifies a schedule proposed by PPRP which targets a final order date of March 26, 2027. Staff's proposed procedural schedule mirrors PPRP's proposal, with the exception that Staff's proposal includes a status conference and motion hearing between November 30 and December 4, 2026.

**COMMISSION DECISION**

The issue of the appropriate procedural schedule in this case has been unusually contentious, largely due to the Applicant's adherence to a June 1, 2027 in-service date and PPRP's need to perform its statutorily required evaluation of the Application, which it

---

[15] The Commission also stated: "[I]n developing Staff's recommendations, it should consider, but not feel bound by, PJM's in-service date of June 1, 2027." Order No. 91709 at n 34.
[16] *Id*. at 14.
[17] *Id*. at 14-16.

5

cannot do without the required field studies. At present, the Applicant's ability to conduct those field studies remains in dispute in federal court. Further, PPRP has stated that it would need a minimum of six months following the reception of these studies to complete its evaluation and recommendations based upon them.

The Commission must perform its required statutory public interest review under *Annotated Code of Maryland*, Public Utilities Article ("PUA") § 7-207, and the schedule proposed by PSEG does not allow the Commission to do so.[18] While the Commission recognizes that PSEG's proposed schedule is based upon deadlines set by PJM, the Commission cannot compromise PPRP's ability to conduct its review of the Application. Allowing the deadline specified in the Applicant's proposal to dictate the procedural schedule would require the Commission to accept the broad outlines of this case, as presented by the Applicant, without any real inquiry or the input of PPRP and the other parties. Put more explicitly, the Commission would be forced to accept the premise that denial of a CPCN will result in electric blackouts for certain Maryland customers without any examination of whether that would actually be the case or whether there are alternatives to the Applicant's proposal to address any reliability issues. Furthermore, any bifurcation of the CPCN review process would be overly burdensome for all parties and would likely extend, rather than shorten, the procedural schedule. Accordingly, the Commission establishes a procedural schedule in this case that allows PPRP and the Commission to perform the statutory responsibilities prescribed in Maryland law, as reflected below.[19]

---

[18] The Commission notes PSEG did not file its Application until December 31, 2024, leaving the Commission and PPRP in a difficult position regarding our ability to perform our responsibilities.

[19] The Commission agrees with PPRP (see Docket No. 450 at 4-5) that the most comparable prior transmission matter the Commission has previously handled is the Application by Transource in Case No. 9471 ("Transource Case"). That Application also involved a project to be constructed on a new right-of-way and was submitted prior to conducting all field surveys. In the Transource Case, consistent with PPRP's assertions

Therefore, the Commission adopts the following dates that will govern this proceeding:[20]

| | |
|---|---|
| **March 2, 2026** | **PSEG files updated analysis (including ERD, environment mapping, and field study reports for all properties in ROW, except for time-of-year restricted field studies. PSEG may also file any updated analysis from PJM.)** |
| **April 2, 2026** | **Status Update** |
| **September 2, 2026** | **Staff, OPC, PPRP, and Intervenors file Direct Testimony** |
| **Weeks of September 21 and 28, 2026** | **Public hearings in each county** |
| **October 16, 2026** | **Rebuttal Testimony responding to other parties and Supplemental Testimony responding to public comments, and any updated recommended conditions.** |
| **November 13, 2026** | **Surrebuttal Testimony** |
| **December 8-18, 2026** | **Evidentiary Hearings** |
| **January 29, 2027** | **Parties' Post-Hearing Initial Briefs** |
| **February 12, 2027** | **Parties' Post-Hearing Reply Briefs** |

---

in this case, a schedule was set prior to all field studies being completed with the understanding that the Applicant would complete and deliver these field studies by a certain date. PPRP stated clearly in the Transource Case's pre-hearing conference that it reserved the right to propose a change in schedule should it not get the necessary information at the predicted time. This is precisely what happened; the Applicant needed extra time to submit the requested information, and the procedural schedule was correspondingly modified.

[20] This procedural schedule is subject to amendment should PSEG be unable to provide its field studies to PPRP in time to allow the parties to include them in their Direct Testimony.

**IT IS THEREFORE**, this 11th day of September, in the year Two Thousand Twenty-Five, by the Public Service Commission of Maryland, **ORDERED** that the Procedural Schedule detailed above shall govern this matter, subject to amendment for good cause.

By Direction of the Commission

*/s/ Andrew S. Johnston*

Andrew S. Johnston
Executive Secretary

**MPRP Statement on Temporary Right of Entry
– from Jason Kalwa, Project Director**

The Maryland Piedmont Reliability Project (MPRP) is a needed infrastructure project that will both help maintain reliability of the electric system in Maryland and put downward pressure on the cost of electricity by increasing the supply entering the state. Maryland currently imports 40% of the energy it consumes from elsewhere. This means electricity must be brought in via transmission lines that move power from other states.

To support the reliability and affordability of the energy Maryland residents need, PSEG must start by completing non-invasive environmental surveys. These surveys are standard practice across many industries for any new construction and are required for the permitting process at the federal, state and local level. They are used for everything from new homes and roads to transmission lines like the MPRP.

To conduct these surveys, PSEG must obtain a temporary right of entry from property owners.  **A temporary right of entry is not an easement and does not grant permanent property rights or construction rights or obligate the landowner to grant an easement.**

**Over the past 4 months, the MPRP team has engaged with property owners along the line on multiple occasions requesting access and offering monetary compensation to conduct these surveys.  Despite our efforts to engage with property owners and even offer reasonable compensation, we have been unable to gain voluntary access from a sufficient number of property owners that will allow us to conduct these environmental surveys.**

**To move forward with this project, on or about April 15, 2025, PSEG will begin to seek court orders to allow surveyors the right of entry to certain properties where property owners have not voluntarily allowed access.**

Because we would prefer to avoid having to take court action we have decided to make one more public effort to request property owners to allow MPRP to conduct surveys on their property.  PSEG is also willing to have discussions with landowners regarding compensation for the Right of Entry. To reiterate, this is not an easement and does not grant permanent property rights or construction rights or obligate the landowner to grant an easement.

Property owners who wish to grant right of entry in exchange for compensation prior to the court filings should contact PSEG at 833-451-MPRP (6777) or through our website at mprp.com.

Exhibit "1I"

# JUST SAY "NO"

## If Contacted by PSEG (Public Service Enterprise Group)



**PSEG plans to install massive 140-foot towers and high-voltage power lines across Frederick, Baltimore and Carroll Counties.**

The Maryland Piedmont Reliability Project (MPRP) is a proposed 70-mile, 500-kilovolt transmission line that would cut across private properties. If your land lies in its path, it could be subject to a permanent 150-foot-wide easement, granting PSEG rights to construct and maintain these structures. If PSEG is unable to obtain easements through private negotiations, they may pursue eminent domain.

The primary intent of the MPRP is to power data centers in Virginia, offering Marylanders little to no direct benefit. There are modern, less destructive alternatives.

Stop MPRP, Inc. is a non-partisan, non-profit organization dedicated to stopping the MPRP. We stand with everyone affected—**you are not alone**. Similar projects have been successfully defeated with far fewer engaged citizens than those mobilized by the Stop MPRP movement. Many of our legislators are listening and taking action.

**You can increase the likelihood of STOPPING MPRP!**
**Stand together!  Refuse to negotiate!**

## IMPORTANT NOTICE TO LANDOWNERS

If your property is on or near PSEG's chosen path for the MPRP, you may receive a letter from PSEG potentially asking to negotiate an easement on your land to construct the towers and wires. **Even if you are not currently on the proposed path, the path may still change!**

➔ It is critical that you do **NOT** engage with PSEG at this time, in any capacity.

➔ Receiving a letter from PSEG does **NOT** mean they can take your land.

➔ You have no legal obligation to engage with them or their real estate agents.

➔ If a PSEG representative or agent requests access to your property, **ASK THEM TO LEAVE IMMEDIATELY**. If they do not comply, call your sheriff's non-emergency number for assistance.

➔ **DO NOT SIGN ANYTHING!**

Exhibit "1J"

➔ PSEG plans to submit an application to the Maryland Public Service Commission (PSC) for a Certificate of Public Convenience and Necessity (CPCN) by the end of this year.

➔ Before submitting the application, they will attempt to negotiate easements with landowners. **DO NOT NEGOTIATE WITH PSEG AT THIS TIME!**. PSEG agents may use pressure tactics to suggest the project is inevitable, **but we assure you it is not**.  If PSEG submits their application with the PSC with zero signed Easement Agreements with landowners it demonstrates public opposition.

➔ PSEG is not a Maryland utility and does **NOT** currently have the authority to use eminent domain to take your land at this stage. They must first secure CPCN approval from the PSC—a process that could take months or even years.

➔ **Don't be fooled by PSEG's scare tactics!** PSEG claims that failing to complete this project by 2027 could lead to rolling brownouts and blackouts. This scare tactic is designed to intimidate the public, shield officials, and pressure landowners into compliance. The real choice isn't between losing our property or losing power. It's between standing up for people and the environment versus prioritizing big energy and tech.

---

## ACTIONS YOU CAN TAKE NOW


SCAN ME

1. **Visit our Landowner Resource Hub.** Access detailed information and guidance tailored for landowners. Complete our Land Survey Form to provide critical information for our attorneys during the PSC process: www.stopmprp.com/landowner-hub.

2. **Become a Member of Stop MPRP, Inc. We are here to support you.**
   We'll continue to provide education and representation throughout the CPCN process. Sign up on our website to receive regular updates and specific actions to protect your property rights. For just $10 for individuals or $15 for families, you can help empower our efforts to protect landowners. Membership enables Stop MPRP, Inc. to initiate legal actions, including those related to eminent domain, in defense of private landowners, local farmers, and property owners. Join online at www.stopmprp.com or mail a check to: Stop MPRP, Inc., P.O. Box 329, Parkton, MD 21120

3. **Email the Maryland Public Service Commission.** Voice your concerns by emailing piedmontcomments.psc@maryland.gov. Your comments will become part of the official public record and contribute to the strength of our community's opposition.

4. **Donate to the Cause.** Support this all-volunteer effort to protect private property and farmland. Every donation helps us continue the fight.

---



## Stop MPRP, Inc.
StopMPRP.com
help@stopmprp.org

# Stop MPRP, Inc.

# Impacted Landowners Resource Hub

## Are you on the MPRP's proposed path? If so, please fill out the form below to provide critical information to our legal counsel.

Name*

Property Address*

Email*

Phone Number*

Directly impacted or adjacent property?*

Exhibit "1K"

# Stop MPRP, Inc.

Is your property located in an environmentally protected area (e.g., wetlands, wildlife habitat, floodplain)?*

Does your property contain any specific agricultural, ecological, or natural resources that could be impacted (e.g., crops, forests, streams)?*

Do you have any wildlife species on your property that may be impacted (e.g., bog turtles, eagles, or other protected species)?*

# Stop MPRP, Inc.

Are there any structures on your property that would be affected by the power line route (e.g., homes, barns, outbuildings)? If yes, please describe.*

Comments

**SEND**

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# Landowner Information

# Stop MPRP, Inc.

## Landowner Alert on PSEG Tactics

December 11, 2024     |     Landowner Resource Info



We received an update from a landowner in Carroll County who received a call from a Contract Land Staff representative today. Contract Land Staff is the Texas company the NJ company PSEG hired to work with Maryland landowners on easements for the proposed MPRP.

The Contract Land Staff representative was reported to be very empathetic. She claimed she understands what we are facing and that she, too, owns a farm in Indiana. The representative went on to offer the landowner $1000 in exchange for permission to conduct a "survey and wilderness and wildlife studies." She said she would then "keep the landowner informed" throughout the process.

The landowner responded that they were not interested in any surveys or studies or in the payment and that their property was protected by No-Trespassing Signs. The

# Stop MPRP, Inc.

Please take note if this happens.

TO LANDOWNERS ACROSS BALTIMORE, CARROLL, and FREDERICK COUNTIES:

- We can all expect similar calls, and it is entirely possible that PSEG will offer increasing amounts of money for permission to come onto your land.

We encourage everyone to "Just Say No!" and not allow any survey or study of their property. Remember, you are under no legal obligation to allow PSEG or its representatives on your property unless and until the Maryland Public Service Commission grants a permit.

Please know that these payments, if accepted, would likely be considered taxable events. PSEG (or the contractor issuing the payment) should then issue an IRS Form 1099 to the landowner for the payment. If the company is offering cash payments for this permission, such an offer would potentially violate several other laws.

- We also urge everyone to be suspicious of empathy or stories of understanding. Unfortunately, we cannot rely on being told the truth.

- Please let Stop MPRP, Inc. know if you receive similar calls by writing to us at help@stopmprp.org

Lastly, many people are facing challenging economic times, and extra money for the holidays would be welcome. We find this tactic distasteful and disrespectful. We have all told PSEG on many occasions that Maryland and Marylanders are not for sale. Apparently, they still haven't gotten the message. Let's work together to ensure that they do.

**Share this post:**      

---

## Categories

**All Posts**

Landowner Resource Info

## Recent Posts

How the Maryland PSC will Review PSEG's CPCN Application

# Stop MPRP, Inc.

Protecting Your Property Rights: Navigating Eminent Domain

Nov 21, 2024

Intervening at the Maryland Public Service Commission

Oct 31, 2024

We understand the concerns and fears you face as a landowner potentially affected by the Maryland Piedmont Reliability Project (MPRP). This page is designed to provide valuable resources, critical information, and reassurance that we, as a community, are united in protecting our land, rights, and way of life.

## Important Things to Know

If your property is on or near PSEG's proposed route for the Maryland Piedmont Reliability Project (MPRP), you may receive a letter or call from PSEG or their assigned agent, Contract Land Staff. They may request permission to conduct surveys or studies on your property or to negotiate an easement for constructing towers and power lines.

**You are NOT obligated to take any action at this time.** You are not required to allow PSEG or their representatives onto your property. We strongly encourage you to "Just Say No!" and deny any request for surveys or studies.

Avoid discussing or attempting to value your property with anyone. Be aware that appraisals conducted during this time may undervalue your property, as the potential for a PSEG easement could negatively affect its perceived market value. Additionally, such appraisals may become discoverable in court proceedings.

# Stop MPRP, Inc.

months or years.

Public hearings with the Maryland Public Service Commission (PSC) are expected in 2025. You can learn more about this process on the CPCN Permit Process section of our blog.

PSEG's permit before the MD PSC will be significantly weaker and less likely to get approved if they have zero easement agreements with landowners

## It Is Important to WAIT

- We understand this situation brings stress and uncertainty, but delaying negotiations works in your favor. We have heard that agents often use pressure tactics to imply that this is a done deal, but we assure you that it is not. When we stand together and all refuse to negotiate an easement that will make the goal to stop the proposed MPRP more likely.
- **Do not allow PSEG representatives onto your property** or start negotiations before you are fully prepared. Waiting ensures the public can achieve the best possible outcome.
- **It is critical that you do NOT engage or sign anything with PSEG at this time, in any capacity.**

## Stay in Touch, Stay Together

We understand this situation brings stress and uncertainty, but you are not alone. Saying no to PSEG and delaying any negotiations works in your favor. Similar projects have been successfully defeated with far fewer engaged citizens than the Stop MPRP movement has mobilized. Many of our legislators are listening—some have signed letters of opposition, and others are drafting legislation to prevent future situations like this. **We increase the likelihood of stopping the MPRP by standing together and refusing to negotiate.**

Together, we can continue to challenge this project and protect our land. **Please fill out the form below to inform us if you receive a letter.** Let's stay united and informed as we navigate this process. We will be providing additional information with more specific steps soon, and by providing your information below, you ensure we will be able to provide you with the resources you need.

## Help Us Reach Everyone

**We urge you to talk with your neighbors, especially those who may not have access to email or technology,** to ensure they are aware of the MPRP and how it could affect their property. If they need assistance submitting their contact information, please help them provide it to us, or let us know on their behalf. Our goal is to make sure every impacted landowner is informed and supported, and we need your help to ensure no one is left out.

Please personally connect with your neighbors, particularly those who may not have a support system or family

## Stop MPRP, Inc.

# Letter for Distribution to Your Neighbors and Community

———

Just Say No Flyer (pdf)

## Learn How to Protect Your Rights

# Stop MPRP, Inc.

**WATCH NOW**

Copyright © 2024 Stop Maryland Piedmont Reliability Project (StopMPRP™). All Rights Reserved.



Powered by



FAQS

WHAT IS AT STAKE

ALTERNATIVES

SOCIALS

MEDIA COVERAGE

HOW YOU CAN HELP

BECOME A MEMBER

SIGN UP FOR EMAIL UPDATES

EVENTS

REFERENCE LIBRARY

MARYLAND GENERAL ASSEMBLY

≡

## Stop MPRP, Inc.

# Save Maryland Farms and Families

## **Stop the Transmission Lines**: MD Residents Will Pay the Social & Financial Cost of Infrastructure to Serve Data Centers

**LEARN MORE**

## The CPCN Process

**LEARN MORE**

## Guide to Intervene at the PSC

Exhibit "1L"

**DOWNLOAD HERE**

# Impacted Landowner Resource Hub



This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

## What To Do If Your Property is on the Proposed MPRP Route

We've launched a new **Landowner Resource Hub** on our website to serve as a one-stop shop for those impacted.

If you are on the proposed route, please fill out the form, which will provide essential information for our legal counsel team, and read the important materials provided. This will help us advocate

for you and keep you updated on how to protect your property rights.

Please rest assured PSEG cannot use eminent domain to take your land at this time. **They will not have that authority unless and until their Certificate of Public Convenience and Necessity (CPCN) is approved**, a process that will take months or years. Remember - Just Say No!

# Frequently Asked Questions

This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

What are the alternatives?    ▾

What areas will be affected? Where can I view the proposed route map?    ▾

Can it be stopped?    ▾

What is the process for this project to be approved?    ▾

Who is Stop MPRP, Inc.?    ▾

How Can I Help?    ▾

How Do I Find My Elected Officials?                                            ⌄

Who is PJM and what is their role in planning our energy solutions?          ⌄

# Sign Up To Receive Our Email Updates

This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

Updates

◂ All Posts

## Protecting Your Property Rights: Navigating Eminent Domain

November 21, 2024    |    Landowner Resource Info

Case 1:25-cv-02226-ABA    Document 1-11   Filed 04/25/25   Page 50 of 189



## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

During the webinar hosted by Stop MPRP on October 23, I discussed the intersection of eminent domain and the MPRP, and fielded thoughtful questions from the audience. For those unable to attend and those with whom I've yet to connect, consider this a general overview detailing how to deal with the Public Service Enterprise Group (PSEG), and how my firm and I can help you.

Before we get into the details, here are some basic dos and don'ts:

If PSEG representatives attempt to contact you:

· Do not sign anything or provide any information to PSEG.

· **Do not attempt to value your property** or discuss value with anyone.

· Before taking any action, seek advice from an experienced eminent domain attorney.

### How to Deal with the MPRP's New Jersey-based Developer

While PSEG has not secured approval for the MPRP or the power of eminent domain to advance the project, this could change. As a publicly traded company aiming for high returns, PSEG is heavily invested in the project. Estimates indicate that the MPRP will cost PSEG around $424 million. A portion of that expense is earmarked for acquiring private land along the preferred route, though PSEG is unlikely to disclose how much.

Case 1:25-cv-03392-ABA     Document 1-1     Filed 10/14/25     Page 153 of 169

If you own property along the route, PSEG is bound to contact you, in writing and in person, and attempt to buy your property. While PSEG may claim its purchase offer is fair, it's highly probable that the offer is below market value. Standing firm in response to these offers is a must.

But don't be fooled. Rejecting PSEG's initial offer does not mean that PSEG cannot acquire your land. If the MPRP is approved by the PSC, PSEG will have the right to acquire land by force of eminent domain. Standing firm at this stage simply sends a message to PSEG that you will not relinquish title to your property, or any part thereof, for less than full compensation.

This messaging is critical. PSEG is a sophisticated enterprise with every tool at its disposal, including a team of lawyers and experts. With or without the power of eminent domain, PSEG will use its expertise to its economic advantage. Perhaps that means

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

campaign will end.

If PSEG ultimately secures the right of eminent domain, we will force PSEG to pay full value for any property it takes. PSEG will face an experienced team on the other side of the table, consisting of legal counsel, appraisers, engineers, land planners, and other professionals working together to build your defense.

Bottom line: If your land sits in the path of the MPRP, follow this link or contact me directly.

*Disclaimer: This article is for informational purposes only and does not constitute legal advice. For guidance on specific legal matters, please consult a qualified attorney.*

*Stop MPRP does not endorse or recommend Rosenberg Martin Greenberg or any specific legal firm. We strongly encourage anyone interested in hiring an eminent domain attorney to conduct their own due diligence in selecting a professional that best suits their individual needs. However, we are sincerely grateful for the time and efforts that Mr. Eistenstein has donated to help educate those impacted by the Maryland Piedmont Reliability Project on their rights.*

**Share this post:**      

# Categories

All Posts

ACTION: General Assembly

Action

Alternatives

Beneath the Yellow Line

CPCN Permit Process

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

**Landowner Resource Info**

Statements from Stop MPRP, Inc

# Recent Posts

Pampered Chef Fundraising Event

Apr 7, 2025

We Need YOU!

Apr 5, 2025

Apr 1, 2025

# About Stop MPRP, Inc.

This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**



This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**



# Our Mission & Vision

At Stop Maryland Piedmont Reliability Project (Stop MPRP), our vision is to safeguard Maryland's families, farms, and private lands from the intrusion of 500 kV transmission lines.

See our FAQ and Updates for more information.

Our mission is clear: to protect and preserve Maryland's unique landscapes and private properties by actively opposing the installation of high-voltage power lines on privately owned land. Through community engagement, education, and advocacy, we aim to uphold property rights, safeguard

our farmlands, and promote environmentally responsible energy solutions that respect our landowners and our communities' well-being.

Together, we stand committed to ensuring a future where progress and preservation go hand in hand.

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

Copyright © 2024 Stop Maryland Piedmont Reliability Project (StopMPRP™). All Rights Reserved.

   

Powered by



FAQS

WHAT IS AT STAKE

ALTERNATIVES

SOCIALS

MEDIA COVERAGE

HOW YOU CAN HELP

BECOME A MEMBER

SIGN UP FOR EMAIL UPDATES

EVENTS

REFERENCE LIBRARY

# This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

# Stop MPRP, Inc.

# Impacted Landowners Resource Hub

## Are you on the MPRP's proposed path? If so, please fill out the form below to provide critical information to our legal counsel.

Name*

Property Address*

Email*

Phone Number*

Directly impacted or adjacent property?*

Exhibit "1M"

Is your property under any type of preservation easement (e.g., agricultural, conservation)? If so, with who?*

Is your property located in an environmentally protected area (e.g., wetlands, wildlife habitat, floodplain)?*

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

could be impacted (e.g., crops, forests, streams)?*

Do you have any wildlife species on your property that may be impacted (e.g., bog turtles, eagles, or other protected species)?*

What is the primary use of your property? (Residential, Agricultural, Commercial, Forested, Other)*

Are there any structures on your property that would be affected by the power line route (e.g., homes, barns, outbuildings)? If yes, please describe.*

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

**SEND**

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# Landowner Information

Case 1:25-cv-02996-ABA    Document 14-12    Filed 10/04/25    Page 162 of 169

◀ All Posts

# Just Say No - Protect Your Land from Land Agents

October 16, 2024    |    Landowner Resource Info



This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

Landowners potentially affected by the Maryland Piedmont Reliability Project (MPRP), may soon be contacted by land agents appointed by PSEG. These agents will attempt to secure easements and land access ahead of any formal approval from the Public Service

Commission (PSC). It's critical to understand that at this point, PSEG does **not** have the authority to take your land by eminent domain, and we urge you to stand firm and **"Just Say No"** to signing anything prematurely.

## Uncertainty and Risk – The Reality of the MPRP

The MPRP is a **greenfield project** that proposes building new transmission lines across previously undisturbed land. This poses significant uncertainty and risk, not just for the landowners but also for PSEG. With an ambitious target of operationalizing the project by June 1, 2027, PSEG is working under an aggressive timeline to obtain all required **rights-of-way (ROWs), easements, and temporary access agreements** for construction. This pressure is why their land agents may rush to secure deals before the project is approved.

**But here's the truth:**

This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

ACCEPT

you've had a chance to consult an attorney or fully assess the situation. They may claim that the project is inevitable and you have no choice, but this is **far from the truth**. The MPRP is **not a certainty**, and there is no guarantee the project will move forward as planned. **Don't sign away your rights** based on fear or misinformation.

Here are key reasons to hold out:

- **Real Estate Value**: You are being asked to enter into agreements at today's low real estate prices. However, construction, if it ever happens, could be years away. Why rush into a deal when the value of your property could increase over time?
- **Eminent Domain Myths**: PSEG will try to convince you that signing now is in your best interest, but taking land through eminent domain is a **long, complicated court process** that they would rather avoid. There is no risk of them simply "taking" your land without compensation, and any offer they make today is unlikely to be their "final offer." Offers typically **increase** the closer a case gets to trial. So, stand firm and know your rights.
- **Court Proceedings**: Power companies, like PSEG, are often reluctant to engage in lengthy and costly court battles. They pride themselves on **negotiating agreements** without resorting to eminent domain, as too many lawsuits damage their public image. If you hold out, you may find their offers improve significantly as they attempt to avoid the court process.

## Beware of Destructive Surveys

PSEG will also likely attempt to obtain **survey rights** for your property. Be wary of allowing access to your land for these so-called "surveys." They could involve **clearcutting**, bringing in heavy equipment, and even **drilling core samples**, all of which could leave your property looking like a war zone. Without the proper permits or court orders, **tell them to leave**.

## Protect Yourself – Consult an Attorney

Before signing anything with PSEG, consult with an **attorney** and a **tax consultant** of your own choosing. These professionals can help you navigate any agreement's legal and financial implications. PSEG's land agents are working to obtain easements as quickly and cheaply as possible, and their tactics are designed to **separate you from your land with**

### This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

deadline, which could force PJM to explore other options.

- **Easements can be reassigned**- If an Easement Agreement is signed and the project is not approved, PSEG holds the lease and can sell it to another company.
- **Know your rights** – you are not obligated to make any decisions until the project is officially approved.

We urge all landowners to stay strong and **"Just Say No"** to PSEG's early requests. You have the power, and there is no need to rush into any agreements before you have the full picture. Together, we can protect our land, rights, and community from unnecessary intrusion.

Visit our Landowner Resource Hub for more resources and to stay informed. Let's stand united in safeguarding our land and our future.

**Share this post:**       

---

## Categories

**All Posts**

# Recent Posts

## How the Maryland PSC will Review PSEG's CPCN Application

Dec 14, 2024

## Landowner Alert on PSEG Tactics

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

We understand the concerns and fears you face as a landowner potentially affected by the Maryland Piedmont Reliability Project (MPRP). This page is designed to provide valuable resources, critical information, and reassurance that we, as a community, are united in protecting our land, rights, and way of life.

# Important Things to Know

If your property is on or near PSEG's proposed route for the Maryland Piedmont Reliability Project (MPRP), you may receive a letter or call from PSEG or their assigned agent, Contract Land Staff. They may request permission to conduct surveys or studies on your property or to negotiate an easement for constructing towers and power lines.

**You are NOT obligated to take any action at this time.** You are not required to allow PSEG or their representatives onto your property. We strongly encourage you to "Just Say No!" and deny any request for

surveys or studies.

Avoid discussing or attempting to value your property with anyone. Be aware that appraisals conducted during this time may undervalue your property, as the potential for a PSEG easement could negatively affect its perceived market value. Additionally, such appraisals may become discoverable in court proceedings.

## PSEG Does Not Have Eminent Domain Authority

PSEG cannot use eminent domain to take your land at this time. **They will not have that authority unless and until their Certificate of Public Convenience and Necessity (CPCN) is approved**, a process that will take months or years.

Public hearings with the Maryland Public Service Commission (PSC) are expected in 2025. You can learn more

This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

ACCEPT

assure you that it is not. When we stand together and all refuse to negotiate an easement that will make the goal to stop the proposed MPRP more likely.

- **Do not allow PSEG representatives onto your property** or start negotiations before you are fully prepared. Waiting ensures the public can achieve the best possible outcome.
- **It is critical that you do NOT engage or sign anything with PSEG at this time, in any capacity.**

## Stay in Touch, Stay Together

We understand this situation brings stress and uncertainty, but you are not alone. Saying no to PSEG and delaying any negotiations works in your favor. Similar projects have been successfully defeated with far fewer engaged citizens than the Stop MPRP movement has mobilized. Many of our legislators are listening—some have signed letters of opposition, and others are drafting legislation to prevent future situations like this. **We increase the likelihood of stopping the MPRP by standing together and refusing to negotiate.**

Together, we can continue to challenge this project and protect our land. **Please fill out the form below to inform us if you receive a letter.** Let's stay united and informed as we navigate this process. We will be providing additional information with more specific steps soon, and by providing your information below, you ensure we will be able to provide you with the resources you need.

# Help Us Reach Everyone

**We urge you to talk with your neighbors, especially those who may not have access to email or technology**, to ensure they are aware of the MPRP and how it could affect their property. If they need assistance submitting their contact information, please help them provide it to us, or let us know on their behalf. Our goal is to make sure every impacted landowner is informed and supported, and we need your help to ensure no one is left out.

Please personally connect with your neighbors, particularly those who may not have a support system or family close by. Offer to be their resource for trusted information and connection.

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**

# Learn How to Protect Your Rights

Learn how to safeguard your property and understand your legal rights as we fight to protect our communities from the MPRP in this recorded webinar featuring Harris Eisenstein from Rosenberg Martin Greenberg, LLP.

**WATCH NOW**

Copyright © 2024 Stop Maryland Piedmont Reliability Project (StopMPRP™). All Rights Reserved.

   

Just Say No - Protect Your Land from Land Agents

Powered by



FAQS

WHAT IS AT STAKE

ALTERNATIVES

SOCIALS

MEDIA COVERAGE

HOW YOU CAN HELP

BECOME A MEMBER

SIGN UP FOR EMAIL UPDATES

## This website uses cookies.

We use cookies to analyze website traffic and optimize your website experience. By accepting our use of cookies, your data will be aggregated with all other user data.

**ACCEPT**